GOODRIDGE

vs

DIAMOND RANCH ACADEMY, INC.


CAMERON W. HUGHES

June 13, 2024





250 E 200 S. Suite 350
Salt Lake City, Utah 84111

Phone 801-328-1188
scheduling@depomaxmerit.com

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF UTAH, CENTRAL DIVISION

* * *

DEAN JEFFRIES L. GOODRIDGE, Individually and as the Natural Father and as Personal Representative of the Estate of TAYLOR GOODRIDGE, Deceased, and AMBERLYNN WIGTION, Individually and as the Natural Mother of TAYLOR GOODRIDGE, Deceased,

   Plaintiffs,

  v.

DIAMOND RANCH ACADEMY, INC.; a Utah Corporation; BIG SPRINGS PROPERTIES, LLC a Utah limited liability company; DANNY WORWOOD, M.D., a resident of Utah; BROOKS WILEY, FPMHNP-BC, a resident of Utah; and CAMERON HUGHES, R.N., a resident of Utah,

   Defendants.

) Civil No.
) 4:22-cv-000102-DN-PK
)
) Videotaped Deposition
) of:
)
) CAMERON W. HUGHES
)
)
) June 13, 2024
) 1:06 p.m.
)
) INJURY SMART LAW
) 661 E. St. George Blvd.
) Suite 102
) St. George, Utah
)
)
)
)
)
)
)
)
)
)

COPY

* * *

* * *

Wade J. Van Tassell
- Registered Merit Reporter -
- Certified Realtime Reporter -
- Certified Realtime Captioner -

**Page 2**

APPEARANCES

For the Plaintiffs:     Alan W. Mortensen
MORTENSEN & MILNE
68 South Main Street
Suite 700
Salt Lake City, Utah  84101

For the Defendants     Bryson R. Brown
Diamond Ranch Academy,     JONES SKELTON & HOCHULI
Big Springs Properties:  10813 S. River Front Parkway
Suite 230
South Jordan, Utah  84095

For the Defendant     Michael L. Ford
Hughes:     STRONG & HANNI
9350 South 150 East
Suite 500
Sandy, Utah  84070

For the Defendant     Kyle C. Thompson
Wiley:     GORDON REES SCULLY MANSUKHANI
15 West South Temple
Suite 1600
Salt Lake City, Utah  84101

For the Defendant     Cami R. Schiel
Worwood:     RENCHER ANJEWIERDEN
460 South 400 East
Salt Lake City, Utah  84111

Also Present:     Danny Worwood
Trish Brutka
Videographer:     Erik Largin
* * *

**Page 3**

I N D E X

| EXAMINATION | PAGE |
|---|---|
| By Mr. Mortensen | 4 |
| By Mr. Thompson | 60 |
| By Mr. Brown | 68 |
| By Ms. Schiel | 75 |
| By Mr. Mortensen | 87 |
| By Mr. Brown | 90 |
| By Mr. Ford | 92 |

EXHIBITS

| No. 17 | Medical Records | 23 |
|---|---|---|
| No. 18 | 12-15-22 Medical Pass-It-On | 39 |
| No. 19 | 12-20-22 E-mail, Hillin to Diamond Ranch Academy | 56 |

**Page 4**

P R O C E E D I N G S

CAMERON W. HUGHES, called as a witness by and on behalf of the plaintiffs, being duly sworn, was examined and testified as follows:

EXAMINATION

BY MR. MORTENSEN:

Q.   Good afternoon, sir.  I'm Alan Mortensen. I represent the Goodridge family.

A.   Hello.

Q.   Now that you're under oath, would you state your name for the record.

A.   Cameron Warren Hughes.

Q.   Okay.  And do you mind if I call you "Cameron" or "Mr. Hughes"?  How do you prefer?

A.   "Cameron" is fine.

Q.   Okay.  And, Cameron, have you ever had your deposition taken before?

A.   This is the first.

Q.   Good.  I'm glad that you've not gone through this before.

Just a few quick ground rules.  Wade, our court reporter, is taking down everything verbatim and it will be put in a booklet form, so we need to have different speaking mannerisms during the

**Page 5**

deposition.

So I would ask that you wait for me to finish a question before you answer and, likewise, I'll try to wait for you to finish an answer before I ask another question because we can't talk over each other because it's impossible to take down two people at once.

A.   Okay.

Q.   Okay.  So if I remind you of that, don't be offended.  Normally in normal conversation we talk over each other all the time.

"Uh-huhs" and "huh-uhs" and nods of the head don't show up on a transcript so if we ask you to answer audibly, don't be taken back by that. We're not trying to be offensive, it's just we want to have a clean record for both you and us.

If at any point in time you want to take a break, talk to your lawyer, we can do that as long as there's not a question pending.  If you need to step down the hall, use the restroom, we can do that.

If you don't understand a question, I would ask you to tell me that so that I can rephrase it so that we're communicating so that you're answering the question that I'm hopefully

**6**

asking correctly.

There may be some objections that some of the lawyers put on the record during the deposition, so if you hear an objection, don't be flustered by that. That's just something that is appropriate and that we do to protect the record if this were to be used at trial. Do you understand that?

A. Yes.

Q. Okay. You understand that your testimony today is under oath and while it's less formal than a courtroom, it still can be used in a courtroom? You understand that?

A. Yes.

Q. Okay. What is your address?

A. 652 South 600 East, apartment 12, St. George, Utah 84770.

Q. Okay. And who do you reside with there?

A. My wife, my spouse, and an 11-month-old daughter.

Q. Congratulations.

A. Thank you.

Q. Do you intend to reside there for the near future?

A. No. We're actually planning on moving

**7**

here in a month or two.

Q. Where are you going to move?

A. In Washington.

Q. Okay. So you're going to stay in Utah?

A. Yes.

Q. Okay. What have you done to prepare for your deposition today apart from talking to your lawyer? I don't want to know -- I mean, I do, but I can't ask you about what you guys talk about.

A. I told Michael today that I went to breakfast with my wife --

MR. FORD: We don't want to hear what you communicated --

Q. Don't tell me anything that you talked to Michael about.

A. I guess, I don't understand the question.

Q. That's fair. Let me break it down. Have you reviewed any documents in preparation for your deposition?

A. Yes.

Q. And what documents have you reviewed?

A. Some of the assessments, yeah.

Q. Okay. Any other documents?

A. Some text messages that are in and the statement that I created that month.

**8**

Q. And who did you create the statement for?

A. Me right now.

Q. Okay. To refresh your memory?

A. Yes.

Q. Okay. Was it made on advice or instruction of your attorney?

A. No. I didn't have an attorney then.

Q. Okay. So then that statement is still available?

A. Yes.

Q. Okay. And did you review it today?

A. Yes.

Q. Okay.

MR. MORTENSEN: We may want to get a copy --

MR. FORD: It was produced in disclosures.

MR. MORTENSEN: Oh, was it?

MR. FORD: Yeah.

MR. MORTENSEN: Okay. Thank you.

Q. Would you give me a brief background of your educational background since you graduated from high school to the present?

A. Since high school. So I attended Brigham Young University for two, three years, then had a

**9**

long-distance relationship with my wife, she was down here, and so from there I transferred here to then-Dixie State University in preparation for nursing school here where I attended nursing school, the BSN program at Dixie State University.

Then from there I applied for and was accepted to UNLV master's of nursing, but prior to matriculation I transferred to Chamberlain University for -- where I'm currently attending for psychiatric mental health nurse practitioner education.

Q. Okay. Where's Chamberlain located?

A. Chicago.

Q. And when do you -- do you intend to -- when is your graduation date set for?

A. August this year.

Q. Oh, congratulations.

And you'll be an NP at that point in time?

A. Yes. I'm -- yeah.

Q. What's the difference between an NP and an RN?

A. So NP, nurse practitioner, is an advanced practice nurse, has a higher license, a different scope of practice than a registered nurse, can

10

prescribe medications, diagnose, create treatment plans.

Q. And those are things as an RN you're not entitled to do, correct?

A. Not on my license alone.

Q. Okay. When did you graduate from Dixie State?

A. Sorry, I've got to remember. May 2021.

Q. And that's where you got your RN?

A. Correct.

Q. When did you pass your boards?

A. I don't recall.

Q. Sometime after May of 2021?

A. I think it was in early June.

Q. All right. Have you ever been involved in a medical malpractice lawsuit before?

A. No.

Q. Tell me what year you graduated from high school.

A. What year?

Q. Yeah.

A. 2013.

Q. All right. Tell me your occupational experience in the medical field since you graduated from high school.

11

A. So my first -- I was a phlebotomist, draw blood at BioLife Plasma Services, and then I was -- once I started nursing school I worked as a medical technician at Diamond Ranch part time.

Do you just want in between or including my nursing?

Q. Including your nursing.

A. Okay. So I was a medical technician part time through nursing school where I went after passing boards and obtaining licensure, worked at BioLife again in the form of a registered nurse there, and then returned to DRA as a -- in the capacity of a registered nurse.

And then currently since -- currently I work at the behavioral health until at Intermountain Health at St. George Regional Hospital.

Q. When were you at DRA as an RN?

A. Starting in -- at the end of 2021, I want to say in December, November, December. I don't recall the exact date.

Q. All right. And then when did you leave Diamond Ranch Academy?

A. April of last year, 2023.

Q. And why did you leave?

12

A. It was -- working at the hospital, I always wanted to do behavioral health, working on the inpatient psychiatric unit was a really good opportunity for me and my family, I felt that it was right. Beyond that it was really stressful at Diamond Ranch.

Q. What was stressful about it?

A. It's a hard environment to practice medicine in. You know, there was a lot of difficult feelings at Diamond Ranch, you know, associated with that, with me, with, I guess, the situation and the practice, and that was also a part of me deciding to leave to go to the hospital.

Q. Did Taylor Goodridge's death have anything to do with it?

A. No.

Q. What was your interaction generally with Taylor Goodridge? How often would you see her on a given week?

A. I can't give you an exact number. I don't remember. She would have medication passes, you know, come up for assessments every now and then, right, for various things that were going on, but I don't have an exact.

Q. Okay. It's fair to say you wouldn't see

13

her on a daily basis?

A. I wouldn't say -- I don't know.

Q. If she wasn't in the medical clinic, would you have an opportunity to see her?

A. I wasn't out, you know, with direct care. I was primarily located in the medical, so if she had a medical need or medications to be passed, then -- and I was present, then I would see her.

Q. Okay. But you weren't responsible for any discipline or program at Diamond Ranch Academy or academic program?

A. No.

Q. Okay. What were you aware of her history that brought her to Diamond Ranch Academy prior to her death?

A. You know, as a registered nurse I didn't really have a major role in the admission process, criteria for coming in. Like many of the students there, I didn't have a major history of what she was there for other than maybe -- yeah.

Q. So you didn't have any specific knowledge of why she was at Diamond Ranch Academy, you just knew she was there?

A. At the time, I don't remember specifics about knowing why she had enrolled and beyond

14

medical information.

Q. Since her death, have you learned why she was there?

A. Not exact reasons why she was there.

Q. Okay. How did you interface -- how would you interface with Brooks Wiley and Dr. Worwood?

A. Interface, what do you mean by that?

Q. Yeah, that's a good -- let me clarify. In the chain of command, you were underneath -- is it fair to say that you were underneath Mr. Wiley?

A. Yes.

Q. Okay. And how often would you report to him?

A. I'd say nearly every shift. He was my supervisor.

Q. Okay. And were you a W-2 employee?

A. Yes.

Q. Okay. How many hours a week would you spend at Diamond Ranch Academy?

A. At least 40.

Q. So it was your full-time job?

A. Yes.

Q. Did you have any other nursing work during that time?

A. No.

15

Q. Okay. Did you have scheduled hours to be there?

A. Yes. Obviously, it varied for coverage, if I needed to help out, but I was scheduled, yes.

Q. And then you'd say "coverage." Was there someone in the medical clinic at all times?

A. From 7:00 a.m. to 9:00 p.m., give or take, yes.

Q. Okay. So it would be you. Who else would help cover?

A. Medical technicians.

Q. Okay. And would you be on call?

A. No.

Q. So if there was something that happened when you weren't there, who would be contacted?

MR. FORD: Foundation. Go ahead.

A. Typically, Brooks or the executive director.

Q. Okay. And that was Mr. Dias?

A. Correct.

Q. Okay. So you wouldn't be contacted if there was an emergency there to go in?

A. No.

Q. So is it fair to say you spent at least 40 hours a week there?

16

A. Yes.

Q. Okay. And if you had a student come in that was ill and it was maybe above your level of expertise, what would you do?

A. I would reach out for clarification just as my scope of practice, yeah.

Q. Mr. Wiley testified that there was an emergency outreach text thread. Are you aware of that?

A. I was aware of it.

Q. Were you on that?

A. No.

Q. Okay. Do you know who was on that?

A. I really didn't. That wasn't my role. I couldn't give you exact people who were on that text thread.

Q. And how did you find out about the text thread?

A. Months after the incident I was added to that, or a month or so after. Sometime after.

Q. Why don't you tell me -- you were with Taylor when she collapsed, correct?

A. Correct.

Q. Tell me what happened.

A. Can you be more specific as far as when,

17

where.

Q. Yeah. From the time she came to the clinic until the time she collapsed in the hall, tell me what you recall.

A. So I got in around between 12:30 and 1:00 o'clock that day, so we had been monitoring -- they had been monitoring in the morning, I continued to monitor in the afternoon, drew the ordered labs, monitored fluid intake, documented vitals that we got with our blood pressure cuffs.

At the time, I was getting ready to get off shift, go home. We had to -- there were two male staff and the female staff was getting set to leave and so protocol we can't have any male staff be alone with female students, so we were arranging for what -- I reached out to Brooks and said, "What do you think?"

And we discussed that it wasn't appropriate to have a female student with two male staff as protocol, so we were preparing to transfer her -- or there weren't enough -- or preparing to transfer her to girls campus to rest and be monitored.

So she stood up, we were taking her down and at that point she said that she was

18

lightheaded, dizzy, and needed to sit down where she sat down on the floor in the medical suite. And at that point I was -- just something felt -- it felt different, it felt that she was sicker, so Garrett and I, a medical technician, helped her up, two-person assisted her to the elevator where we were in communication with Brooks and he gave the order to send off to the emergency department.

As we were preparing to transfer her in the elevator, she became dizzy and weak again and she did vomit in the elevator and so it became apparent that I would need a wheelchair, so we took the elevator back up to get the wheelchair while the ride was being arranged to the emergency department. And I went back into the medical suite, which was close to the elevator, to get the wheelchair, we placed her in the wheelchair where I noticed that she -- at that point she stopped responding.

And I did my assessment, no pulse, no breathing, no response to me, where we activated EMS, basic life support CPR, fetched the AED.

Q. And then what happened?

A. So I started CPR, we attached -- they sent a staff to get the AED. While we were doing

19

compressions, placed the AED, there was no shock advisable, and continuing CPR. Then a police officer arrived first on scene, relieved me of compressions, I went to managing breaths, and shortly after emergency services arrived and took point of care where I stayed present to answer questions, history, such.

Q. With the EMTs?

A. Yes.

Q. Okay. And at that point in time, the EMTs took over the care of Taylor?

A. Yes.

Q. Did you go with her to the hospital?

A. I did not.

Q. Did anyone from Diamond Ranch Academy take her to the hospital -- go with her to the hospital?

A. I don't know.

Q. Okay. All right. So she's taken to the hospital and then what do you do?

A. What did I do?

Q. Yeah.

A. The detective there wanted to just review the area, the scene, what had happened, and beyond that I don't remember.

20

Q. Did you give any statements to the detective?

A. I did.

Q. Was it written or oral, did he tape it?

A. I don't remember. I would assume that he had. I don't remember.

Q. Okay. All right. Did you participate at all in the investigation by the State of Utah?

A. Could you clarify.

Q. The Health and Human Services, did you participate at all in that process?

A. What do you mean by "participate"?

Q. Did you give any statements?

A. I was never interviewed by the Department of Health and Human Services.

Q. Okay. Apart from any attorney for Diamond Ranch, did you give information to anyone else about what had happened?

A. No.

Q. Okay. Who have you talked to about this event apart from your attorneys?

A. Staff, my wife, yeah.

Q. I take it this was a fairly traumatic event; is that fair?

A. Yes.

21

Q. How did you find out that Taylor had passed?

A. I don't remember the exact how I found out or what time. I just -- later that evening I'd heard.

Q. Were you still at the facility?

A. Yeah.

Q. Okay. Was there any kind of -- was there any kind of decompression meeting or a what happened type of meeting?

A. Within the department or --

Q. Yeah, within the school.

A. We had a service for her a few days later. We had -- I mean, you know, I didn't sleep that night, obviously replayed it, discussed with staff, medical staff, collaborated what happened.

Q. Was there discussion about the fact that Taylor had been sick the week previous?

A. I don't recall. I don't remember.

Q. Okay. Do you recall who was there that you collaborated with?

A. Brooks. You know, he and I had discussed it.

Q. Was there discussions about the fact that Taylor had been vomiting that week or was that

22

something you didn't know yet?

A. Yes.

Q. Okay. And what were those discussions?

A. Just trying to understand how it got to that point, just I couldn't believe that it happened the way that it did, mourning for Taylor and the situation.

Q. Did you ever have any conversations with Taylor's parents?

A. I did not.

Q. Did you have any conversations with any of Taylor's family members apart from her parents?

A. No.

Q. And I should have made this clear. That was after her death you had no conversations with them?

A. Oh, I'd spoken with the father a year prior just for a medical history on a medication, but after I haven't had any contact.

Q. Okay. Tell me what you recall about the conversation with Taylor's father.

A. That was a long time ago.

Q. Just the best of your memory. I'm not --

A. Taylor wanted to get off of a medication that she'd been on prior to Diamond Ranch and

23

continued on it at Diamond Ranch because her physician previously prescribed her it, and I was just acting as an advocate for Taylor with the father saying that, you know, she didn't want to be on the medication, she's a minor, of course, so it would have to go through parent approval. That was the gist of the conversation.

Q. Was that the HIV medicine?

A. No.

Q. Okay.

A. I don't --

Q. You don't recall?

A. It wasn't an HIV medication. I would not have . . .

Q. Do you recall the first time that you saw Taylor?

A. No, I don't recall.

Q. All right. Did you know her first name? Like, when she came in, would you know who she was?

A. Yeah. I learned all the students' names that interacted with medical and Taylor was no exception.

Q. Okay. We'll mark this as Exhibit 17.

(Exhibit No. 17 was marked.)

Q. It's a packet of records that -- I

24

apologize. We didn't have -- I realized I was missing some records so I went and printed them off over lunch, but they've got little numbers at the bottom in my handwriting.

A. Oh, that's okay.

Q. Do you recall being made aware -- strike that.

Let me have you look at page 1. Tell me what this is.

A. This is a pink slip request form that Taylor filled out and turned into medical.

Q. So page 1 is a -- it's called a pink slip?

A. Yes.

Q. And Taylor would have filled this out?

A. So she filled out the pink slip, turned it into medical, a staff, Carson Pugh, then went and generated it into the system so that it popped up for review.

Q. And what do you do with the pink slip after it's put into the medical record?

A. So it goes to -- it routed to me to review, I would review the pink slips, the concerns, I would discuss with the patient/client what's going on, if it's warranted -- or not

25

warranted. If, you know, it's -- yeah, and then I would make an assessment on what to do next with it, whether that's add for med clinic, pink slips varied on questions, you know, from diet to wanting to see the doctor, braces off, right?

So, yeah, I would review and discuss and then allocate accordingly.

Q. Okay. So on page 1 is it fair to say that Carson Pugh would have put the pink slip information into the computer system?

A. Yes.

Q. Okay. And on December 9th of 2022, Taylor was reporting, "This past week my back has been hurting. It's starting to hurt when I breathe. Because of the pain, I have trouble sleeping. I've been taking ibuprofen."

And there it shows it's digitally signed at 5:38 p.m. by Carson Pugh?

A. Is that a question?

Q. Yeah. I'm sorry. It's signed by Carson Pugh?

A. Yes.

Q. And then it looks like you signed it about six days later at 3:18 p.m.?

A. Yes.

26

Q.   Were you made aware of this medical request by Taylor?

A.   Not prior to this.

Q.   Not prior to?

A.   Me reading this pink slip.

Q.   Okay.  So today are you talking about or are you talking about back in December 15th?

A.   I was talking about December 15th, that day.  Sorry.

Q.   Okay.  Would anyone else in that six-day period, would anyone else in the medical staff be made aware of this note?

MR. BROWN:  Let me get an objection.  I'm just going to object to foundation on that.

MR. FORD:  Join.

Q.   You can go ahead and answer.

A.   So she had the opportunity to discuss with medical staff at any time.  I can't say if she had brought that to the attention; however, this specific note would have routed to me for review.

Q.   And how does that routing work?  First of all, what's the program, the computer program?

A.   What was it called?

Q.   If you can't recall, that's fine.

A.   Whatever -- oh, BestNotes.

27

Q.   Okay.  So BestNotes.  It goes into the system and it routes to you.  Would you look at those the same day or -- I mean, here it's a six-day difference and I'm just wondering why it took six days for you to review it or to digitally sign it?

A.   It was different every week, varied week to week.  What day was the 9th?  Can I look that up?

Q.   Sure.

A.   Because I believe it was -- so the 9th was a Friday, through the weekend I didn't look, and then I would typically review them the same day.  Obviously, if -- pink slips weren't an urgent matter for students to fill out.  We would rely on them or staff to communicate with us directly if there was an urgent matter.

Q.   Who would make the determination whether it was urgent?  The medical tech?

A.   Just . . .

MR. FORD:  I'll just object.  Foundation, speculation.  Go ahead.

A.   I don't know who makes it urgent.  I just said that to help describe what a pink slip was.  I guess, it would also vary.

28

Q.   When you were a medical tech at Diamond Ranch Academy, would you make a determination whether something was serious and needed to go up the chain or not?

A.   If I saw something and, you know -- if I saw something that I deemed urgent as a medical technician, I would.

Q.   Okay.  Do you know Carson Pugh?

A.   Yes.

Q.   And who's Carson Pugh?

A.   He was a medical technician.

Q.   Do you know where he's located?

A.   Currently?

Q.   Yes.

A.   I couldn't say.

Q.   Would this also get routed to -- would this also get routed to Mr. Wiley?

A.   I don't remember.

Q.   You don't know?

A.   Pink slips, at this time he didn't sign it, it would not have been routed to him.

Q.   Okay.  And same with Dr. Worwood, it wouldn't have been routed to him?

A.   No.

MS. SCHIEL:  Object to foundation.

29

Q.   All right.  So that's December 9th.  And then if we turn over to page 2 --

MR. MORTENSEN:  Cami, did you get that packet I sent?

MS. SCHIEL:  I did.  Thank you, Alan.

MR. MORTENSEN:  Okay.

Q.   Have you seen page 2 before?

A.   Yes.

Q.   Okay.  And were you involved at all in this Medical Assessment?

A.   No.

Q.   And who is Noelia Hernandez?

A.   A medical technician.

Q.   Okay.  And then it says, "Reporting Staff:  Samara."  Do you know who that is?

A.   Yes.

Q.   What's Samara's last name, if you know?

A.   That I don't know.

Q.   Do you know if Samara still lives here locally?

A.   I don't.  I don't know.

Q.   Okay.  Would this get routed to you?

A.   No.

Q.   And why would it not get routed to you as opposed to the earlier one?

30

MR. FORD: Foundation. Go ahead.

A. Because part of my -- one of my responsibilities was to manage the pink slip requests and this wasn't part of my description and role.

Q. Okay. It wasn't your role to do Medical Assessments, correct?

A. No. Well, I mean, I would do a Medical Assessment if I were the one, just like Noelia is doing this Medical Assessment, but it wouldn't route to me. Does that make sense?

Q. Yeah. As a registered nurse, you can't diagnose; is that correct?

A. Correct.

Q. And you can't prescribe?

A. Correct.

Q. Can you order labs?

A. No.

Q. Okay. Were you made aware at some point in time that Taylor had been vomiting on December 12th of 2022?

A. I don't recall. I don't remember.

Q. All right. Let's turn to page 3. This is another Medical Assessment, it looks like, on the same day but a couple hours later; is that

31

fair?

A. Yes.

Q. And have you seen this document before?

A. Yes.

Q. But, again, would this have been routed to you?

A. No.

Q. And do you know Kayla Lewis?

A. Yes.

Q. Where does she live?

A. Here in St. George.

Q. And is she still in the medical profession, medical field?

A. I don't know. I believe she does work at a mental health clinic.

Q. Okay. Let me have you turn to the next page, page 4. This looks like a Sickbay Observation as opposed to a Medical Assessment or a pink slip that was turned in. This, again, looks like it's a little bit later in the day, 6:22 p.m.?

A. Yes.

Q. Here it looks like this was signed by Medical Manager Kayla Lewis. What's a medical manager?

A. She would manage the medical department,

32

make the schedule, do kind of those, I guess, managerial tasks.

Q. Okay. She wasn't -- was she a med tech?

A. She would do similar things as a medical technician; however, her role was the manager, medical manager.

Q. Okay. Let me have you turn back to page 3. I apologize. Do you see where at the bottom it says, "Notify: (Nurse, Medical Director, physician)"?

A. Uh-huh.

Q. What does that signify?

MR. FORD: Object to form. Go ahead.

Q. If you know.

A. We didn't use that, yeah.

Q. Was that just, like, a format that it would just say, "(Nurse, Medical Director, physician)," on everything under Notify or was that something that she would have put in, if you know?

A. No. Sorry, I cut you off. That was just -- I don't know, like, the BestNotes system, if it prepopulated there with that form of electronic health record. I don't know. It populates on all of them.

Q. Okay. And then back on page 4.

33

Let's turn to page 5. This is a Medical Assessment performed by you, correct?

A. Correct.

Q. And it looks like it's the next day at 8:01 a.m.?

A. Correct.

Q. Okay. It looks like the reporting staff was Jaiden; is that correct?

A. Yes.

Q. Do you know who Jaiden is?

A. I would have to see a face to remember, but I know it was a staff there.

Q. Okay. It's my understanding that the staff who actually sees someone vomit is the one that should bring them to the medical bay. Is that fair?

A. As part of protocol I -- you know, I didn't know the exact protocol, not in my department, but as far as I understood, if an incident occurs, you should come up to medical for an assessment, yes, but this one -- yeah.

Q. Okay. So it says the reporting staff is Jaiden and then it says, "Dasia (staff) brought Taylor (student) to medical to be assessed." Do you know which person, whether it was

34

Jaiden or Dasia or someone else, that had seen her vomit?

MR. BROWN: Objection. Foundation.

MR. FORD: Join. Go ahead.

A. So I put just after you finished reading, "earlier this morning with night staff." Jaiden was a night staff. Medical was not on campus then and so it would have been protocol to notify staff and medical to be assessed first thing when available.

Q. What if there was an emergency in the middle of the night, what would staff do?

MR. BROWN: Objection. Foundation.

Q. What should they do?

MR. FORD: Speculation.

MR. BROWN: Join.

MR. FORD: Go ahead.

A. Reach out to supervisors, notify the emergency team, the executive director, the medical director, Brooks, yeah.

Q. Okay.

A. Escalate it.

Q. And then it looks like that she was given Tylenol and then she was submitted to the sick bay for monitoring and rest there under Plan?

35

A. Correct.

Q. Okay. Do you recall this actual visit or do you have an independent memory of it?

A. I don't.

Q. And then it looks like you digitally signed it that same day at 10:40 a.m.; is that correct?

A. Yes.

Q. And then it says it was digitally signed by Assistant Medical Director Brooks Wiley. He would have access to this?

A. Yes.

Q. And did you or he ever have conversations about this assessment?

A. Not that I recall, that I remember.

Q. Okay. So when he digitally signed this, he didn't call you or text you and say, "Hey, call me"?

A. Not that I recall.

Q. And then if you turn to page 6, it looks like your Sickbay Observations are listed there; is that fair?

A. Page 6. Yes.

Q. Okay. And you would have filled out this form?

36

A. Yes.

Q. Did you ever get any sense that she was not being honest about her vomiting?

A. No. I've, you know, taken an objective approach, monitor, vital sign, reported symptoms, it is what the patient says it is, and so we admit to sick bay, we would admit students just like Taylor that were sick so that they could rest, recover, and we could monitor closely.

Q. How close is the sick bay to the medical clinic?

A. It's within the same suite.

Q. Okay. And then it says that the campus director was contacted?

A. Where are you reading that?

Q. It says, "Left sickbay at," and then it says, "Campus Director Contacted."

A. So there's a colon after that. That's just prepopulated as well.

Q. Okay. So do you recall whether the campus director was contacted after this observation?

A. Staff were aware that -- had to be aware of the whereabouts of each student at all times, so they were aware. As far as campus director, staff

37

were aware where she was, communication.

Q. Okay. Was there anything about her vitals that were concerning to you?

MS. SCHIEL: Object to form.

Q. There's some listed at 12:45 p.m.

A. No, vitals were within normal limits. I mean, the initial set where I say, "7:30 a.m. - refer to the Medical Assessment for vitals," her heart rate was slightly elevated at 110, but it's so variable.

At this time, you know, reading through these vital signs, I don't -- nothing sticks out to me on the vital signs.

Q. All right. Let's have you turn to page 10. And this is a Medical Assessment performed by you; is that correct?

A. Correct.

Q. Okay. And that's dated December 17th of 2022?

A. Correct.

Q. Did you have any interface with Taylor between December 17, 2022, and December 13, 2022, where you were observing her in the sick bay?

A. Could you clarify that again. From the 13th to the 17th?

38

Q.   17th.

A.   So, yes.  And, you know, with this on the 13th, we just reviewed I had interaction with her and -- in the sick bay, then the 15th I had interaction with her.

Q.   The 15th?

A.   Oh, I'm sorry.  I guess, I was -- no, not 15th, sorry, 17th.  I looked at the wrong . . .

Q.   All right.  So there was about a four-day gap where you didn't treat Taylor; is that fair?

A.   Let's see, that would have been -- 17th was Saturday, I think.  Can I look?

Q.   Yeah, of course.  I think it was Saturday.

A.   So I was present those days, my typical schedule, so I don't recall anything particular where I had interacted with her, whether that's in medication pass or such.

Q.   Okay.  Would you get e-mails with the Medical Pass-It-Along form, with the Medical Pass-It-Along form?

A.   Yes.

Q.   Okay.  And would you read those?

A.   Yes, I would open them, anything, you know, that would come about.

39

Q.   Okay.

(Exhibit No. 18 was marked.)

Q.   What is a Medical Pass-It-Along?

A.   So departments within Diamond Ranch Academy would send out these Pass-It-Ons as quick ways to just have in general the campus know about, you know, generally what is going on, anything of note.

Q.   Okay.  And it looks like Taylor reported, at least on this Medical Pass-It-On, that she had a Medical Assessment on December 15th again vomiting.  Do you see that?

A.   Yes.

Q.   Okay.  So you would have received this?

A.   Yes.

Q.   Do you recall receiving it?

A.   I don't recall receiving it.  Just it's an e-mail sent out every night.

Q.   Okay.  And given that it was a Medical Pass-It-On, is that something you would spend time on every night looking at it or was it just -- did it kind of become white noise?

A.   I wouldn't look at it at home after hours, if that's the question.

Q.   You would?

40

A.   I would not.

Q.   Would not, okay.

A.   I didn't open my e-mail at home.

Q.   At the top where it says, "Name: Cameron, Nanette, Garrett, Chase, Carson," who's that referring to?

A.   Cameron, the nurse, medical staff on the unit that day.

Q.   Okay.  Yeah, so you were listed there?

A.   Yeah.

Q.   Did this cause you any concern that she was vomiting on the 15th of December?

A.   You know, in doing the assessment, I think there was an assessment even done that day, her vital signs were okay, someone else, if you look just below her name, had vomited as well, so we, you know, treated it as we assessed and monitored.

Q.   But, again, you didn't assess her on the 15th, correct?

A.   No.

Q.   Okay.  So then we come to the 17th on page 10.  Tell me do you have an independent memory of this Medical Assessment?

MS. SCHIEL:  I'm sorry, Alan, did you say

41

17?

MR. MORTENSEN:  Page 10.  It's December 17th.

MS. SCHIEL:  Oh, thank you.

A.   I'm sorry, what was the question?

Q.   I forgot, too.

A.   I did do this assessment.

Q.   Okay, you did.  What do you recall about this assessment?

A.   What I had documented, she was once again brought to medical it looks like at 7:59 p.m. to be assessed for vomiting, I listened to her bowel sounds there with staff in the room, she rated mild stomach pain 3 out of 10.

Q.   It looks like that her color was pale?

A.   Yeah.

Q.   But she wasn't -- you saw no distension of her stomach at that time?

A.   No.

Q.   Is there anything about the vitals that are concerning?

A.   The vitals are within normal limits.

Q.   Okay.

A.   Consistent with what they had been.

Q.   So at this point in time, you were aware

42

that she'd been vomiting for five days; is that fair?

A. Yes.

Q. And did the fact that she'd been vomiting for five days cause you concern?

A. It's so hard. There's so many different variables in the medical field, right? At the time -- I can't speculate obviously now, right, but at the time with the objective signs and my assessments and listening to her bowel sounds, she had been passing, you know, bowel movements okay, I -- no.

Q. Okay. It looks like that you had made a plan where she was going to meet with Dr. Worwood the following week, looking at the Plan?

A. Correct.

Q. Okay. Under Assessment where it says, "Vomit as reported by staff and student," do you recall the staff that reported it? It looks like a Zhena?

A. Yeah, I don't recall. It looks like a staff named Kaylee brought her up.

Q. Okay. But, again, it was the staff that saw the student vomit that was supposed to bring them to the medical clinic, correct?

43

A. As protocol.

Q. And then it says, "Transported off Ranch."

A. Yeah, once again, that's -- I'm sorry, I cut you off.

Q. Is that autopopulated?

A. Yeah, it appears on all of them.

Q. Why would that be autopopulated that way and then the other ones are autopopulated with different inputs?

MR. FORD: Speculation, foundation.

A. Which other ones are you referring to?

Q. Excuse me, I'm looking at the Medical Assessment. It looks like the Medical Assessments always have that.

She was, "Educated on the importance of hydrating and eating meals."

Dehydration was an issue if you've been throwing up for four or five days, correct?

A. Common medical, yeah, practice.

Q. Okay. And then it says, "Student given dose of Pepto per request and returned to group with staff."

Pepto Bismol?

A. Correct.

44

Q. Okay. Was there any other discussion about getting some other -- any other medication in her?

A. At that time, I don't recall.

Q. Okay. And then you digitally sign this at 8:03 p.m. Is that correct?

A. Correct.

Q. And then it looks like Brooks Wiley signed it the next day at 11:18 a.m.; is that correct?

A. Yes.

Q. Did you guys have any independent conversations about this Medical Assessment?

A. Not that I remember.

Q. And then the next day on page 11 it looks like there's another Medical Assessment done by you at 12:40 p.m.?

A. Yes.

Q. Okay. What was Taylor's complaints at that point in time?

A. Going off my documentation, she had vomited during the nighttime, that she wasn't feeling any nausea but had discomfort in her stomach was her chief complaint.

Q. Okay. But she did report that she had

45

vomited during the night with the night staff?

A. Yes.

Q. And would that have been Allie R. that was the night staff?

A. Yes, that's who I have as the reporting staff. I would have to, you know, ask -- the staff would inform me who was the reporting staff that witnessed it and who was going to be completing the incident report.

Q. Okay. So is there an incident report apart from the Medical Assessment?

A. For this particular one?

Q. That would be generated.

A. For this particular one or in general?

Q. In general.

A. Protocol was to have an incident report tied to every Medical Assessment.

Q. Okay. And then the Plan was, "Student give PRN and instructed to return if medical symptoms worsen. Assessment normal findings and no objective findings. Student returned to group."

That was your findings, that there was no objective findings?

A. That's what I documented, yes.

Q. Is vomiting, is that an objective

46

finding?

A. If I would have seen it, yes, but being reported to me the night prior that she had would have been subjective.

Q. Okay. Even if it came from staff member that had seen it?

A. It's still being told to me as the medical.

Q. Okay. All right. And it looks like she didn't throw up in front of you, correct?

A. Correct.

Q. That was on the 18th of December. Did you see Taylor on the 19th of December?

A. No. I didn't work Monday.

Q. Okay. You see on page 12 there was a -- it says it's a Doctor's Note and it was authored by Brooks Wiley. Do you see where I'm referring to?

A. Page 12, yes.

Q. Okay. Have you seen this document before today?

A. Yes.

Q. Okay. Did you see this in realtime on the 20th?

A. Not that I remember, no.

47

Q. Would you have access to this if you wanted to go find it?

A. On the BestNotes system, yeah, I would have.

Q. Would this be routed to you under the BestNotes system?

A. No.

Q. And then it looks like there's a Sickbay Observation by Nanette Jenson on page 13?

A. Page 13, yes.

Q. Okay. Who's Nanette Jenson?

A. She's a medical technician. She also is an aesthetician that would, you know, work in the medical unit with us.

Q. And here it looks like you digitally signed this, this document, at 9:31 p.m.?

A. Yes.

Q. Okay. She was given Zofran and Vistaril. What's Zofran?

A. Zofran is an antiemetic medication.

Q. And when it says, "Student assessed by Brooks," was that an in-person assessment?

MR. FORD: Objection. Form, foundation. Go ahead.

A. I wasn't there yet that day, but I

48

believe it's referring to the in-person assessment on the page prior, yes.

Q. Again, you've digitally signed this at 9:31 p.m. that night. Did you have any involvement in giving her Tylenol?

A. Where are you reading that?

Q. At 12:00 p.m. under the Time/Observation.

A. No, I did not. My portion of this note started at 1:00 p.m.

Q. Okay. And it says, "Student" -- at 10:00 a.m. it says, "Student assessed by Brooks," and then it lists some vitals. Is there anything concerning about those vitals?

A. Her diastolic is slightly elevated. Everything else -- I don't know about her weight, where it was, I couldn't say that, but --

Q. When someone takes vitals, normally do you take their weight?

A. It depends.

Q. If someone's losing weight and they're vomiting, that's something you'd want to know, correct?

A. Yes.

49

Q. All right. And then it looks like at 4:55, "Brooks instructed us to take student to ER for further evaluation." Tell me -- at 1:00 p.m. is when you came on. Did you do the blood draw at 2:00 p.m.?

A. It was around there where I documented, within that time frame.

Q. Okay.

A. Yeah, it wasn't, like, a time stamp, but within that time frame, yes.

Q. So you draw the blood and then what do you do with it?

A. So we're contracted with Quest Diagnostics, who is, I guess, a national laboratory service, and we would draw blood often and send it off for results or testing.

Q. Okay. Where would it get sent?

A. I don't know.

Q. Was it same-day?

A. No.

Q. Okay. If you needed a same-day blood test, would you take them to a hospital or to an urgent care facility?

A. We didn't have the capacity to do same-day results and we'd discussed doing a stat

50

order, but Quest did not offer it in our area.

Q. Okay. So if a student needed to have a blood test done, that's something you'd have to -- an immediate blood test result, you'd need to take them off-site?

A. Correct.

Q. Okay. And then on page 14 there's a medical summary -- and I probably am a little bit out of order, I apologize -- at 10:31 a.m. It says, "Savannah (staff) brought Taylor (student) to medical to be assessed after she vomited this morning. Staff reports 'bile' like vomit."

Were you aware of that?

A. I wasn't here at this time. Not that I recall. I don't remember hearing that.

Q. Okay. When you came on at 1:00 o'clock, did anyone tell you, "Hey, her vomit is bile-like vomit?

A. I don't remember. I came in and did that manual blood pressure. I don't recall.

Q. Okay. And under the vitals at 10:31, is there anything concerning her vitals at that point in time?

A. Let's see. Her heart rate was a little lower. Her blood pressure had dropped a little

51

bit, but the blood pressure is still within normal range.

Q. And then it looks like the pain is described as a 7 in the abdomen?

A. Yes.

Q. Okay. Turning to page 15. This is a record you generated, correct?

A. Yes.

Q. Okay. It says, "Once reaching the elevator, it became apparent that a wheelchair was needed to assist in the transport of the student."

Did you document anywhere that she had vomited in the elevator?

A. I don't remember. It just all -- yeah.

Q. Ran together?

A. Yeah, just happened once -- no, I don't think so.

Q. But you do recall that she did vomit in the elevator?

A. Yes.

THE WITNESS: Do you have that?

A. I don't have mine, but, yeah.

Q. Okay. This documents what we talked about at the first part of your deposition, the lifesaving efforts that you made?

52

A. Oh, yes.

Q. Okay. Have we talked about all of your hands-on care of Taylor from December 12th until the time she collapsed at Diamond Ranch Academy?

A. I believe so, through this documentation.

Q. Okay. You don't have any independent memory of seeing her in the cafeteria or something like that where -- I just want to make sure that I've covered all of your interactions with her because this is my one chance to talk to you about it.

A. Yeah, not that I remember. From what we discussed is -- yeah.

Q. Okay. Let me hand you what we'll mark as Exhibit 4 -- what we've marked as Exhibit 4. Have you seen this text message before?

A. No.

Q. Okay. This is the first time you've seen it?

A. Yes.

Q. And, again, as the registered nurse at Diamond Ranch Academy, you were never provided any information on December 17th that Taylor had been throwing up and that at least staff had never seen her this way before and that if it was her kid, she

53

would take her to the hospital?

A. I didn't have any involvement with this beyond my assessment that night that we already discussed on the 17th, but I didn't have any involvement with this.

Q. All right. When you had your assessment that night, did she talk to you -- did Taylor talk to you at all about going to the hospital?

A. No.

Q. Do you have a specific memory of that or is it if she had said something, you would have documented?

A. If she had said something about needing to go to the hospital, then I would have discussed the options and what to do and I would have worked with her.

Q. Okay. Let me show you Exhibit 5. Let me ask you are you on that text chain at all?

A. I mean, I can't see all the messages, but, no, just looking at it, I'm not involved in this.

Q. Okay. Do you know did Taylor ever ask for a heating pad?

A. Yes, on the -- you know, I vaguely remember on the 17th she had heated up -- when she

54

came up to medical during night medication pass for that assessment, she'd heated up, I think, one of her stuffed animals in the microwave and she was laughing and all the staff were laughing that -- and students with her that it smelled. Beyond that -- like, as a heating pad. We didn't have those, but I didn't see an issue with it.

Q. And it says, "Heating pads are not on the approved items list."

Is that a list that Diamond Ranch Academy has?

MR. FORD: Object to form. Go ahead.

A. I didn't have anything to do with that approved items list. It would have been the programming department, but, yeah, they had an approved items list, I guess.

Q. Did the medical clinic have heating pads?

A. I don't even remember.

Q. Okay. If a patient came in and asked for a heating pad and you thought it was medically indicated, would you provide one?

MR. FORD: Speculation. Go ahead.

A. Yeah, actually, we did have a plug-in heating pad that, you know, we could have used.

Q. Okay. Did you have a portable one or a

55

water bottle that you'd fill it up with hot water so that they could not be tied to an electrical --

A. Yeah, not that I remember. I do remember the plug-in heating one that we did have.

Q. Okay. But, again -- have you seen those texts before?

A. No.

Q. And as the registered nurse at the Diamond Ranch Academy, did you rely on staff to report up to medical things that they were observing?

A. Yes. It was part of our documentation and assessment, that subjective, you know, report.

Q. If one of the staff members, for example, Rachel Goodrich, had come with her to medical and said, "Hey, I think she should go to the hospital," what would you have done?

MR. FORD: Objection. Speculation. Go ahead.

MR. BROWN: Join.

MR. THOMPSON: Join.

MS. SCHIEL: Join.

MR. THOMPSON: Jinx.

MS. SCHIEL: Sorry, I couldn't get the unmute in time.

56

THE WITNESS: No worries.

A. I can't speculate, right, what-ifs. You know, it was always better to have the more information as general in the medical field, right, to have the whole story, but as to say would it have done this, would it have done that, I don't know. It's hard to say what-ifs, right?

Q. Yeah.

A. But it's always better to have the complete story.

Q. But, again, when you met with her that night, she did not talk about going to the hospital?

A. No. Taylor?

Q. Taylor.

A. Taylor did not or anybody --

Q. Did any of the other staff --

A. -- I guess, I should say.

Q. You anticipated my next question.

(Exhibit No. 19 was marked.)

Q. Sir, have you seen this document before?

A. You know, I'm sure -- it was addressed to all of Diamond Ranch. I'm sure that I have seen it, but I don't remember seeing this e-mail.

Q. Okay.

57

MS. SCHIEL: I'm sorry, Alan, is there a Bates number for that?

MR. MORTENSEN: Yes. It's TAYLOR 000394.

MS. SCHIEL: Thank you.

MR. MORTENSEN: Yeah, it's Exhibit 19 that we just marked.

Q. Are you aware at all of the circumstances about getting Taylor out of bed that morning and her showering?

A. No, I would not have been involved with that beyond reading what you're reading right now.

Q. Okay. And then it says, "After breakfast we let her know that she would need to go to class or up to medical, since we had other students that we needed to talk with. After some time she agreed to go up to medical where she was kept in sick bay."

Do you know how -- well, this is an e-mail from Ms. Hillin. Do you know how Ms. Hillin got this information?

A. I don't know.

Q. Okay. And when it says at the bottom, "Students ineligible for incentives," what did that mean, if you know?

A. You know, I really wasn't too tied to,

you know, the direct care, the programming of the school. So I know that there were, you know, incentives that they got for, you know, certain things, achievements that they got, but I couldn't even speak to what the -- the exact stipulations and everything that went into that.

Q. Okay. Let me hand you what we marked as Exhibit 7.

A. Thank you.

Q. Have you seen that document before?

A. I couldn't -- I'm sure that I'd seen it. It's obviously part of the protocol, the manual, I would assume.

Q. This comes from a protocol manual?

A. Okay.

Q. No, I'm asking you.

A. Yes, I would -- I don't know if I'm supposed to assume, but, yes.

Q. Okay. So there was a policies and procedures manual?

A. Yes.

Q. And it appears to you that this would be included in that?

A. It appears as it would.

Q. Okay. And was it your understanding that the policies and procedures of Diamond Ranch Academy were that, "DRA staff must bring students to medical for an assessment any time a student vomits, appears ill, or complains of illness"?

A. Yes.

Q. Okay. And that, "DRA staff must take all student health complaints seriously whether self-reported or reported by staff"?

A. Yes.

Q. Okay. Were you aware of a urinalysis that was done earlier in the week that Taylor had passed away?

A. Not that I can recall at that time. I've since heard of that.

Q. Have you seen documentation of it?

A. I know I've seen it. I don't remember what's on it.

Q. Who did you hear it from?

A. Brooks and I had discussed it after the matter.

Q. And what was your discussion about?

A. Just trying to identify when it was done, why it was done, just trying to remember what -- yeah, where -- what was it about, I guess.

Q. Okay. What were the results of that?

A. I couldn't even tell you. I don't remember.

Q. Was there anything concerning about it?

A. Like I said, I can't say to remember exactly what was on it, just that it was there.

Q. All right. Have you been involved at all in a group of people trying to reopen the Diamond Ranch Academy or open it under another name?

A. No.

Q. Okay.

MR. MORTENSEN: I believe that's all the questions I have for now. Thank you.

THE WITNESS: You're welcome.

MS. SCHIEL: Should we take a break? We've been going for about an hour and a half.

MR. MORTENSEN: That would be great.

(Off record at 2:39 p.m.)

(Recess.)

(On record at 2:46 p.m.)

EXAMINATION

BY MR. THOMPSON:

Q. Okay. Mr. Hughes, my name is Kyle Thompson. I represent Brooks Wiley. Do you know Mr. Wiley?

A. Yes.

Q. How long have you known him?

A. At least five years, five, six years.

Q. Five, six years. What is your relationship with Mr. Wiley?

A. You know, he started as my, you know, supervisor, but grown into a friend and mentor over the years.

Q. Do you have an opinion of Mr. Wiley's competence professionally?

A. Yes. Brooks is, you know, one of the most intelligent people I know, several degrees, highly competent. Even having a conversation with him you can tell that.

Q. With respect to the treatment of Taylor Goodridge, you've been through the -- some of her records today, you're, I think, familiar with the treatment she received more or less on the day of her death, correct?

A. Yes.

Q. Are you aware of anything that, in your opinion, Mr. Brooks did incorrectly or failed to do that he should have done with respect to the treatment of Taylor Goodridge?

A. No.

Q. I think you went through this with

62

Mr. Mortensen, but just to be clear. How long did you work at DRA?

A. Like I talked about with Mr. Mortensen, I don't have an exact date in front of me, I don't know my hire date, but if I were to -- probably, you know, 2018, '19 as a medical technician and then short hiatus away when I graduated nursing school and then returned as the registered nurse, so four years, give or take, three, four years.

Q. Okay. My understanding is at DRA there's a boys campus and a girls campus -- or there was. Is that correct?

A. Correct.

Q. Do you have an impression of the culture of the girls campus with respect to the staff there, say, in the six months leading up to the death of Taylor Goodridge?

A. You know, there were a lot of acute cases. You know, we would have a lot of self-harm with girls campus, various different mental illnesses that were present. I mean, my presentation is it was a very difficult environment to work with, especially on girls campus.

Q. Are you familiar with the emergency outreach text that was utilized or group text that

63

was utilized by DRA?

A. Yes, I'm familiar with it. At the time, I wasn't a part of it and I didn't know, but I am familiar with it.

Q. Now --

A. Now I know.

Q. Post the incident with Taylor Goodridge, you became aware of it?

A. Yes.

Q. But prior to Taylor's death, did you know that it existed?

A. You know, I don't think I did because I -- it just wasn't part of my job description and capacity. I know there was a -- you know, obviously people communicated, but to say that that one text --

Q. You weren't part of it?

A. No.

Q. And while you were maybe aware of -- that communication took place, you weren't -- it sounds like you weren't explicitly aware that they took place on that particular text thread?

A. Correct.

Q. From your perspective, at about the time that Taylor Goodridge passed away, what was the

64

protocol for the staff at DRA, and I'm talking about any program staff, any academic staff, any night staff, anyone associated with the campus, what was the protocol for them reporting any concerns -- medical concerns regarding students to the medical staff?

MR. BROWN: Objection. Foundation, calls for speculation.

MR. FORD: Join. Go ahead.

MS. SCHIEL: Join.

A. You know, see something, say something. If you had a concern, report to your respective supervisor and escalate it.

Q. Would that be true after hours as well as during business hours?

MR. BROWN: Same objections.

MR. FORD: Join.

A. Yes.

Q. With respect to what you know about the treatment of Taylor Goodridge and the circumstances of, say, the last week of her life, do you have an opinion as to whether that protocol was followed by the staff at DRA?

MR. FORD: Objection. Foundation.

MR. BROWN: Calls for speculation and

65

join in the foundation.

A. I don't know. Like I said before, the more information the better. Protocols were there to help out and give the most information and so we could provide the best treatment. Sometimes we would get, you know, situations where we would, you know, have a miscommunication, but, yeah -- does that answer your question?

Q. I think it's a good faith effort to answer my question, but I'm going to ask you a follow-up.

A. Okay.

Q. My question was whether you'd formed an opinion as to whether protocol had been followed. And my understanding of your answer is, "I don't know."

I'm not sure whether you're telling me you don't know whether you have an opinion or you don't know whether protocol was followed, so could you just clarify that for me.

MR. FORD: Same objections. Go ahead.

MR. BROWN: Join in the objections.

A. As we discussed earlier, it would appear that some protocol was missed with, you know, the same -- the reporting staff not -- that witnessed

66

the vomits bringing her up for assessment. And, you know, at times it was difficult, the medical aspect, how we would, you know, assess. We weren't direct-care staff so we relied heavily on that subjective symptom and that subjective report, so, you know, looking back it appears that maybe some protocol was missed.

MR. BROWN: Move to strike to the extent he doesn't have foundation to say who witnessed the vomit versus who reported it.

Q. Can you specify which protocol or exactly how you believe the protocol was missed?

A. I can't specify which particular protocol was missed other than, to my best knowledge, the protocol was if there's any incident, vomit illness incident, to report to medical to have the student assessed and give a subjective report of said incident, but I can't give you an exact protocol that it was in.

Q. Okay. Is it your impression that staff members on campus had information about Taylor Goodridge's condition in the week or so leading up to her death that was not passed along to medical prior to her death?

MR. FORD: Speculation, foundation. Go

67

ahead.

MR. BROWN: Join in those objections.

A. Post death it became apparent. You know, even just looking through some of these text messages, I guess.

Q. Do you know Ricky Dias?

A. Yes.

Q. What is your impression of Mr. Dias?

A. Can you be more specific.

Q. What is your impression generally of Mr. Dias? I understand it can be -- you know, it may be a tough question, but . . .

MR. BROWN: I'll just object to the form.

A. He was confident, you know, sometimes difficult to work with, would sometimes handle situations or say things that wasn't the best approach, sometimes behind your back, but, you know, I didn't have too much interaction with him, you know, with this incident as much as others would, just more hearsay from what other people would discuss.

Q. You're familiar with sepsis?

A. Yes.

Q. Have you ever treated any patient for sepsis, to your knowledge?

68

A. To my knowledge, not that I recall.

Q. Based upon your understanding of sepsis and your understanding of the medical records associated with Taylor Goodridge, did Taylor Goodridge exhibit symptoms of sepsis prior to her death?

MR. MORTENSEN: Objection. Calls for -- lack of foundation.

MS. SCHIEL: I'll just object to form.

A. You know, following the paper trail and the objective symptoms, it wasn't even on my mind at the time.

Q. She never ran a fever, to your understanding; is that correct?

A. That I can remember, no.

MR. THOMPSON: Those are all my questions for right now. Thanks.

MR. BROWN: I can go next.

(Discussion off the record.)

EXAMINATION
BY MR. BROWN:

Q. My name's Bryson Brown. I represent Diamond Ranch Academy. I appreciate taking some time to talk to us today.

A. Thanks.

69

Q. I just want to make sure I lock down your testimony. I know there was some questions about specific examinations you did, but I'm going to ask some questions that are a little bit broader.

First of those is between -- or December 12th and December 19th, so I just want you to think that date range, and, I guess, we could include the 12th and the 19th, so on that date range between -- on and between those dates, did you have any discussions in person with Brooks about Taylor?

A. The 12th through the 19th?

Q. Yes. And I would include the 12th and the 19th in that.

A. Not anything that I specifically remember.

Q. Okay. During that same window of time, did you have any discussions with Brooks about Taylor over the phone?

A. Not that I remember. I don't think I would have.

Q. Okay. And did you text with Brooks about Taylor during that time frame at all?

A. No, not -- I mean, I guess, I can't -- not that I recall specifically about Taylor.

Q. Okay. Did you ever text -- just

GOODRIDGE vs DIAMOND RANCH ACADEMY, INC.
June 13, 2024                                    Cameron W. Hughes

70

generally while you were working at Diamond Ranch Academy, did you ever text with Brooks about patients in general?

A. Yeah, common.

Q. Okay. Did Brooks ever tell you not to do that or instruct you that was improper or was that something that he allowed you to do?

A. Do you have a specific example? Like, he would give nonverbal orders over the phone, which is common with provider and nurses, but do you have a specific example or anything?

Q. No. I guess, what I'm getting at is did Brooks ever object to you and him dialoguing about a patient over text message?

A. Oh, no.

Q. Okay. That was something that you did and that you understood was okay to do?

A. Yes.

Q. So if you believe there was a need to send Taylor to the hospital and Brooks wasn't at the facility, you would have felt comfortable calling him or texting him, true?

A. Yes.

Q. So, again, just looking at that narrow window of time, December 12th through the 19th, did

71

Taylor ever tell you that she believed she needed to go to the hospital?

A. Not me personally, no.

Q. Did she ever tell someone else that you overheard her saying it?

A. No.

Q. Did anyone at Diamond Ranch Academy during that same window of time ever tell you that that staff member believed Taylor needed to go to the hospital?

A. No.

Q. At any point between, again, December 12th through December 19th, did you ever observe Taylor with a distended abdomen?

A. December 12th to the 19th?

Q. Yes.

A. Not that I remember.

Q. Okay. What about on the 20th?

A. At the moment of starting compressions, I noticed her abdomen becoming distended and getting -- you know, growing. Prior to that, not to my recollection.

Q. Okay. Maybe we can break that down. When you observed that, was it -- did you come to believe that it was the compressions themselves

72

that were causing the distension?

A. I don't know. I don't know what was causing that distension.

Q. Did you observe the distension before the compressions started?

A. I don't remember in that moment, like, when we got the wheelchair and such, I don't remember, but prior to that I didn't note, you know, distension.

Q. Okay. And then was your testimony, then, that during compressions, you observed her abdomen becoming more distended?

A. Yes.

Q. Okay. So you were previously handed an exhibit, it was that thicker packet, I forget which exhibit number it was.

A. 17 maybe.

Q. Yeah, 17. So go to page 10 of 17. I just want you to go to the Objective note. And the Objective section is something that you fill out based upon what you personally observe?

A. Yes.

Q. Okay. And I just had a quick follow-up question. It looks like the last sentence it says, "Pallor color in face."

73

A. Uh-huh.

Q. Do you see that?

A. Under the Objective symptom, yes.

Q. Okay. Did you write that?

A. I did.

Q. And what did you mean by, "Pallor color in face"?

A. Pale according to her typical ethnicity, yeah.

Q. Okay. And then the Subjective section mentions vomiting, true?

A. Correct.

Q. Okay. And then if you go to the bottom, it looks like this was signed by Brooks Wiley on December 18th. Does that appear to be what this document says?

A. Yes.

Q. Okay. So if Brooks had reviewed this, he would have seen your note mentioning of pale coloration in the face and then the Subjective note mentioning vomit?

A. Yes.

Q. Now, there was some mention of a urinalysis. Do you recall that testimony?

A. Yes.

Wade J. Van Tassell, RPR, RMR, CRR
DepomaxMerit Litigation Services

**74**

Q. Did you check the date on that urinalysis?

A. I'm sure I did. I don't remember the exact date. I just know it was prior to the day of her death. I don't remember the exact date.

Q. Do you have any memory or recollection at all concerning the date of that urinalysis as you sit here today?

A. I don't remember the date.

Q. Is it possible that that was a urinalysis from 2021?

A. I don't think so. I think it was that week prior. I just don't know the date prior.

Q. Okay. So if we again narrow in on that time frame, December 12th through December 19th, did you perform every Medical Assessment that the staff did of Taylor during that time frame?

A. Did I perform?

Q. Or participate in every Medical Assessment?

A. No, I did not participate in every Medical Assessment.

Q. Did you take every report that staff gave to the medical -- that the typical programming staff gave to the medical staff concerning Taylor?

**75**

A. Did I take every single report? No.

Q. Yes. There were other people in the medical staff that took reports, right?

A. Correct.

Q. Okay. So is it fair to say, then, that you do not know everything that was said to medical from the programming staff during that window of time?

A. Yeah, that's fair to say.

Q. Okay. And based upon that, is it fair to say that you really cannot have an opinion on whether protocols about reporting were followed?

MR. MORTENSEN: Object to the form.

MR. FORD: Join.

A. Yeah. Yeah.

Q. Okay.

MR. BROWN: Thank you. No further questions.

MR. MORTENSEN: I just have a couple -- oh, Cami, do you want to go?

MS. SCHIEL: Yeah, I can go.

EXAMINATION

BY MS. SCHIEL:

Q. Okay. My name is Cami Schiel and I represent Dr. Worwood. I had a couple questions,

**76**

follow-up questions on some things you had said. You had said earlier you had advocated to Taylor's father about a medication and I just had a quick question about that.

Is that normal for you to advocate to a student's family members about a medication or was that atypical?

A. So as a registered nurse, you know, I would work closely with the pharmacy and deliveries and medication refills, make sure that we were stocked with the medications, so I wouldn't say it was common, but I did have a fair amount of communication with parents; however, of course, it would have had to be ordered by the provider to discontinue that medication.

Q. Sure. Sure. Did you get a sense of the relationship between Taylor and her father?

A. During that phone call?

Q. Yeah, or based on any conversations you had with him.

A. You know, during the phone call or conversations that I had with him, I wouldn't say that I gathered any, you know, conclusion from that, but I, you know, was aware of, you know, strained relationships between, you know, students

**77**

and parents, particularly, I guess, Taylor.

Q. Can you explain that a little more. What do you mean "strained relationship"?

A. I guess, arguments, her not wanting to be at Diamond Ranch, which most kids didn't, of that nature, just disagreements and such.

Q. Did you ever get the sense that he maybe wasn't listening to her?

MR. MORTENSEN: Object. Calls for speculation, lack of foundation.

A. I couldn't -- I don't know. I didn't have that much interaction with him or Taylor in regards to, you know, parents.

Q. That's fine.

Okay. Did she ever make any statements to you about the strained relationship or is that just from your observations?

A. Nothing in particular. You know, with going on with that example, just, yeah, she just wanted to get off of that certain medication and didn't know if her father would be on board or not, but --

Q. Did he seem to be on board with that when you talked to him?

A. No, he did not want her to get off that

78

medication.

Q.  Do you remember generally was it -- what kind of a medication was it?

A.  It was for bladder spasms and, like, enuresis, so -- I believe, to the best of my memory.

Q.  Sure.  Do you remember if he said why he didn't want her to go off of that?

A.  I don't remember.  That's going back a long time.  Sorry.

Q.  No, that's okay.

A.  Just that the --

Q.  Just trying to see what you remember.

A.  Yeah, I don't recall.

Q.  Okay.  Prior to this date, December 20, 2022, did you ever advocate for a patient to go to the emergency room?

A.  Yes.

Q.  In general, was that anytime they asked to go to the emergency room?

A.  You know, I love my job and I really do care about people and if someone brought a concern to me, a student, staff, I would, you know, do what was in my best knowledge to do.

In the cases where they did ask me to go

79

to the emergency department, I would, you know, assess the situation, what's going on, where they're coming from, and, you know, ultimately together with the student decide, "Okay, if you want to go, then let's go."

Obviously, there are certain cases where -- it just varies, but to answer your question, yes, I would assess them first and then collaborate together with them with Brooks or Dr. Worwood and send off.

Q.  My understanding is that around this time, December 2022, there were multiple students that were experiencing abdominal pain, nausea, and vomiting.  Do you remember that at all?

A.  Yes.

Q.  Did you advocate for any of them to go to the hospital?

A.  I mean, there wasn't that need to advocate.  They didn't ask, nobody asked to go to the hospital or, you know, the objective symptoms and assessments didn't warrant such, so, no.

Q.  What objective symptoms and such are you talking about?

A.  Blood pressure, assessment findings, you know, things that we would do as part of that

80

Medical Assessment, breathing, respiratory rate, oxygen saturation.

Q.  So if any of those were abnormal, that's what you were looking for?

A.  Yes.

Q.  Okay.  And it sounds like, just based on nausea, vomiting, stomach pain alone, that to you did not indicate that they needed to go to the emergency room; is that fair?

MR. MORTENSEN:  Objection.  Incomplete hypothetical.

Q.  You can answer.

A.  I'm so sorry, I don't remember the question.

Q.  Yeah, so it sounds like just based on nausea, vomiting, belly pain alone, that to you did not warrant sending to the emergency room; is that fair?

MR. MORTENSEN:  Same objection.

A.  Yes.

Q.  Okay.  When the students came with those symptoms, nausea, vomiting, belly pain, would you automatically draw labs on them?

A.  No.

Q.  Or give IV fluids?

81

A.  No.

Q.  To your knowledge, did any of them have sepsis?

A.  To my knowledge, no.

Q.  Or peritonitis?

A.  No.

Q.  Is it safe to say that you're not aware of any other students dying -- of any other of those students complaining of nausea, vomiting, belly pain dying from that?

A.  No, not any students.

Q.  Okay.  So is it fair to say that you haven't seen anything similar to what happened to Taylor; is that fair -- or what happened in Taylor's situation?

A.  In my experience as a nurse or ever?

Q.  Yeah.

A.  No, I haven't dealt with anything like this before.

Q.  Okay.  And you were with her for several days prior to her death; is that right?

A.  Yes.

Q.  Based on your review of the records, especially the ones that you signed off on, did you feel at any time that she was unstable, physically,

82

hemodynamically, or medically?

A. No. She had symptoms of illness, but not unstable.

Q. I know you were asked some questions earlier about sepsis. Have you been trained on what to look for in sepsis?

A. As part of my scope of practice and education, we, you know, discussed sepsis.

Q. Okay. So when you said that -- I think you said earlier that sepsis wasn't even on your mind when it came to Taylor's care. Does that mean -- I'm just trying to better understand that.

Is that, like, a, "I forgot about sepsis," or is that a, "She didn't -- you know, based on my clinical observations she didn't indicate that sepsis should be considered"?

A. Yeah, based on the, you know, information and the assessments and objective findings that we had, it just didn't correlate with sepsis to me.

Q. Okay. Did you observe her eating and drinking on that day she died, December 20, 2022?

A. Sorry, I'm just going to refer to my notes, if that's okay.

Q. Yeah. Yeah. Will you just let me know what Bates number you're looking at.

83

A. 13 on Exhibit 17.

So she did, you know, drink water and Gatorade throughout the day. You know, we were encouraging oral hydration, had even discussed sending off for IV hydration had she not been able to orally rehydrate, but it appears that she was drinking okay.

Q. Okay. Did she seem like -- on the day -- on December 20, 2022, did you observe her -- I'm going to use the phrase, "She shut down." Like, did she ever -- I don't know if that means anything to you. Did she ever stop engaging with medical care or questions that you observed or when you were caring for her?

A. No. She, you know, engaged with me, went out to draw labs, she provided, you know -- calling -- saying my name, you know, up until that point where we ultimately decided to take her off because I noticed that she -- at that point that it was maybe beyond our care and we needed to send her off, which we did, or initiated.

Q. Can you just help me understand a little bit better the change that you observed in the sense of what was she like before and then what was she like after that moment that you're referring

84

to?

A. Coherent, being able to talk with me. Obviously, she was sick, like, she had an illness, was vomiting, but, you know, able to communicate with me, walk independently, coherent up until, you know, around the time we started walking her out, Garrett and I and Brittney, where she felt lightheaded, dizzy, weak, at which point, you know, we'd already decided that we were going to transport her and then we already discussed the rest.

Q. Uh-huh. Okay. Thank you.

Do you remember whether or not she was able to move around without appearing to be in discomfort prior to that -- you know, that moment that you're talking about, that change?

A. She was able to walk independently.

Q. Do you remember if she was able to roll around in bed without any pain prior to that moment?

A. Since I had been there, she was able to, you know, engage with me. Obviously, she was not comfortable, she was sick.

Q. Sure.

A. But beyond basic moving, she was able to

85

do that independently, rolling around.

Q. Do you remember if she ever got up to go to the bathroom?

A. She did get up to go to the bathroom. We collected a urinalysis that day, too, which she collected independently.

Q. So she had some urine output?

A. Yes.

Q. Do you remember what color it was?

A. I don't remember.

Q. Okay. A couple of questions about Dr. Worwood. Did you ever speak with Dr. Worwood?

A. At my time at DRA, yes.

Q. Yeah.

A. Yes, multiple times.

Q. How often in general would you say you spoke with him?

A. When he was there during clinic seeing students every other week, I would help with that clinic.

Q. Okay. So it sounds like when he was there, it was pretty routine, regular most of the day that he was there?

A. For me to talk to him?

Q. Yeah.

86

A. Yes.

Q. Did you ever speak with him when he wasn't at the school?

A. Very seldom, but, you know, I consider him, you know, a friend, but I wouldn't speak with him outside of Diamond Ranch at that time.

Q. Do you ever remember discussing Taylor's care with Dr. Worwood in the two weeks before she passed away?

A. Before she passed, no.

Q. Do you know if Dr. Worwood had an office at the clinic there at Diamond Ranch?

A. Not to my knowledge.

Q. These might be some questions just to double-check because this is the only time I get to talk to you.

Have you ever seen a contract between Dr. Worwood and Diamond Ranch?

A. Not to my knowledge. I haven't seen anything.

Q. Did you ever see Dr. Worwood edit any policies and procedures at the school?

A. I didn't personally see him edit any policies, no, procedures.

Q. Do you have any knowledge as to how he

87

was compensated by Diamond Ranch?

A. I have no idea. I don't know.

Q. In regard to Taylor's care, it sounds like Dr. Worwood was not involved, to your knowledge; is that correct, for this illness that occurred in December 2022?

A. For the duration of this illness, yeah, to my knowledge, correct.

Q. Is it fair to say, then, you don't have any criticisms of his involvement in Taylor Goodridge's illness the last two weeks of her life?

A. No.

MR. MORTENSEN: Object to the form.

A. No.

Q. I'm sorry, that's no criticisms?

A. No criticisms of Dr. Worwood. He's awesome.

Q. Okay.

MS. SCHIEL: That's all the questions I have. I really appreciate your time. Thanks.

FURTHER EXAMINATION
BY MR. MORTENSEN:

Q. I just have a couple follow-up.

You never treated Taylor for self-harm,

88

correct?

A. I don't know. I don't remember. I can't say. I don't remember off the top of my head.

Q. All right. But you don't have the impression as you sit here today that she was always threatening self-harm or anything like that to get attention, do you?

A. No, I don't have that today.

Q. Okay. And then isn't vomiting a symptom of sepsis?

A. Can be.

Q. And abdominal pain?

A. Can be.

MS. SCHIEL: Object to form, foundation.

Q. All right. And of those other students that were vomiting, how many vomited for seven to eight days?

A. I don't know. I can't say.

Q. Okay. What training did you get when you began working as an RN at Diamond Ranch Academy?

A. Can you -- in regards to what?

Q. Was there, like, any training seminars that you went to where Brooks or Dr. Worwood would train you on policies and procedures?

MS. SCHIEL: Object to form and facts not

89

in evidence and foundation.

MR. FORD: Go ahead.

A. I would discuss with them certain cases. There wasn't -- you know, we would have trainings every now and then on certain, you know, assessment techniques and such. No formal trainings other than, you know, my licensure that qualified me to work in that capacity and the basic protocol, you know, through the medical department.

Q. And I take it that you hadn't -- what kind of direct interface did you have with Ricky Dias that leads you to your opinion that he can be difficult?

A. Prior to Taylor's death, I had very limited interaction. Afterwards, also, you know, limited interaction months after, so not a whole lot, but just -- yeah.

Q. Did he ever chew you out for anything or criticize you for anything about Taylor's care?

A. No, he didn't chew me out or criticize me for, you know, her direct care.

Q. What conversations have you had with him about Taylor's care?

A. Honestly, beyond discussing, you know, what had -- the events of the day and the



**90**

assessments in sick bay, not much discussion surrounding the events of Taylor's death with Ricky.

Q. And isn't it true that a lot of the students at Diamond Ranch Academy have difficulties with their parents?

A. Yes.

Q. And, actually, there's, like, counseling that's given to these students so that they can improve their relationship with their family?

A. Yes.

Q. That's one of the reasons that people send their kids to Diamond Ranch Academy?

A. Yes.

Q. Okay.

MR. MORTENSEN: Thank you. That's all I have.

FURTHER EXAMINATION
BY MR. BROWN:

Q. I did come up with a few more questions. So, again, I just want you to look at that window of time, December 12th through the 19th.

Did Taylor ever make complaints to you about back pain during that window of time?

**91**

A. Aside from this pink slip, no.

Q. Okay.

A. And she never brought up the back pain, to my recollection, again.

Q. Okay. What was Taylor's demeanor like when you assessed her on December 17th?

A. Like I said, you know, she was -- I do remember her, you know, joking, laughing about the smell of what she put in the microwave or what they had heated up. She was pleasant.

Q. Was joking -- was being pleasant and joking consistent with Taylor's demeanor on other days, if you know?

A. I don't know. I don't remember specifics.

Q. Anything other than joking and pleasant that you would use to describe her demeanor on December 17th?

A. Laughing, cooperative with my assessments.

Q. Okay. How about for December 13th when you assessed her, do you have a recollection of what her demeanor was like on that day?

A. I don't. I just remember that specific event with the heated-up object.

**92**

Q. Okay. Fair enough.

MR. BROWN: That's all the questions I have. Thank you.

THE WITNESS: Thanks.

EXAMINATION
BY MR. FORD:

Q. All right. I just wanted to ask one follow-up question for you.

Do you believe the care that you provided to Taylor Goodridge throughout your treatment of her was within the standard of care for a registered nurse?

MR. MORTENSEN: Object to the form.

A. Yes, with the findings and all things considered, yes, it was.

MR. FORD: All right. That's it. I think we're done. We'll read and sign.

(Signature requested by Mr. Ford.)

(Whereupon the taking of this deposition was concluded at 3:32 p.m.)

* * *

Original transcript filed with Mr. Mortensen.

Reading transcript submitted to Mr. Ford.

**93**

C E R T I F I C A T E

STATE OF UTAH          )

COUNTY OF _____ )

I HEREBY CERTIFY that I have read the foregoing testimony consisting of 89 pages, numbered from 4 through 92 inclusive, and the same is a true and correct transcription of said testimony except as I have corrected Original transcript in ink, initialed same, and indicated said changes on enclosed errata sheet.

_____
CAMERON W. HUGHES

Subscribed and sworn to at this         day of                 2024.

_____
Notary Public

My commission expires:

* * *

94

                    C E R T I F I C A T E
STATE OF UTAH            )
COUNTY OF SALT LAKE    )
          THIS IS TO CERTIFY that the deposition of CAMERON
W. HUGHES was taken before me, Wade J. Van Tassell, a
Registered Merit Reporter and Certified Realtime
Reporter.
          That the said witness was by me, before
examination, duly sworn to testify the truth, the whole
truth, and nothing but the truth in said cause.
          That the testimony was reported by me in Stenotype,
and thereafter transcribed by computer under my
supervision, and that a full, true, and correct
transcription is set forth in the foregoing pages,
numbered 4 through 92 inclusive.
          I further certify that I am not of kin or otherwise
associated with any of the parties to said cause of
action and that I am not interested in the event thereof.
          WITNESS MY HAND and official seal at Salt Lake
City, Utah, this 22nd day of June, 2024.



_____
          Wade J. Van Tassell, RPR/RMR/CRR/CRC

### Exhibits

**Hughes Exhibit 17**
23:23,24 83:1

**Hughes Exhibit 18** 39:2

**Hughes Exhibit 19** 56:20
57:5

---

### 0

**000394** 57:3

---

### 1

**1** 24:8,12 25:8
**10** 37:15 40:23 41:2,14
72:18
**10813** 2:6
**10:00** 48:12
**10:31** 50:9,21
**10:40** 35:6
**11** 44:15
**11-month-old** 6:19
**110** 37:9
**11:18** 44:9
**12** 6:16 46:16,19
**12-15-22** 3:15
**12-20-22** 3:16
**12:00** 48:8
**12:30** 17:5
**12:40** 44:17
**12:45** 37:5
**12th** 30:21 52:3 69:6,8,11,
12 70:25 71:13,15 74:15
90:22
**13** 37:22 47:9,10 83:1
**13th** 37:25 38:3 91:21
**14** 50:7
**15** 2:12 51:6
**150** 2:9
**15th** 26:7,8 38:4,6,8 39:11
40:12,20
**1600** 2:12
**17** 3:14 23:23,24 37:22
41:1 72:17,18 83:1
**17th** 37:18,25 38:1,8,11
40:22 41:3 52:23 53:4,25
91:6,18
**18** 3:15 39:2
**18th** 46:12 73:15
**19** 3:16 56:20 57:5 62:6

**19th** 46:13 69:6,8,11,13
70:25 71:13,15 74:15
90:23
**1:00** 17:6 48:10 49:4 50:16

---

### 2

**2** 29:2,7
**20** 78:15 82:21 83:9
**2013** 10:22
**2018** 62:6
**2021** 10:8,13 11:19 74:11
**2022** 25:12 30:21 37:19,22
78:16 79:12 82:21 83:9
87:6
**2023** 11:24
**20th** 46:24 71:18
**23** 3:14
**230** 2:6
**2:00** 49:5
**2:39** 60:17
**2:46** 60:19

---

### 3

**3** 30:23 32:8 41:14
**39** 3:15
**3:18** 25:24
**3:32** 92:20

---

### 4

**4** 3:3 31:17 32:25 52:15
**40** 14:20 15:25
**400** 2:15
**460** 2:15
**4:55** 49:2

---

### 5

**5** 33:1 53:17
**500** 2:9
**56** 3:16
**5:38** 25:18

---

### 6

**6** 35:20,23
**60** 3:4
**600** 6:16
**652** 6:16

**68** 2:3 3:5
**6:22** 31:20

---

### 7

**7** 51:4 58:8
**700** 2:3
**75** 3:6
**7:00** 15:7
**7:30** 37:7
**7:59** 41:11

---

### 8

**84070** 2:10
**84095** 2:7
**84101** 2:4,13
**84111** 2:15
**84770** 6:17
**87** 3:7
**8:01** 33:5
**8:03** 44:6

---

### 9

**90** 3:8
**92** 3:9
**9350** 2:9
**9:00** 15:7
**9:31** 47:16 48:4
**9th** 25:12 27:8,11 29:1

---

### A

**a.m.** 15:7 33:5 35:6 37:7
44:9 48:12 50:9
**abdomen** 51:4 71:14,20
72:11
**abdominal** 79:13 88:12
**abnormal** 80:3
**academic** 13:11 64:2
**Academy** 2:5 3:17 11:23
13:10,14,22 14:19 19:15
28:2 39:5 52:4,22 54:10
55:9 59:2 60:8 68:23 70:2
71:7 88:20 90:5,13
**accepted** 9:7
**access** 35:11 47:1
**achievements** 58:4
**acting** 23:3
**activated** 18:21

**actual** 35:2
**acute** 62:18
**add** 25:3
**added** 16:19
**address** 6:15
**addressed** 56:22
**admission** 13:17
**admit** 36:6,7
**advanced** 9:23
**advice** 8:5
**advisable** 19:2
**advocate** 23:3 76:5 78:16
79:16,19
**advocated** 76:2
**AED** 18:22,25 19:1
**aesthetician** 47:13
**afternoon** 4:8 17:8
**agreed** 57:15
**ahead** 15:16 26:16 27:22
30:1 32:13 34:4,17 47:24
54:12,22 55:19 64:9 65:21
67:1 89:2
**Alan** 2:2 4:8 29:5 40:25
57:1
**Allie** 45:3
**allocate** 25:7
**allowed** 70:7
**amount** 76:12
**animals** 54:3
**ANJEWIERDEN** 2:14
**answering** 5:25
**anticipated** 56:19
**antiemetic** 47:20
**anytime** 78:19
**apartment** 6:16
**apologize** 24:1 32:8 50:9
**apparent** 18:12 51:10 67:3
**appearing** 84:14
**appears** 43:7 58:22,24
59:4 66:6 83:6
**applied** 9:6
**approach** 36:5 67:17
**approval** 23:6
**approved** 54:9,14,16
**April** 11:24
**area** 19:24 50:1
**arguments** 77:4
**arranged** 18:14
**arranging** 17:15
**arrived** 19:3,5

aspect 66:3

assess 40:19 66:3 79:2,8

assessed 33:24 34:9 40:17 41:12 47:21 48:12 50:11 66:17 91:6,22

assessment 18:20 25:2 29:10 30:9,10,24 31:18 33:2,21 35:14 37:8,15 39:11 40:13,14,24 41:7,9 42:17 43:14 44:13,16 45:11,17,20 47:22 48:1 53:3,6 54:2 55:13 59:3 66:1 74:16,20,22 79:24 80:1 89:5

assessments 7:22 12:22 30:7 42:10 43:14 79:21 82:18 90:1 91:20

assist 51:11

Assistant 35:10

assisted 18:6

assume 20:5 58:13,18

attached 18:24

attended 8:24 9:4

attending 9:10

attention 26:19 88:7

attorney 8:6,7 20:16

attorneys 20:21

atypical 76:7

audibly 5:14

August 9:16

authored 46:17

automatically 80:23

autopopulated 43:6,8,9

aware 13:13 16:8,10 24:6 26:1,12 30:19 36:23,25 37:1 41:25 50:13 57:7 59:10 61:20 63:8,19,21 76:24 81:7

awesome 87:18

**B**

back 5:14 18:13,15 25:13 26:7 32:7,25 66:6 67:17 78:9 90:25 91:3

background 8:21,22

based 68:2 72:21 75:10 76:19 80:6,15 81:23 82:15, 17

basic 18:22 84:25 89:8

basis 13:1

Bates 57:2 82:25

bathroom 85:3,4

bay 33:15 34:24 36:7,10 37:23 38:4 57:17 90:1

bed 57:8 84:19

began 88:20

behalf 4:3

behavioral 11:15 12:2

believed 71:1,9

belly 80:16,22 81:10

Bestnotes 26:25 27:1 32:21 47:3,6

Big 2:6

bile 50:12

bile-like 50:17

Biolife 11:2,11

Bismol 43:24

bit 31:20 50:8 51:1 69:4 83:23

bladder 78:4

blood 11:2 17:10 49:5,11, 15,21 50:3,4,20,25 51:1 79:24

board 77:21,23

boards 10:11 11:10

booklet 4:24

bottle 55:1

bottom 24:4 32:9 57:22 73:13

bowel 41:12 42:10,11

boys 62:11

braces 25:5

break 5:18 7:17 60:14 71:23

breakfast 7:11 57:12

breathe 25:15

breathing 18:21 80:1

breaths 19:4

Brigham 8:24

bring 33:15 42:24 59:2

bringing 66:1

Brittney 84:7

broader 69:4

Brooks 14:6 15:17 17:16 18:7 21:22 34:20 35:10 44:8 46:18 47:22 48:12 49:2 59:19 60:23 61:10,21 69:10,17,21 70:2,5,13,20 73:14,18 79:9 88:23

brought 13:14 26:19 33:23 41:11 42:22 50:10 78:22 91:3

Brown 2:5 3:5,8 26:13 34:3,13,16 55:20 64:7,16, 25 65:22 66:8 67:2,13 68:18,21,22 75:17 90:19 92:2

Brutka 2:17

Bryson 2:5 68:22

BSN 9:5

business 64:15

**C**

cafeteria 52:7

call 4:14 15:12 35:17 76:18,21

called 4:3 24:12 26:23

calling 70:22 83:17

calls 64:7,25 68:7 77:9

Cameron 4:2,13,15,16,17 40:5,7

Cami 2:14 29:3 75:20,24

campus 17:22 34:7 36:13, 17,21,25 39:6 62:11,15,20, 23 64:3 66:21

capacity 11:13 49:24 63:14 89:8

care 13:5 19:6,11 49:23 52:3 58:1 78:22 82:11 83:13,20 86:8 87:3 89:19, 21,23 92:9,11

caring 83:14

Carson 24:17 25:9,18,21 28:8,10 40:5

cases 62:19 78:25 79:6 89:3

causing 72:1,3

chain 14:9 28:4 53:18

Chamberlain 9:9,12

chance 52:10

change 83:23 84:16

Chase 40:5

check 74:1

chew 89:18,20

Chicago 9:13

chief 44:24

circumstances 57:7 64:20

City 2:4,13,15

clarification 16:5

clarify 14:8 20:9 37:24 65:20

class 57:13

clean 5:16

clear 22:14 62:1

clinic 13:3 15:6 17:3 25:3 31:15 36:11 42:25 54:17 85:18,20 86:12

clinical 82:15

close 18:16 36:10

closely 36:9 76:9

coherent 84:2,5

collaborate 79:9

collaborated 21:16,21

collapsed 16:22 17:3 52:4

collected 85:5,6

colon 36:18

color 41:15 72:25 73:6 85:9

coloration 73:20

comfortable 70:21 84:23

command 14:9

common 43:20 70:4,10 76:12

communicate 27:16 84:4

communicated 7:13 63:15

communicating 5:24

communication 18:7 37:1 63:20 76:13

compensated 87:1

competence 61:9

competent 61:12

complaining 81:9

complains 59:4

complaint 44:24

complaints 44:19 59:7 90:24

complete 56:10

completing 45:8

compressions 19:1,4 71:19,25 72:5,11

computer 25:10 26:22

concern 40:11 42:5 64:12 78:22

concerns 24:24 64:5

concluded 92:20

conclusion 76:23

condition 66:22

confident 67:14

congratulations 6:21 9:17

considered 82:16 92:15

consistent 41:24 91:12

contact 22:19

contacted 15:15,21 36:14, 17,21

continued 17:8 23:1

continuing 19:2

contract 86:17

contracted 49:13

conversation 5:10 22:21 23:7 61:12

conversations 22:8,11,15 35:13 44:13 76:19,22 89:22

cooperative 91:19

copy 8:15

correct 10:4,10 15:20 16:22,23 30:7,13,14,16 33:2,3,6,8 35:1,7 37:16,17, 20 40:20 42:16,25 43:19, 25 44:6,7,10 46:10,11 48:24 50:6 51:7 61:18 62:12,13 63:23 68:14 73:12 75:4 87:5,8 88:1

correctly 6:1

correlate 82:19

counseling 90:8

couple 30:25 75:19,25 85:11 87:24

court 4:23

courtroom 6:12

cover 15:10

coverage 15:3,5

covered 52:9

CPR 18:22,24 19:2

create 8:1 10:1

created 7:25

criteria 13:18

criticisms 87:10,16,17

criticize 89:19,20

cuffs 17:10

culture 62:14

cut 32:20 43:5

**D**

daily 13:1

Danny 2:16

Dasia 33:23 34:1

date 9:15 11:21 62:4,5 69:7,8 74:1,4,5,7,9,13 78:15

dated 37:18

dates 69:9

daughter 6:20

day 17:6 26:9 27:3,8,14 30:25 31:20 33:4 35:6 40:8,14 44:9,15 47:25 61:18 74:4 82:21 83:3,8 85:5,23 89:25 91:23

days 21:13 25:24 27:5 38:15 42:1,5 43:19 81:21 88:17 91:13

dealt 81:18

death 12:14 13:15 14:2 22:15 61:18 62:17 63:10 66:23,24 67:3 68:6 74:5 81:21 89:14 90:2

December 11:20 25:12 26:7,8 29:1 30:21 37:18,22 39:11 40:12 41:3 46:12,14 52:3,23 69:5,6 70:25 71:13,15 73:15 74:15 78:15 79:12 82:21 83:9 87:6 90:22 91:6,18,21

decide 79:4

decided 83:18 84:9

deciding 12:13

decompression 21:9

deemed 28:6

Defendant 2:8,11,14

Defendants 2:5

degrees 61:11

Dehydration 43:18

deliveries 76:9

demeanor 91:5,12,17,23

department 18:8,15 20:14 21:11 31:25 33:19 54:15 79:1 89:9

departments 39:4

depends 48:21

deposition 4:18 5:1 6:4 7:7,19 51:24 92:19

describe 27:24 91:17

description 30:4 63:13

detective 19:23 20:2

determination 27:18 28:2

diagnose 10:1 30:13

Diagnostics 49:14

dialoguing 70:13

Diamond 2:5 3:16 11:4,23 12:6,10 13:10,14,22 14:19 19:15 20:17 22:25 23:1 28:1 39:4 52:4,22 54:10 55:9 56:23 59:1 60:7 68:23 70:1 71:7 77:5 86:6,12,18 87:1 88:20 90:5,13

Dias 15:19 67:6,8,11 89:12

diastolic 48:16

died 82:21

diet 25:4

difference 9:21 27:4

difficult 12:10 62:22 66:2 67:15 89:13

difficulties 90:5

digitally 25:17 27:5 35:5,9, 16 44:5 47:15 48:3

direct 13:5 58:1 89:11,21

direct-care 66:4

directly 27:16

director 15:18 32:9,17 34:19,20 35:10 36:14,17, 21,25

disagreements 77:6

discipline 13:10

disclosures 8:17

discomfort 44:23 84:15

discontinue 76:15

discuss 24:24 25:6 26:17 67:21 89:3

discussed 17:18 21:15,22 49:25 52:13 53:4,14 59:19 65:23 82:8 83:4 84:10

discussing 86:7 89:24

discussion 21:17 44:1 59:21 68:19 90:1

discussions 21:24 22:3 69:10,17

distended 71:14,20 72:12

distension 41:17 72:1,3,4, 9

Dixie 9:5 10:7

dizzy 18:1,10 84:8

doctor 25:5

Doctor's 46:17

document 31:3 46:20 47:16 51:12 56:21 58:10 73:16

documentation 44:21 52:5 55:12 59:15

documented 17:9 41:10 45:24 49:6 53:12

documents 7:18,21,23 51:23

dose 43:22

double-check 86:15

DRA 11:12,18 59:2,6 62:2, 10 63:1 64:1,23 85:13

draw 11:1 49:5,11,15 80:23 83:16

drew 17:8

drink 83:2

drinking 82:21 83:7

dropped 50:25

duly 4:4

duration 87:7

dying 81:8,10

**E**

e-mail 3:16 39:18 40:3 56:24 57:19

e-mails 38:19

earlier 29:25 34:6 59:11 65:23 76:2 82:5,10

early 10:14

East 2:9,15 6:16

eating 43:17 82:20

edit 86:21,23

Educated 43:16

education 9:11 82:8

educational 8:22

effort 65:9

efforts 51:25

electrical 55:2

electronic 32:23

elevated 37:9 48:16

elevator 18:6,10,11,13,16 51:10,13,19

emergency 15:22 16:8 18:8,14 19:5 34:11,19 62:24 78:17,20 79:1 80:9, 17

employee 14:16

EMS 18:22

EMTS 19:8,11

encouraging 83:4

end 11:19

engage 84:22

engaged 83:15

engaging 83:12

enrolled 13:25

entitled 10:4

enuresis 78:5

environment 12:8 62:22

ER 49:2

Erik 2:18

escalate 34:22 64:13

ethnicity 73:8

evaluation 49:3

evening 21:4

event 20:21,24 91:25

events 89:25 90:2

evidence 89:1

exact 11:21 12:20,24 14:4 16:15 21:3 33:18 58:5 62:4 66:18 74:4,5

EXAMINATION 3:2 4:6 60:20 68:20 75:22 87:22 90:18 92:5

examinations 69:3

examined 4:4

exception 23:22

Excuse 43:13

executive 15:17 34:19

exhibit 23:23,24 39:2 52:15 53:17 56:20 57:5 58:8 68:5 72:15,16 83:1

EXHIBITS 3:13

existed 63:11

experience 10:24 81:16

experiencing 79:13

expertise 16:4

explain 77:2

explicitly 63:21

extent 66:8

**F**

face 33:11 72:25 73:7,20

facility 21:6 49:23 70:21

fact 21:17,24 42:4

facts 88:25

failed 61:21

fair 7:17 12:25 14:10 15:24 20:24 25:8 31:1 33:16 35:22 38:10 42:2 75:5,9,10 76:12 80:9,18 81:12,14 87:9 92:1

fairly 20:23

faith 65:9

familiar 61:16 62:24 63:2,4 67:22

family 4:9 12:4 22:12 76:6 90:10

father 22:17,21 23:4 76:3, 17 77:21

feel 81:25

feeling 44:23

feelings 12:10

felt 12:4 18:3,4 70:21 84:7

female 17:13,15,19

fetched 18:22

fever 68:13

field 10:24 31:13 42:7 56:4

filed 92:22

fill 27:15 55:1 72:20

filled 24:11,15,16 35:24

find 16:17 21:1 47:2

finding 46:1

findings 45:20,21,22,23 79:24 82:18 92:14

fine 4:16 26:24 77:14

finish 5:3,4

finished 34:5

floor 18:2

fluid 17:9

fluids 80:25

flustered 6:5

follow-up 65:11 72:23 76:1 87:24 92:8

Ford 2:8 3:9 7:12 8:16,19 15:16 26:15 27:21 30:1 32:13 34:4,15,17 43:11 47:23 54:12,22 55:18 64:9, 17,24 65:21 66:25 75:14 89:2 92:6,16,18,23

forget 72:15

forgot 41:6 82:13

form 4:24 11:11 24:10 32:13,22 35:25 37:4 38:20, 21 47:23 54:12 67:13 68:9 75:13 87:14 88:14,25 92:13

formal 6:11 89:6

format 32:16

formed 65:13

found 21:3

foundation 15:16 26:14 27:21 28:25 30:1 34:3,13 43:11 47:23 64:7,24 65:1 66:9,25 68:8 77:10 88:14 89:1

four-day 38:9

frame 49:7,10 69:22 74:15, 17

Friday 27:12

friend 61:6 86:5

front 2:6 46:10 62:4

full-time 14:21

future 6:24

**G**

gap 38:10

Garrett 18:5 40:5 84:7

gathered 76:23

Gatorade 83:3

gave 18:7 74:23,25

general 39:6 45:14,15 56:4 70:3 78:19 85:16

generally 12:17 39:7 67:10 70:1 78:2

generated 24:18 45:13 51:7

George 6:17 11:16 31:11

girls 17:22 62:11,15,20,23

gist 23:7

give 8:21 12:20 15:7 16:15 20:1,13,17 45:19 62:9 65:4 66:17,18 70:9 80:25

giving 48:5

glad 4:20

good 4:8,20 12:3 14:8 65:9

Goodrich 55:15

Goodridge 4:9 12:18 61:15,23 62:17 63:7,25 64:20 68:4,5 92:10

Goodridge's 12:14 66:22 87:11

GORDON 2:11

graduate 10:6

graduated 8:22 10:18,24 62:7

graduation 9:15

great 60:16

ground 4:22

group 43:22 45:21 60:7 62:25

growing 71:21

grown 61:6

guess 7:16 12:11 27:25 32:1 38:7 49:14 54:16 56:18 59:24 67:5 69:7,23 70:12 77:1,4

guys 7:9 44:12

**H**

half 60:15

hall 5:20 17:3

hand 52:14 58:7

handed 72:14

handle 67:15

hands-on 52:3

handwriting 24:4

HANNI 2:8

happened 15:14 16:24 18:23 19:24 20:18 21:10, 16 22:6 51:16 81:13,14

hard 12:8 42:6 56:7

head 5:13 88:3

health 9:10 11:15,16 12:2 20:10,15 31:15 32:23 59:7

hear 6:4 7:12 59:18

heard 21:5 59:14

hearing 50:15

hearsay 67:20

heart 37:9 50:24

heated 53:25 54:2 91:10

heated-up 91:25

heating 53:23 54:6,8,17, 20,24 55:4

heavily 66:4

helped 18:5

hemodynamically 82:1

Hernandez 29:12

Hey 35:17 50:17 55:16

hiatus 62:7

high 8:23,24 10:19,25

higher 9:24

highly 61:12

Hillin 3:16 57:19

hire 62:5

history 13:13,19 19:7 22:18

HIV 23:8,13

HOCHULI 2:5

home 17:12 39:23 40:3

honest 36:3

Honestly 89:24

hospital 11:17 12:1,13 19:13,16,17,20 49:22 53:1, 8,14 55:16 56:13 70:20 71:2,10 79:17,20

hot 55:1

hour 60:15

hours 14:18 15:1,25 30:25 39:24 64:14,15

Hughes 2:8 4:2,13,15 60:22

huh-uhs 5:12

Human 20:10,15

hurt 25:14

hurting 25:14

hydrating 43:17

hydration 83:4,5

hypothetical 80:11

**I**

ibuprofen 25:16

idea 87:2

identify 59:22

ill 16:3 59:4
illness 59:4 66:15 82:2 84:3 87:5,7,11
illnesses 62:21
importance 43:16
impossible 5:6
impression 62:14 66:20 67:8,10 88:5
improper 70:6
improve 90:10
in-person 47:22 48:1
incentives 57:23 58:3
incident 16:19 33:20 45:9, 10,16 63:7 66:15,16,18 67:19
include 69:7,12
included 58:23
including 11:5,7
Incomplete 80:10
incorrectly 61:21
independent 35:3 40:23 44:12 52:6
independently 84:5,17 85:1,6
ineligible 57:23
inform 45:7
information 14:1 20:17 25:10 52:23 56:4 57:20 65:3,4 66:21 82:17
initial 37:7
initiated 83:21
inpatient 12:3
inputs 43:10
instruct 70:6
instructed 45:19 49:2
instruction 8:6
intake 17:9
intelligent 61:11
intend 6:23 9:14
interacted 23:21 38:17
interaction 12:17 38:3,5 67:18 77:12 89:15,16
interactions 52:9
interface 14:5,6,7 37:21 89:11
Intermountain 11:16
interviewed 20:14
investigation 20:8
involved 10:15 29:9 53:20 57:10 60:6 87:4
involvement 48:5 53:2,5 87:10

issue 43:18 54:7
items 54:9,14,16
IV 80:25 83:5

J

Jaiden 33:8,10,23 34:1,6
Jenson 47:9,11
Jinx 55:23
job 14:21 63:13 78:21
join 26:15 34:4,16 55:20, 21,22 64:9,10,17 65:1,22 67:2 75:14
joking 91:8,11,12,16
JONES 2:5
Jordan 2:7
June 10:14

K

Kayla 31:8,23
Kaylee 42:22
kid 52:25
kids 77:5 90:13
kind 21:8,9 32:1 39:22 78:3 89:11
knew 13:23
knowing 13:25
knowledge 13:21 66:14 67:25 68:1 78:24 81:2,4 86:13,19,25 87:5,8
Kyle 2:11 60:23

L

laboratory 49:15
labs 17:9 30:17 80:23 83:16
lack 68:8 77:10
Lake 2:4,13,15
Largin 2:18
laughing 54:4 91:8,19
lawsuit 10:16
lawyer 5:18 7:8
lawyers 6:3
leading 62:16 66:23
leads 89:12
learned 14:2 23:20
leave 11:22,25 12:13 17:14
Left 36:16
level 16:3

Lewis 31:8,23
license 9:24 10:5
licensure 11:10 89:7
life 18:22 64:21 87:12
lifesaving 51:25
lighthead 18:1 84:8
likewise 5:3
limited 89:15,16
limits 37:6 41:22
list 54:9,10,14,16
listed 35:21 37:5 40:9
listened 41:12
listening 42:10 77:8
lists 48:13
live 31:10
lives 29:19
locally 29:20
located 9:12 13:6 28:12
lock 69:1
long 5:19 22:22 61:1 62:1 78:10
long-distance 9:1
looked 38:8
losing 48:22
lot 12:9 62:18,19 89:17 90:4
love 78:21
lower 50:25
lunch 24:3

M

made 8:5 22:14 24:6 26:1, 12 30:19 42:13 51:25
Main 2:3
major 13:17,19
make 25:2 27:18 28:2 30:11 32:1 52:8 69:1 76:10 77:15 90:24
makes 27:23
male 17:13,14,19
malpractice 10:16
manage 30:3 31:25
manager 31:23,24 32:5,6
managerial 32:2
managing 19:4
mannerisms 4:25
MANSUKHANI 2:11
manual 50:20 58:12,14,20
mark 23:23 52:14

marked 23:24 39:2 52:15 56:20 57:6 58:7
master's 9:7
matriculation 9:8
matter 27:15,17 59:20
meals 43:17
means 83:11
med 25:3 32:3
medical 3:14,15 10:16,24 11:3,8 13:3,6,7 14:1 15:6, 11 18:2,5,15 21:16 22:18 23:21 24:11,17,21 26:1,11, 18 27:19 28:1,6,11 29:10, 13 30:6,8,10,24 31:12,13, 18,23,25 32:4,6,9,17 33:1, 15,20,24 34:7,9,19 35:10 36:10 37:8,15 38:20 39:3, 10,11,19 40:7,24 41:11 42:7,25 43:13,14,20 44:13, 16 45:11,17,19 46:8 47:12, 14 50:8,11 54:1,17 55:10, 15 56:4 57:14,16 59:3 62:6 64:5,6 66:3,16,24 68:3 74:16,19,22,24,25 75:3,6 80:1 83:12 89:9
medically 54:20 82:1
medication 12:21 22:18, 24 23:5,13 38:18 44:2 47:20 54:1 76:3,6,10,15 77:20 78:1,3
medications 10:1 13:7 76:11
medicine 12:9 23:8
meet 42:14
meeting 21:9,10
member 46:5 71:9
members 22:12 55:14 66:21 76:6
memory 8:3 22:23 35:3 40:23 52:7 53:10 74:6 78:6
mental 9:10 31:15 62:20
mention 73:23
mentioning 73:19,21
mentions 73:11
mentor 61:6
message 52:16 70:14
messages 7:24 53:19 67:5
met 56:11
Michael 2:8 7:10,15
microwave 54:3 91:9
middle 34:12
mild 41:13
MILNE 2:2
mind 4:14 68:11 82:11

mine 51:22

minor 23:5

miscommunication 65:7

missed 65:24 66:7,12,14

missing 24:2

moment 71:19 72:6 83:25 84:15,20

Monday 46:15

monitor 17:8 36:5,9

monitored 17:9,23 40:18

monitoring 17:6,7 34:25

month 7:1,25 16:20

months 16:19 62:16 89:16

morning 17:7 34:6 50:12 57:8

Mortensen 2:2 3:3,7 4:7,8 8:14,18,20 29:3,6 41:2 57:3,5 60:11,16 62:1,3 68:7 75:13,19 77:9 80:10, 19 87:14,23 90:16 92:13, 22

mourning 22:6

move 7:2 66:8 84:14

movements 42:11

moving 6:25 84:25

multiple 79:12 85:15

**N**

name's 68:22

named 42:22

names 23:20

Nanette 40:5 47:9,11

narrow 70:24 74:14

national 49:14

nature 77:6

nausea 44:23 79:13 80:7, 16,22 81:9

needed 15:4 18:1 28:3 49:21 50:2 51:11 57:15 71:1,9 80:8 83:20

needing 53:13

night 21:15 34:6,7,12 39:18,21 45:1,4 46:3 48:4 53:3,7 54:1 56:12 64:3

nighttime 44:22

nods 5:12

Noelia 29:12 30:9

noise 39:22

nonverbal 70:9

normal 5:10 37:6 41:22 45:20 51:1 76:5

note 26:12,20 39:8 46:17 48:9 72:8,19 73:19,20

notes 82:23

noticed 18:18 71:20 83:19

notify 32:9,18 34:8,18

November 11:20

NP 9:18,21,23

number 12:20 57:2 72:16 82:25

numbers 24:3

nurse 9:10,23,24,25 11:11, 13 13:16 30:12 32:9,17 40:7 52:21 55:8 62:8 76:8 81:16 92:12

nurses 70:10

nursing 9:4,7 11:3,6,7,9 14:23 62:7

**O**

oath 4:11 6:11

object 26:14 27:21 28:25 32:13 37:4 54:12 67:13 68:9 70:13 75:13 77:9 87:14 88:14,25 91:25 92:13

objection 6:4 26:13 34:3, 13 47:23 55:18 64:7,24 68:7 80:10,19

objections 6:2 64:16 65:21,22 67:2

objective 36:4 42:9 45:21, 23,25 68:11 72:19,20 73:3 79:20,22 82:18

observation 31:18 36:22 47:9

observations 35:21 77:17 82:15

observe 71:14 72:4,21 82:20 83:9

observed 71:24 72:11 83:13,23

observing 37:23 55:11

obtaining 11:10

occupational 10:23

occurred 87:6

occurs 33:20

off-site 50:5

offended 5:10

offensive 5:15

offer 50:1

office 86:11

officer 19:3

open 38:24 40:3 60:8

opinion 61:8,21 64:22 65:14,18 75:11 89:12

opportunity 12:4 13:4 26:17

opposed 29:25 31:18

options 53:15

oral 20:4 83:4

orally 83:6

order 18:8 30:17 50:1,9

ordered 17:9 76:14

orders 70:9

Original 92:22

output 85:7

outreach 16:8 62:25

overheard 71:5

oxygen 80:2

**P**

p.m. 15:7 25:18,24 31:20 37:5 41:11 44:6,17 47:16 48:4,8,10 49:4,5 60:17,19 92:20

packet 23:25 29:4 72:15

pad 53:23 54:6,20,24

pads 54:8,17

pain 25:15 41:14 51:3 79:13 80:7,16,22 81:10 84:19 88:12 90:25 91:3

pale 41:15 73:8,19

Pallor 72:25 73:6

paper 68:10

parent 23:6

parents 22:9,12 76:13 77:1,13 90:6

Parkway 2:6

part 11:4,8 12:13 30:2,4 33:17 51:24 55:12 58:12 63:3,13,17 79:25 82:7

participate 20:7,11,12 74:19,21

pass 10:11 38:18 54:1

Pass-it-along 38:20,21 39:3

Pass-it-on 3:15 39:10,20

Pass-it-ons 39:5

passed 13:7 21:2 59:12 63:25 66:23 86:9,10

passes 12:21

passing 11:10 42:11

past 25:13

patient 36:6 54:19 67:24 70:14 78:16

patient/client 24:24

patients 70:3

pending 5:19

people 5:7 16:15 60:7 61:11 63:15 67:20 75:2 78:22 90:12

Pepto 43:22,24

perform 74:16,18

performed 33:2 37:16

period 26:11

peritonitis 81:5

person 33:25 69:10

personally 71:3 72:21 86:23

perspective 63:24

pharmacy 76:9

phlebotomist 11:1

phone 69:18 70:9 76:18,21

phrase 83:10

physically 81:25

physician 23:2 32:10,18

pink 24:10,12,16,20,23 25:3,9 26:5 27:14,24 28:20 30:3 31:19 91:1

place 63:20,22

plaintiffs 2:2 4:4

plan 34:25 42:14,15 45:18

planning 6:25

plans 10:2

Plasma 11:2

pleasant 91:10,11,16

plug-in 54:23 55:4

point 5:17 9:18 17:25 18:3, 18 19:6,10 22:5 30:19 41:25 44:20 50:22 71:12 83:18,19 84:8

police 19:2

policies 58:19 59:1 86:22, 24 88:24

popped 24:18

populates 32:24

portable 54:25

portion 48:9

Post 63:7 67:3

practice 9:24,25 12:8,12 16:6 43:20 82:7

practitioner 9:11,23

prefer 4:15

preparation 7:18 9:3

prepare 7:6

preparing 17:20,21 18:9

prepopulated 32:22 36:19

prescribe 10:1 30:15

prescribed 23:2

present 2:16 8:23 13:8 19:6 38:15 62:21

presentation 62:22

pressure 17:10 50:20,25 51:1 79:24

pretty 85:22

previous 21:18

previously 23:2 72:14

primarily 13:6

printed 24:2

prior 9:7 13:14 22:18,25 26:3,4 46:3 48:2 63:10 66:24 68:5 71:21 72:8 74:4,13 78:15 81:21 84:15, 19 89:14

PRN 45:19

procedures 58:20 59:1 86:22,24 88:24

process 13:17 20:11

produced 8:16

profession 31:13

professionally 61:9

program 9:5 13:10,11 26:22 64:2

programming 54:15 58:1 74:24 75:7

Properties 2:6

protect 6:6

protocol 17:14,20 33:17, 18 34:8 43:1 45:16 58:12, 14 64:1,4,22 65:14,19,24 66:7,11,12,13,15,18 89:8

protocols 65:3 75:12

provide 54:21 65:5

provided 52:22 83:16 92:9

provider 70:10 76:14

psychiatric 9:10 12:3

Pugh 24:17 25:9,18,21 28:8,10

pulse 18:20

put 4:24 6:3 24:21 25:9 32:19 34:5 91:9

---

**Q**

qualified 89:7

Quest 49:14 50:1

question 5:3,5,19,22,25 7:16 25:19 39:24 41:5 56:19 65:8,10,13 67:12

72:24 76:4 79:8 80:14 92:8

questions 19:7 25:4 60:12 68:16 69:2,4 75:18,25 76:1 82:4 83:13 85:11 86:14 87:20 90:20 92:2

quick 4:22 39:5 72:23 76:4

---

**R**

Rachel 55:15

ran 51:15 68:13

Ranch 2:5 3:17 11:4,23 12:6,10 13:10,14,22 14:19 19:15 20:17 22:25 23:1 28:2 39:4 43:3 52:4,22 54:10 55:9 56:23 59:1 60:8 68:23 70:1 71:7 77:5 86:6, 12,18 87:1 88:20 90:5,13

range 51:2 69:7,8

rate 37:9 50:24 80:1

rated 41:13

reach 16:5 34:18

reached 17:16

reaching 51:9

read 38:23 92:17

reading 26:5 34:5 36:15 37:11 48:7 57:11 92:23

ready 17:11

realized 24:1

realtime 46:23

reasons 14:4 90:12

recall 10:12 11:21 17:4 21:19,20 22:20 23:12,15, 17 24:6 26:24 30:22 35:2, 15,19 36:20 38:16 39:16, 17 41:8 42:19,21 44:4 50:15,20 51:18 59:13 68:1 69:24 73:24 78:14

received 39:14 61:17

receiving 39:16,17

Recess 60:18

recollection 71:22 74:6 91:4,22

record 4:12 5:16 6:3,6 24:21 32:23 51:7 60:17,19 68:19

records 3:14 23:25 24:2 61:16 68:3 81:23

recover 36:9

REES 2:11

refer 37:8 82:22

referring 40:6 43:12 46:18 48:1 83:25

refills 76:10

refresh 8:3

regard 87:3

Regional 11:16

registered 9:25 11:11,13 13:16 30:12 52:21 55:8 62:8 76:8 92:12

regular 85:22

rehydrate 83:6

relationship 9:1 61:4 76:17 77:3,16 90:10

relationships 76:25

relied 66:4

relieved 19:3

rely 27:15 55:9

remember 10:8 12:21 13:24 19:25 20:5,6 21:3,19 28:18 30:22 33:11 35:15 44:14 46:25 50:15,19 51:14 52:12 53:25 54:18 55:3 56:24 59:16,23 60:2,4 68:15 69:15,19 71:17 72:6, 8 74:3,5,9 78:2,7,9,13 79:14 80:13 84:13,18 85:2, 9,10 86:7 88:2,3 91:8,14, 24

remind 5:9

RENCHER 2:14

reopen 60:7

rephrase 5:24

replayed 21:15

report 14:12 44:25 45:9, 10,16 55:10,13 64:12 66:6, 16,17 74:23 75:1

reported 36:5 39:9 42:18, 19 46:3 59:8 66:10

reporter 4:23

reporting 25:13 29:14 33:7,22 45:5,7 64:4 65:25 75:12

reports 50:12 75:3

represent 4:9 60:23 68:22 75:25

request 24:10 26:2 43:22

requested 92:18

requests 30:4

reside 6:18,23

respect 61:14,22 62:15 64:19

respective 64:12

respiratory 80:1

responding 18:19

response 18:21

responsibilities 30:3

responsible 13:9

rest 17:22 34:25 36:8 84:11

restroom 5:20

result 50:4

results 49:16,25 59:25

return 45:19

returned 11:12 43:22 45:21 62:8

review 8:11 19:23 24:19, 23 25:6 26:20 27:5,13 81:23

reviewed 7:18,21 38:3 73:18

Ricky 67:6 89:12 90:3

ride 18:14

River 2:6

RN 9:22 10:3,9 11:18 88:20

role 13:17 16:14 30:5,6 32:5

roll 84:18

rolling 85:1

room 41:13 78:17,20 80:9, 17

route 30:11

routed 24:22 26:20 28:16, 17,21,23 29:22,24 31:5 47:5

routes 27:2

routine 85:22

routing 26:21

rules 4:22

---

**S**

safe 81:7

Salt 2:4,13,15

Samara 29:15,19

Samara's 29:17

same-day 49:19,21,25

Sandy 2:10

sat 18:2

saturation 80:2

Saturday 38:12,14

Savannah 50:10

scene 19:3,24

schedule 32:1 38:16

scheduled 15:1,4

Schiel 2:14 3:6 28:25 29:5 37:4 40:25 41:4 55:22,24 57:1,4 60:14 64:10 68:9 75:21,23,24 87:20 88:14, 25

school 8:23,24 9:4,5 10:19,25 11:3,9 21:12 58:2 62:8 86:3,22

scope 9:25 16:6 82:7

SCULLY 2:11

section 72:20 73:10

sees 33:14

seldom 86:4

self-harm 62:19 87:25 88:6

self-reported 59:8

seminars 88:22

send 18:8 39:5 49:16 70:20 79:10 83:20 90:13

sending 80:17 83:5

sense 30:11 36:2 76:16 77:7 83:24

sentence 72:24

sepsis 67:22,25 68:2,5 81:3 82:5,6,8,10,14,16,19 88:10

service 21:13 49:15

services 11:2 19:5 20:10, 15

set 9:15 17:13 37:7

she'd 22:25 42:1,4 54:2

shift 14:14 17:12

shock 19:1

short 62:7

shortly 19:5

show 5:13 53:17

showering 57:9

shows 25:17

shut 83:10

sick 21:18 34:24 36:7,8,10 37:23 38:4 57:16 84:3,23 90:1

sickbay 31:17 35:21 36:16 47:8

sicker 18:4

sign 27:6 28:20 36:5 44:5 92:17

signature 92:18

signed 25:17,20,23 31:22 35:6,9,16 44:9 47:16 48:3 73:14 81:24

signify 32:12

signs 37:12,13 40:15 42:9

similar 32:4 81:13

single 75:1

sir 4:8 56:21

sit 18:1 74:8 88:5

situation 12:12 22:7 79:2 81:15

situations 65:6 67:16

six-day 26:10 27:4

SKELTON 2:5

sleep 21:14

sleeping 25:16

slightly 37:9 48:16

slip 24:10,13,16,20 25:9 26:5 27:24 30:3 31:19 91:1

slips 24:23 25:3 27:14 28:20

smell 91:9

smelled 54:5

someone's 48:22

sounds 41:13 42:10 63:20 80:6,15 85:21 87:3

South 2:3,7,9,12,15 6:16

spasms 78:4

speak 58:5 85:12 86:2,5

speaking 4:25

specific 13:21 16:25 26:20 53:10 67:9 69:3 70:8,11 91:24

specifically 69:14,24

specifics 13:24 91:15

speculate 42:8 56:2

speculation 27:22 34:15 43:11 54:22 55:18 64:8,25 66:25 77:10

spend 14:19 39:20

spent 15:24

spoke 85:17

spoken 22:17

spouse 6:19

Springs 2:6

St 6:17 11:16 31:11

staff 17:13,14,20 18:25 20:22 21:16 24:17 26:11, 18 27:16 29:15 33:7,12,14, 22,23 34:6,7,8,12 36:23,25 40:7 41:13 42:18,19,22,23 43:23 45:1,4,6,7 46:5 50:10,12 52:24 54:4 55:9, 14 56:17 59:2,6,8 62:15 64:1,2,3,6,23 65:25 66:4, 20 71:9 74:17,23,25 75:3,7 78:23

stamp 49:9

standard 92:11

started 11:3 18:24 48:10 61:5 72:5 84:6

starting 11:19 25:14 71:19

stat 49:25

state 4:12 9:3,5 10:7 20:8

statement 7:25 8:1,8

statements 20:1,13 77:15

stay 7:4

stayed 19:6

step 5:20

sticks 37:12

stipulations 58:5

stocked 76:11

stomach 41:14,18 44:24 80:7

stood 17:24

stop 83:12

stopped 18:18

story 56:5,10

strained 76:25 77:3,16

Street 2:3

stressful 12:5,7

strike 24:6 66:8

STRONG 2:8

student 16:2 17:19 33:24 36:24 42:18,24 43:21 45:18,21 47:21 48:11,12 49:2 50:2,10 51:11 59:3,7 66:16 78:23 79:4

student's 76:6

students 13:18 17:15 27:15 36:7 54:5 57:14,23 59:2 64:5 76:25 79:12 80:21 81:8,9,11 85:19 88:15 90:5,9

students' 23:20

stuffed 54:3

subjective 46:4 55:13 66:5,17 73:10,20

submitted 34:24 92:23

suite 2:3,6,9,12 18:2,16 36:12

summary 50:8

supervisor 14:15 61:6 64:13

supervisors 34:18

support 18:22

supposed 42:24 58:18

surrounding 90:2

sworn 4:4

symptom 66:5 73:3 88:9

symptoms 36:5 45:20 68:5,11 79:20,22 80:22 82:2

system 24:18 25:10 27:2 32:21 47:3,6

**T**

takes 48:19

taking 4:23 17:24 25:16 68:23 92:19

talk 5:5,11,18 7:9 52:10 53:7 56:12 57:15 68:24 84:2 85:24 86:16

talked 7:14 20:20 51:23 52:2 62:3 77:24

talking 7:7 26:6,7,8 64:1 79:23 84:16

tape 20:4

tasks 32:2

Taylor 12:14,18 16:22 19:11 21:1,18,25 22:6,24 23:3,16,21 24:11,15 25:13 26:2 30:20 33:24 36:8 37:21 38:10 39:9 46:13 50:10 52:3,23 53:7,22 56:14,15,16 57:3,8 59:11 61:15,23 62:17 63:7,25 64:20 66:22 68:4,5 69:10, 18,22,24 70:20 71:1,9,14 74:17,25 76:17 77:1,12 81:14 87:11,25 90:24 92:10

Taylor's 22:9,12,21 44:19 63:10 76:3 81:15 82:11 86:7 87:3 89:14,19,23 90:2 91:5,12

team 34:19

tech 27:19 28:1 32:3

technician 11:4,8 18:5 28:7,11 29:13 32:5 47:12 62:6

technicians 15:11

techniques 89:6

telling 65:17

Temple 2:12

test 49:22 50:3,4

testified 4:5 16:7

testimony 6:10 69:2 72:10 73:24

testing 49:16

text 7:24 16:8,16,17 35:17 52:16 53:18 62:25 63:16, 22 67:4 69:21,25 70:2,14

texting 70:22

texts 55:6

then-dixie 9:3

thicker 72:15

thing 34:9

things 10:3 12:23 32:4 55:10 58:4 67:16 76:1

79:25 92:14

**Thompson** 2:11 3:4 55:21,23 60:21,23 68:16

**thought** 54:20

**thread** 16:8,16,18 63:22

**threatening** 88:6

**throw** 46:10

**throwing** 43:19 52:24

**tied** 45:17 55:2 57:25

**time** 5:11,17 9:19 11:4,9 13:24 14:24 17:2,3,11 19:10 21:4 22:22 23:15 26:18 28:20 30:20 37:11 39:20 41:18,25 42:8,9 44:4,20 49:7,9,10 50:14,23 52:4,18 55:25 57:15 59:3, 13 63:2,24 68:12,24 69:16, 22 70:25 71:8 74:15,17 75:8 78:10 79:12 81:25 84:6 85:13 86:6,15 87:21 90:22,25

**Time/observation** 48:8

**times** 15:6 36:24 66:2 85:15

**today** 6:11 7:7,10 8:11 26:6 46:21 61:16 68:24 74:8 88:5,8

**told** 7:10 46:7

**top** 40:4 88:3

**tough** 67:12

**trail** 68:10

**train** 88:24

**trained** 82:5

**training** 88:19,22

**trainings** 89:4,6

**transcript** 5:13 92:22,23

**transfer** 17:20,22 18:9

**transferred** 9:2,8

**transport** 51:11 84:10

**Transported** 43:2

**traumatic** 20:23

**treat** 38:10

**treated** 40:17 67:24 87:25

**treatment** 10:1 61:14,17, 23 64:20 65:5 92:10

**trial** 6:7

**Trish** 2:17

**trouble** 25:15

**true** 64:14 70:22 73:11 90:4

**turn** 29:2 30:23 31:16 32:7 33:1 35:20 37:14

**turned** 24:11,16 31:19

**Turning** 51:6

**two-person** 18:6

**Tylenol** 34:24 48:6

**type** 21:10

**typical** 38:15 73:8 74:24

**typically** 15:17 27:13

---

**U**

**Uh-huh** 32:11 73:1 84:12

**Uh-huhs** 5:12

**ultimately** 79:3 83:18

**underneath** 14:9,10

**understand** 5:22 6:7,10, 13 7:16 22:4 67:11 82:12 83:22

**understanding** 33:13 58:25 62:10 65:15 68:2,3, 14 79:11

**understood** 33:19 70:17

**unit** 12:3 40:8 47:14

**University** 8:25 9:3,5,9

**UNLV** 9:7

**unmute** 55:25

**unstable** 81:25 82:3

**urgent** 27:14,17,19,23 28:6 49:23

**urinalysis** 59:10 73:24 74:2,7,10 85:5

**urine** 85:7

**Utah** 2:4,7,10,13,15 6:17 7:4 20:8

**utilized** 62:25 63:1

---

**V**

**vaguely** 53:24

**variable** 37:10

**variables** 42:7

**varied** 15:3 25:4 27:7

**varies** 79:7

**vary** 27:25

**verbatim** 4:23

**versus** 66:10

**visit** 35:2

**Vistaril** 47:18

**vital** 36:5 37:12,13 40:15

**vitals** 17:10 37:3,6,8 41:20, 22 48:13,15,19 50:21,22

**vomit** 18:11 33:14 34:2 42:18,24 50:12,17,18 51:18 66:10,15 73:21

**vomited** 40:16 44:22 45:1 50:11 51:13 88:16

**vomiting** 21:25 30:20 36:3 39:11 40:12 41:12 42:1,4 45:25 48:23 73:11 79:14 80:7,16,22 81:9 84:4 88:9, 16

**vomits** 59:4 66:1

---

**W**

**W-2** 14:16

**Wade** 4:22

**wait** 5:2,4

**walk** 84:5,17

**walking** 84:6

**wanted** 12:2 19:23 22:24 47:2 77:20 92:7

**wanting** 25:4 77:4

**warrant** 79:21 80:17

**warranted** 24:25 25:1

**Warren** 4:13

**Washington** 7:3

**water** 55:1 83:2

**ways** 39:6

**weak** 18:10 84:8

**week** 12:19 14:18 15:25 21:18,25 25:13 27:7,8 42:15 59:11 64:21 66:22 74:13 85:19

**weekend** 27:12

**weeks** 86:8 87:11

**weight** 48:17,20,22

**West** 2:12

**what-ifs** 56:2,7

**wheelchair** 18:12,13,17 51:10 72:7

**whereabouts** 36:24

**white** 39:22

**wife** 6:19 7:11 9:1 20:22

**Wiley** 2:11 14:6,10 16:7 28:17 35:10 44:8 46:18 60:23,24 61:4 73:14

**Wiley's** 61:8

**window** 69:16 70:25 71:8 75:7 90:22,25

**witnessed** 45:8 65:25 66:9

**wondering** 27:4

**work** 11:15 14:23 26:21 31:14 46:15 47:13 62:2,23 67:15 76:9 89:8

**worked** 11:3,10 53:15

**working** 12:1,2 70:1 88:20

**worries** 56:1

**worsen** 45:20

**Worwood** 2:14,16 14:6 28:22 42:14 75:25 79:10 85:12 86:8,11,18,21 87:4, 17 88:23

**write** 73:4

**written** 20:4

**wrong** 38:8

---

**Y**

**year** 9:16 10:18,20 11:24 22:17

**years** 8:25 61:2,3,7 62:9

**Young** 8:25

---

**Z**

**Zhena** 42:20

**Zofran** 47:18,19,20