GOODRIDGE

vs

DIAMOND RANCH ACADEMY, INC.

DANNY WORWOOD, M.D.

June 04, 2024



250 E 200 S. Suite 350
Salt Lake City, Utah 84111

Phone 801-328-1188
scheduling@depomaxmerit.com

GOODRIDGE vs DIAMOND RANCH ACADEMY, INC.
June 04, 2024                                      Danny Worwood, M.D.

1

IN THE UNITED STATES DISTRICT COURT
FOR DISTRICT OF UTAH COUNTY, CENTRAL DIVISION

* * *

DEAN JEFFRIES L.                )
GOODRIDGE, Individually         )
and as the Natural Father       )   CASE NO.
and Personal                    )   4:22-cv-000102-DN-PK
Representative of the           )
Estate of TAYLOR                )   DEPOSITION OF:
GOODRIDGE, Deceased, and        )   DANNY WORWOOD, M.D.
AMBERLYNN WIGTION,              )   (Via Zoom)
INDIVIDUALLY and as the         )
Natural Mother of TAYLOR        )   WITNESS LOCATION:
GOODRIDGE, Deceased,            )   Hurricane, Utah
                                )
Plaintiffs,                     )
                                )
        vs.                     )
                                )
DIAMOND RANCH ACADEMY,          )
INC.; a Utah Corporation;       )
BIG SPRINGS PROPERTIES,         )
LLC, a Utah limited             )
liability company; DANNY        )
WORWOOD, M.D., a resident       )
of Utah; BROOKS WILEY,          )
FPMHNP-BC, a resident of        )
Utah; and CAMERON HUGHES,       )
R.N., a resident of Utah,       )
                                )
Defendants.                     )

* * *

June 4, 2024
9:02 a.m.

* * *

Via Remote Zoom Connection

* * *

Amber Park (Via Zoom)
- Certified Court Reporter -
- Registered Professional Reporter -



**2**

```
              A P P E A R A N C E S
For the Plaintiffs:
        ALAN W. MORTENSEN
        (Via Zoom)
        MORTENSEN & MILNE
        68 South Main Street
        Floor 7
        Salt Lake City, Utah 84101

For Defendant Danny Worwood, MD:
        CAMI SCHIEL
        (Via Zoom)
        RENCHER ANJEWIERDEN
        460 South 400 East
        Salt Lake City, Utah 84111

For Defendants Diamond Ranch Academy and Big Springs
Properties:
        BRYSON R. BROWN
        (Via Zoom)
        JONES SKELTON & HOCHULI
        10813 South River Front Parkway
        Suite 230
        South Jordan, Utah 84095

For Defendant Cameron Hughes, RN:
        MICHAEL L. FORD
        (Via Zoom)
        STRONG & HANNI
        9350 South 150 East
        Suite 820
        Sandy, Utah 84070

For Defendant Brooks Wiley, FPMHNP-BC:
        KYLE C. THOMPSON
        (Via Zoom)
        GORDON REES SCULLEY MANSUKHANI
        15 West South Temple
        Suite 1600
        Salt Lake City, Utah 84101
```

**3**

```
Also present:
        Lance Harrison- Videographer
        (Via Zoom)
        Trish Brutka-Curi (Via Zoom)

                  * * *

              I N D E X
```

| EXAMINATION | PAGE |
| --- | --- |
| Examination by Mr. Mortensen | 4 |
| Examination by Mr. Thompson | 67 |
| Examination by Mr. Brown | 69 |
| Further Examination by Mr. Mortensen | 80 |
| Examination by Ms. Schiel | 81 |
| Further Examination by Mr. Mortensen | 85 |
| Further Examination by Mr. Brown | 89 |
| Further Examination by Mr. Mortensen | 90 |

**4**

Tuesday, June 4, 2024:  9:02 a.m.

P R O C E E D I N G S

DANNY WORWOOD, M.D.,

called as a witness, having been duly sworn, was examined and testified as follows:

EXAMINATION

BY MR. MORTENSEN:

Q    Good morning, Doctor.  Now that you've been placed under oath, would you state your name for the record?

A    Yes.  My name is Danny K. Worwood.

Q    And do you mind if I call you Doctor or would you prefer Danny or Mr. Worwood?

A    Doctor or Danny would be fine.

Q    Okay.  Thank you. Doctor, have you ever had your deposition taken before?

A    Yes, I have.

Q    How many times?

A    Two.

Q    Okay.  Have you ever had your deposition taken before where you were a party to the lawsuit as opposed to a witness?

A    No, I have not.

Q    Okay.  But you generally understand how

**5**

this process works where we will be asking you questions under oath and you have an obligation to answer truthfully, correct?

A    Yes, I do understand.

Q    Okay.  Especially because we're on Zoom, I would just like to go over a few ground rules.  I would ask for you to wait for me to finish a question before you answer so that we're not speaking over each other.  And that way Amber doesn't have to try to take down verbatim two people at the same time.  Likewise, I'll try to wait for you to finish an answer before I ask another question.  Sometimes I violate that rule, and Amber will remind me if I do.

If at any point in time you want to take a break, please let us know.  If you want to talk to your counsel, please let us know.  As long as there's not a question pending, we can accommodate any breaks you need to make.

Uh-huhs and huh-uhs and nods of the head don't show up very well on the transcript or on video, so if I ask you to say "yes" or "no" or to give an audible answer, it's not because I'm trying to be a jerk or anything like that, it's just so that we have a clean record.  Because sometimes it's -- our patterns of speech in a deposition are a little bit

6

awkward, so I apologize for that.

Doctor, what have you done to prepare for your deposition today apart from speaking with your attorneys? I don't want to know what you spoke to them about but what have you done as far as preparing?

A    I've reviewed the autopsy report and I've reviewed my notes pertaining to Taylor Goodridge, as well as the notes in the weeks preceding her death.

Q    And when you say "notes," are those the medical records that are -- that have been provided in your initial disclosures in this case as opposed to handwritten notes?

A    Yes.  Those are the notes that were kept by the medical staff at Diamond Ranch Academy.

Q    Okay.  Any other documents that you've reviewed?

A    Not that I recall.

Q    Doctor, can you just give me a brief summary of your educational background?

A    Yes.  I graduated from high school, I completed my undergraduate degree in chemistry at Brigham Young University.  I attended the Uniform Services University of Health Sciences in Bethesda, Maryland -- it's the F. Edward Herbert School of Medicine -- where I obtained my medical degree.  And

7

then I completed a residency in family medicine at Fort Belvoir, Virginia.

Q    When did you graduate from high school?

A    1981.

Q    And what high school?

A    Richfield High School in Richfield, Utah.

Q    Okay.  So fair to say that you grew up in Richfield?

A    That's where I spent my formative years, yes.

Q    And then you went to BYU and then you went to the Uniformed Services Military Medical School?

A    In Bethesda, that's correct.

Q    And that's in Bethesda?

A    Correct.

Q    And where did you do your residency again?

A    Fort Belvoir, Virginia.

Q    And when did you finish your residency?

A    In 1996.

Q    And since finishing your residency in 1996 -- well, first of all, you're a board certified family practitioner?

A    Yes, I am.

Q    Since finishing your residency, where have you -- where have you practiced medicine?

8

A    I was in the military, so I -- the first few years I traveled around a lot.  My first duty station was in Fort Irwin, California.  From there I went to Tripler Armory Medical Center in Hawaii where I was part of the residency faculty.  From there I went -- I was affiliated with the Office of the Army Surgeon General and lived in Colorado Springs, Colorado, but most of my time was -- during that period was spent in Washington, DC, and traveling around to different Army bases.  From there I exited the military and came to Hurricane, Utah, in 2003 where I've practiced since.

Q    And you have a -- do you have a family medical practice there in Hurricane?

A    I did --

Q    Okay.

A    -- for 16 years, and then a few more years in St. George in a medical clinic there.  But I'm now retired as of April of last year.

Q    And are you retired from the practice of medicine or you're retired from all types of employment?

A    I'm retired from clinical medicine, but I'm still the medical director of a hospice organization and I teach at the medical school at

9

Rocky Vista University in Ivins, Utah.

Q    And you retired from your medical practice in April -- did you say April of 2023?

A    Yes.  Correct.

Q    And did your retirement have to do with this lawsuit at all?

A    In all honesty, it was part of the impetus for me to retire.  But I would have retired anyway in the next few years.

Q    Okay.  So the lawsuit maybe sped up the process a little bit or made things more clear in your mind of what you wanted to do?

A    Yeah.  I felt like I no longer wanted to take the risk of practicing medicine and being responsible for the health of my patients.  I found it more and more difficult to see patients because I felt that they were putting the responsibility of their health on me, and I wanted them to take responsibility for their own health.

Q    And was that something that changed after the lawsuit or was that something that you've noticed kind of a change in the culture as you've progressed in your practice?

A    The latter of the two.

Q    Okay.  Have you ever -- have you ever been

10

sued before prior to this lawsuit?

A   No, I have not.

Q   Okay.  Have there been any -- has your license ever been suspended or revoked or put on probation in any way?

A   No.  Never.

Q   Now it's my understanding that you were the medical director at Diamond Ranch Academy back in 2021 to '22, is that correct?

MS. SCHIEL:  I'll just object to facts not in evidence.

MR. MORTENSEN:  Sometimes there will be some objections and don't be taken back by those. Your counsel's just protecting the record and there's nothing inappropriate about that.  Unless she tells you not to answer, I still would request that you provide an answer to the question.

THE WITNESS:  I was never contracted to be the medical director at Diamond Ranch Academy.

(BY MR. MORTENSEN)

Q   Okay.  So when -- you were never contracted to be the -- what does that mean?

A   I mean, I was never asked to be the medical director, I never signed a contract stating that I was the medical director, I was never paid a

11

stipend as the medical director of Diamond Ranch Academy.

Q   You've seen where you've been listed as the medical director of Diamond Ranch Academy on some --

A   Yes.

Q   -- of their literature?

A   Yes, I have.

Q   How did that -- how did you become listed as the medical director of Diamond Ranch Academy?

MS. SCHIEL:  I'll just object to foundation.

(BY MR. MORTENSEN)

Q   To the extent you know.

A   I don't know.

Q   Okay.  Did you ever give permission to Diamond Ranch Academy to list you as the medical director?

A   No, I did not.

Q   Did you ever see you being listed on the web page of Diamond Ranch Academy as the medical director prior to Taylor Goodridge's death?

A   Yes, I did.

Q   And did you talk to anyone about that?

A   No, I did not.

12

Q   And why not?

A   I didn't feel that my name on a website was important enough for me to contest it.

Q   Is it fair to say that you didn't agree with that, though, that you were a paid medical director of the Diamond Ranch Academy?

A   I never saw myself as the medical director of Diamond Ranch Academy.

Q   Did you ever work with Diamond Ranch Academy in putting together policies and procedures for the medical care of the students there?

A   No, I did not.

Q   How did you become involved with the Diamond Ranch Academy?

A   I had a patient that was a nurse at Diamond Ranch Academy and she said that there was an opening for a physician to see patients through Diamond Ranch Academy.  She put me in contact with the then director who agreed for me to see students at Diamond Ranch.

Q   Who was the director that you dealt with at Diamond Ranch Academy?

A   His first name was Fotu, I don't remember his last name.

Q   And who was the patient that was a nurse?

13

And I'll agree for purposes of the deposition that we will not release her name in any way -- his or her name in any way.

(Answer protected per agreement of the parties.)

June 04, 2024

GOODRIDGE vs DIAMOND RANCH ACADEMY, INC.
Danny Worwood, M.D.



**14**

THE WITNESS: I remember her first name was Carma, but I don't remember her last name.

**15**

MR. MORTENSEN: Okay.

MS. SCHIEL: I just want to be careful that that stays confidential and privileged here.

MR. MORTENSEN: Absolutely. It's your patient and we will respect the HIPAA rights of your patient so... It's more so that if I wanted to track her down, I can make efforts on my end to do that so I appreciate that.

(BY MR. MORTENSEN)

Q When did you start being involved with the Diamond Ranch Academy?

A I don't believe -- I don't know the exact year, but I think it was around 2008.

Q And is it fair to say that you had involvement with Diamond Ranch Academy from 2008 until April of 2023?

A Yes.

Q And what was the -- what was the working relationship between you and Diamond Ranch Academy?

MS. SCHIEL: Just object to form.

THE WITNESS: I was asked to see the students at the medical space that they had for their admission physicals, their sports participation physicals, and to see them for any subacute problems that came up while they were at Diamond Ranch Academy.

**16**

So, like, a acute care or subacute care clinic for sprained ankles, rashes, menstrual abnormalities, management of their medications.

(BY MR. MORTENSEN)

Q And just for the jury, what does -- what's the difference between acute care and subacute care?

A Acute care is something that needs to be seen in a relatively expedited situation, something that needs to be taken care of within 72 hours. Subacute are things -- problems that are ongoing that while they need to see a physician or seek a physician's consultation, it doesn't have to be done in a certain time frame. Maybe in a -- within a week or two.

Q Okay. And so did you view you being over or in charge of the acute care of the students there?

A No. It was a shared responsibility between me and a PA or a nurse practitioner.

Q And did you personally have any employees at the Diamond Ranch Academy?

A No, I did not.

Q Would the medical providers there at the Diamond Ranch Academy, either the physician assistant or nurse, would they be employed by the Diamond Ranch Academy as opposed by you?

**17**

MS. SCHIEL: Just object to foundation.

MR. BROWN: Join.

THE WITNESS: Can you repeat the question?

(BY MR. MORTENSEN)

Q Sure. Would the PAs that you worked with or the nurse practitioners that you worked with at Diamond Ranch Academy, would they be employed by you?

A No, they were not employed by me.

Q Do you know who they were employed by?

MR. BROWN: Foundation.

MS. SCHIEL: Join.

THE WITNESS: The first PA that I worked with, Dennis Mitchell, he, I believe, was contracted as well, just like I was. And then later with Brooks Wiley, I believe he was an employee of Diamond Ranch Academy.

(BY MR. MORTENSEN)

Q Did you ever have any written agreements between you or your -- any of your businesses and the Diamond Ranch Academy, written agreements?

A When I first started at Diamond Ranch Academy, I had to get permission from my employer to be able to practice there. And initially my medical liability was covered by my employer as part of that, and so there was a written agreement that for the

patients that I saw at Diamond Ranch Academy, that Intermountain Health would cover my medical liability as long as the payments were sent to them, and then they would take off the top a small fee to cover my medical liability and then pay me out on my Intermountain Healthcare paycheck. Eventually they no longer wanted to manage that responsibility so I obtained my own liability insurance through UMIA and paid for that out of my personal account in order to continue practicing for the little bit of time that I spent at Diamond Ranch Academy.

Q   And when you say a little bit of time, how much time in a month would you spend at Diamond Ranch Academy?

A   It varied from four to ten hours per month.

Q   And were there set days that you would be there or would you be on call?

A   There were set days. I would go there on Wednesdays every other week, and then the week that I wasn't there, the students were seen in the clinic either by the PA, Dennis Mitchell, or by Brooks Wiley.

Q   How were you paid by Diamond Ranch Academy? Were you paid -- well, strike that.
    Did Diamond Ranch Academy pay you directly

or did you bill the insurance or the -- or whoever the self payers were when you would provide services to Diamond Ranch Academy students?

A   I was paid directly by Diamond Ranch Academy on a 1099.

Q   And in the -- let's say within the past five years prior to 2023 -- or including and back 2023 -- how much of your income would be derived from your work at Diamond Ranch Academy?

MS. SCHIEL: Just object to form.

THE WITNESS: Just under 10 percent of my annual income was from Diamond Ranch.

(BY MR. MORTENSEN)

Q   Did -- were there any policies or procedures about what to do if someone was in an acute situation? Would they call you?

MS. SCHIEL: I'll just object to foundation.

MR. MORTENSEN: Let me start it again.

(BY MR. MORTENSEN)

Q   If there was a student that had an acute medical situation, what was the protocol to be followed in addressing that situation?

MS. SCHIEL: I'll just object to foundation and form.

MR. BROWN: I'll join.

THE WITNESS: I'm not aware of any specific policy, written policy, but when I was working with Brooks Wiley, because we had a social relationship outside of Diamond Ranch Academy, he felt comfortable and I felt comfortable with him calling me if he had questions about acute problems that I wasn't going to be able to see that week or it was too far away in time for me to see them in a reasonable time frame. He would either text or call me.

(BY MR. MORTENSEN)

Q   Okay. And did you ever have any situations where Mr. Wiley would either text or call you and you would go out to Diamond Ranch Academy to address a student's problems, medical problems?

A   Yes.

Q   And how often would that occur?

A   There was no set pattern, but on average it was probably maybe two times a month.

Q   Okay. So it wasn't out of the ordinary that Diamond Ranch Academy would call with a student's medical situation and you would go out to the Diamond Ranch Academy?

A   It wasn't out of the ordinary for Brooks to call me or text me.

Q   All right. Was there a different procedure for people that were not Brooks Wiley?

A   I don't remember ever being contacted by people outside of Brooks Wiley.

Q   Okay. And do you recall any of the situations that Brooks called you about -- or Mr. Wiley called you about that you would run out and treat or look at a student at Diamond Ranch Academy?

A   There were no times when Brooks texted or called me that I made a -- that I would make a special visit to Diamond Ranch Academy to assess. There were times where I was working in the acute care clinic or in my family practice that I would recommend that they bring the student in to see me in my clinic.

Q   Okay. And it would be Diamond Ranch Academy that would bring the student to your clinic?

A   There were times when they were transported by Diamond Ranch Academy and there were times when they were transported by their family.

Q   Were there any times that Mr. Wiley would call you and you would tell him that they should take the student to either an emergent care or a hospital ER?

A   Yes.

Q   How many times did that happen?

22

A    I don't remember an exact number, but I would estimate maybe five to ten times.

Q    And over how much time would those five to ten times be?

A    Over three to five years.

Q    And that would have occurred all with Mr. Wiley, is that correct?

A    Yes.

Q    Do you have any independent memory of Taylor Goodridge?

A    Yes, I do.

Q    And I've seen a couple of notes where you saw her. Do you have a memory of those or would your memory be based upon your review of the notes?

A    My memory is based on the review of the notes.

Q    Okay. It's fair to say that there's no independent recollection apart from your review of the notes?

A    Correct.

Q    Based upon your review of the notes, up until the time that she had her catastrophic situation, would you agree that Taylor was a healthy kid?

MS. SCHIEL:  Just object to form.

23

MR. BROWN:  Join.

THE WITNESS:  I think that by virtue of her being at Diamond Ranch that she had health and mental issues at baseline.

(BY MR. MORTENSEN)

Q    Okay. So the fact that -- her -- the health conditions and the mental health conditions you're referring to are the ones that qualified her to be in the Diamond Ranch Academy in the first place, correct?

A    Yes.

Q    She had no -- she didn't present at Diamond Ranch Academy with any -- any situations -- or long-term situations that would cause her life to be at risk in any way?

MR. BROWN:  I'll object to the form and foundation.

MS. SCHIEL:  Join.

THE WITNESS:  My first interaction with Taylor was when she initially came to Diamond Ranch and had been put on medication prophylaxis to prevent an HIV infection, because she had potential exposures prior to coming to Diamond Ranch where her provider felt that she needed the HIV prophylaxis.

(BY MR. MORTENSEN)

24

Q    So that would be the -- the HIV prophylactics would -- would have been a situation that you viewed her risky behavior may be putting her long-term health at issue?

MS. SCHIEL:  Just object to form and foundation.

THE WITNESS:  It was definitely a possibility because of her potential exposures.

(BY MR. MORTENSEN)

Q    Okay. Just a second here. Sorry, I'm trying to pull up a document here.

What training, if any, did Diamond Ranch Academy provide to you in how to deal with these troubled teens?

A    I received no formal training from Diamond Ranch Academy.

Q    Were you aware of any kind of, like, bill of rights that these students would have?

A    No, I am not.

Q    Did you work for any other troubled teen industry schools, boarding schools, congregate care facilities apart from Diamond Ranch Academy?

A    No, I did not.

Q    And had -- before you worked for Diamond Ranch Academy -- or before you provided medical

25

services to Diamond Ranch Academy, did you provide any care to other congregate care facilities?

A    I'd like clarification on what you mean by congregate care.

Q    Let me take the military off of the table because I can see that that -- some of that could be potentially under that definition.

Did you ever work for any other schools similar to Diamond Ranch Academy?

A    No, I did not. May I make a correction?

Q    Of course you can.

A    In my position in an acute care clinic, there were times that I saw students from other facilities. But I was never paid directly by those facilities.

Q    Okay. There's quite a few there in the Hurricane area, is that correct?

MS. SCHIEL:  Just object to foundation.

THE WITNESS:  I don't know what's meant by "quite a few," but I'm aware of five or six in the local area.

(BY MR. MORTENSEN)

Q    Okay. So let me share my screen here. Can you see this document, Doctor, the residential treatment center policies and procedures manual?

26

A   Yes, I can.

Q   Had you ever been provided a copy of this by Diamond Ranch Academy?

A   Not to my recall, no.

Q   Okay.  Let me come down to some of the services provided list in this policy and procedures manual.  It says services provided, residential treatment, individual, group, family therapy, equine assisted therapy, psychological assessments, parental support, and then it gets down to (j), on-site medical care.  Do you see that?

A   Yes, I do.

Q   You understood, did you not, that Diamond Ranch Academy was advertising that it offered on-site medical care?

MS. SCHIEL:  Just object to form and foundation.

THE WITNESS:  Yes.

(BY MR. MORTENSEN)

Q   Let me show you -- Doctor, this is a -- this is a screenshot of Diamond Ranch's Academy's web page shortly after Taylor passed.  Here it says, "On behalf of the Medical Department" -- and then it goes on to say -- kind of give -- it gives a description of the medical department and what a parent and a student

27

can expect.

Did you have any involvement at all in drafting this document?

A   No.

Q   Do you know who drafted it?

A   I do not know.

Q   At the time -- it says here at the bottom of this -- of the first paragraph it says, "Diamond Ranch's medical department is composed of various experienced, licensed medical professionals whose mission is to provide the highest quality of care to every student that enters the program."

When Taylor Goodridge died on December 20th of 2022, who was -- who -- what individuals consisted of the -- of Diamond Ranch's medical department?

MS. SCHIEL:  Just object to form and foundation.

MR. BROWN:  Join.

THE WITNESS:  Because I'm an independent contractor, I'm not sure I can state who composed the entire medical staff at Diamond Ranch Academy.

(BY MR. MORTENSEN)

Q   Okay.  And then down here further under philosophy and medical services provided it says that,

28

"The on-site medical services can be compared to what is offered in your basic family medical practice.  If your child becomes ill or injured, medical staff will attend to their needs, and licensed healthcare providers will perform examinations and provide recommendations when necessary."

Again.  Did you have any involvement with the drafting of that statement?

A   No, I did not.

Q   Was it your experience with Diamond Ranch Academy that the medical clinic there was comparable to a family medical practice?

A   I don't know if I'm qualified to make that statement because I was only there one day every two weeks.

Q   I take it when you were there, it was operating like a family medical practice because you were there, is that fair?

A   That was my --

MS. SCHIEL:  Objection.  Form and foundation.

THE WITNESS:  That was my aim to take care of them as if they were my family practice patients.

MR. MORTENSEN:  Okay.  Sorry, I'm trying to exit out here.  I'm horrible with Zoom.

29

(BY MR. MORTENSEN)

Q   I take it, Doctor, based on your testimony, that -- that you were relying on the people at Diamond Ranch Academy, the staff and the medical providers there, to stay on top of the students' healthcare issues, and you weren't there on a day-to-day basis so you relied on them to bring to you whatever problems that they saw, is that fair?

MR. BROWN:  Object to the form.

THE WITNESS:  Again, as a contracted physician, I felt like I needed to take care of my responsibility that I agreed to do.  I can't speak to what Diamond Ranch's intentions were when I wasn't there.

(BY MR. MORTENSEN)

Q   Doctor, I'm putting up on my screen the -- it's the admitting history and physical dated October 28th of 2021.  Have you seen this document before?

A   I can't read the whole document but I believe I have.

Q   Okay.  And do you know who filled this document out?

A   Can you scroll to the bottom so --

Q   I'm looking here.  Sorry.

30

A    If you scroll up, there was a digitally signed box.

Q    Okay.

A    It looks like Brooks Wiley completed this document.

Q    All right.  And you had earlier testified that you would do the intake physicals when a new patient would come?

A    It was a shared responsibility.  It depended on how many students came in the week prior to my visit.

Q    And who would you share that responsibility with?

A    With the PA or the nurse practitioner who saw the students on the weeks that I wasn't there.

Q    And is a nurse practitioner qualified to give those intake physicals?

A    Brooks Wiley is a -- an independent practitioner who is fully qualified to perform this intake.

Q    Let me just jump to your initial disclosures.  Just give me one second.  I'm trying to find this.  This is one of the problems with having an old lawyer take your deposition because the young lawyers would just whip through this quickly so... All

31

right.  I'll come back to that and I'll find it at a break.  We'll talk about some other documents here.  Oh, here it is.

Doctor, can you see that, your initial disclosure document?

A    Yes.

Q    Okay.  I've just got some questions from these, so we'll just scroll through them and when I have a question I'll stop and it might not be in chronological order, but given my awkwardness with the documents, this will probably be the fastest way to do it.

So here's a -- here's a note dated November 24th of 2021 at 9:41 a.m.  And it looks like your name is there on the top, is that correct?

A    Yes.

Q    Okay.

MS. SCHIEL:  Alan, would you mind just -- is there a Bates number associated with this?

MR. MORTENSEN:  Sure.  It's Worwood 1 from the initial disclosures.  Thank you.

(BY MR. MORTENSEN)

Q    Let me see if I can -- maybe this would make it better.  Does that make it any bigger?

A    No.  There we go.

32

Q    Okay.  Was this the first time that you had seen Taylor?

A    I believe so, yes.

Q    Okay.  And I believe you earlier referenced that she was on anti-HIV medicine, is that correct?

A    Yes.

Q    And she explained that she didn't know why.  Is that fair?

A    Yes.

Q    And what did -- what did your exam of Ms. Goodridge reveal, if anything?

MS. SCHIEL:  Object to form.

MR. MORTENSEN:  Yeah, let me ask a different question.

(BY MR. MORTENSEN)

Q    Did you have any concerns about her health at that point in time, based upon your examination of her?

MS. SCHIEL:  Same objection.

THE WITNESS:  I can state that I felt comfortable enough that she had been on the HIV prophylaxis long enough that she no longer needed to be on it.  She had had an HIV test that was negative.  She had some food allergies or intolerance that we

33

wanted to accommodate.  And on her exam she had some earwax that needed to be irrigated out of her ears.  Other than that, I saw no specific major health issues.

(BY MR. MORTENSEN)

Q    Okay.  And how would this information be input?  Did you actually input it into Diamond Ranch Academy's medical record system or did you have your own system?

A    No.  I input it into the Diamond Ranch system.

Q    Okay.  And would that information transfer at all to your clinical practice in Hurricane --

A    No.

Q    -- or St. George?  All right.

Then there's a -- on Bates number Worwood 2 -- and, again, you might -- these might be going out of chronological order, but this will be the easiest way given the difficulty of me finding these documents.

Here's a sick bay observation of January 26, 2022, from Kayla Lewis.  Do you know who Ms. Lewis is?

A    I think so.  I knew a Kayla, I didn't know her last name.  But there was only one Kayla that I

34

knew.

Q   And do you know what her position was at Diamond Ranch Academy?

A   No, I don't.

Q   Do you know if she was a nurse practitioner or physician assistant?

A   No, she -- not to my knowledge, no.

Q   And do you know if she was a nurse?

A   I don't believe she was a nurse.

Q   Do you know what credentials she had?

A   No, I do not.

Q   And it looks like she was there for a sore throat, cough, and headache, and she was pale.  It says the campus director notif- -- well, there's an area for campus director notified, therapist notified.  Do you know -- how would I tell if -- strike that.

Would that information be filled in if that information had been passed on to the campus director or a therapist?

MS. SCHIEL:  Just object to foundation.

MR. BROWN:  Join.

THE WITNESS:  I don't know.

(BY MR. MORTENSEN)

Q   Okay.  Down here at the bottom, it looks like Kayla Lewis is medical manager.  Do you know what

35

that means?

MR. BROWN:  Foundation.

MS. SCHIEL:  Join.

THE WITNESS:  No.

(BY MR. MORTENSEN)

Q   All right.  Let's move on to February 2nd, 2022, 9:22 a.m.  You're listed on this -- you're listed on this document.  What -- looks like Taylor was coming in for a sore knee?

A   Yes.

Q   Okay.  Do you recall, would this represent all of the treatment you gave her for that knee pain?

A   All of the treatment that I gave or recommended, yes.

Q   Do you have any independent memory of this meeting on February 2nd, 2022?

A   I remember that I saw her in this time period, but I didn't remember exactly the reason why until I reviewed the note.

Q   Then there's a -- moving on to Worwood 4, there's a note from April 19, 2022.  Did you have any involvement with Taylor's complaints or treatment based on this right shoulder pain?

A   No, I did not.

Q   Moving to Worwood 5, there's a medical

36

assessment from November 3rd of 2022 where it looks like Taylor had been -- had the back of her ankle rolled over by a cart.  Did you have any involvement with her treatment here?

A   No.

Q   And it looks like that both Kayla Lewis and Brooks Wiley digitally signed this document, is that fair?

A   Yes.

Q   Okay.  And then moving on to Worwood 6, there's a medical assessment dated December 12, 2022, and it looks like a Noelia Hernandez is the author of this assessment.  Do you know a Noelia Hernandez?

A   No.

Q   Do you know what her qualifications would be?

A   No.

Q   And I -- again, the incident was vomiting.  She said that her stomach hurt but she felt a little bit better after she vomited.

Did you ever receive any information or a phone call or a text from anybody at Diamond Ranch Academy about this December 12, 2022, assessment?

A   No.

Q   Is there anything on this assessment that

37

as a family practitioner would have caused you concern or you would have liked to have been contacted?

MS. SCHIEL:  Just object to form.

THE WITNESS:  Having seen this student in my own practice, I probably would have performed a similar evaluation and treatment.  I don't see any red flags.

(BY MR. MORTENSEN)

Q   Okay.  Do you know why the temperature -- or temperature's not listed?

A   I do not.

Q   And then on Worwood 7, again there's another -- there's a medical assessment by Kayla Lewis at 5:40.  It looks like she was brought to the medical to be assessed after she had vomited multiple times.

Did you ever receive any information or a phone call, or any texts after this second medical assessment that was done on December 12?

A   No.

Q   And would this -- as a family practitioner, would you have liked to have been contacted after she had reported twice on December 12 because she was vomiting?

A   With her vital signs being normal, this could very easily be a gastroenteritis and wouldn't

38

necessarily need extra consultation or evaluation at this time.

Q    Go down to Worwood 8.  And this a is sick bay observation of December 13th of 2022.  You've seen this document before, correct?

A    Yes.

Q    Would there be anything on this report that would have -- as a family practitioner you would have liked to have been contacted to be involved in her care and treatment at that point in time?

A    I think in my family practice environment, this is someone who could continue to be taken care of at home with just home care.

Q    Do you know Cameron Hughes?

A    Yes, I do.

Q    Okay.  And would he be qualified as a registered nurse to give family practice treatment to Taylor Goodridge?

(Inaudible due to multiple individuals speaking at the same time.)

(Court reporter asked for clarification.)

MR. FORD:  Objection.  Foundation.

MS. SCHIEL:  Form and foundation.

MR. BROWN:  I'll join in all the objections that have been made.

39

THE WITNESS:  Can you repeat the question?

MR. MORTENSEN:  Amber, could you read it back?

THE WITNESS:  Oh, do I know Cameron Hughes and is he qualified?  Registered nurses are trained in triaging patients and helping determine the priority of their care, and my personal experience with Cameron is that he is well-qualified.

(BY MR. MORTENSEN)

Q    At your family practice clinic, would you have registered nurses do these types of evaluations as opposed to you?

A    Registered nurses and medical assistants, yes.

Q    Would they -- would they run it by you after they had done -- provided the treatment or would you -- would you just defer to them there at your clinic?

A    It depends on my level of comfort with the individual.  There are MAs that I would like more input -- give my own input on because I haven't developed a sense of trust with them.  But with Cameron, I would feel comfortable with his evaluation.

Q    And what was it about Cameron that made you feel comfortable with him?

40

A    I'd worked with him enough and knew that he was conscientious enough and a capable nurse.

Q    And is there anything about her vitals that would cause you concern?

A    No.

Q    Down to Worwood 9.  Looks like this is back on the December 12, 6:22 p.m.  Looks like there was a third visit on December 12th of 2022, is that how you would read this?

A    That's my impression, yes.  Or maybe a continuation of the 5:40 visit.

Q    Okay.  This was, again, with Kayla Lewis.

Let's move on to Worwood 10.  You've seen this document before, correct?

A    Yes.

Q    Is this the same -- would this be the same assessment as above or is this a different assessment?

MS. SCHIEL:  Object to foundation.

MR. BROWN:  Join.

THE WITNESS:  It looks like this was performed on the 13th in the morning.  So it would be a separate assessment.

(BY MR. MORTENSEN)

Q    All right.  And was there anything about her vitals that would have caused you concern as a

41

family practitioner?

A    Her heart rate is a little elevated.  Not a great concern, but I would like to -- I would probably in my clinic get a repeat set of vital signs in 15 to 20 minutes.  It's not uncommon for your heart rate to rise when you've thrown up or you're not feeling well, but I would like -- I would just like a repeat of the vital signs.

Q    Would you have wanted -- if given two days of vomiting, would you have wanted a blood test to be done?

A    In reality, many times in my family practice people have been sick like this for three or four days before they even come in to see me.  They've been doing home care to treat their symptoms.  The most common diagnosis associated with these findings would probably be a viral gastroenteritis and doesn't always require medical care.  So it just depends on how well she's doing.

Q    When you say "how well she's doing," would -- how is that determined?  Based on her vitals?  Based on her --

A    Based on her appearance and vitals and history.  In here it says that her appetite's poor but she was able to eat about 50 percent of her breakfast.

42

Her skin is warm and dry.  She's not pale or diaphoretic, sweaty.

Q    Okay.  Let's move on to Worwood 11.  This is a medical assessment done by Garrett Allred on December 15th of 2022, at 5:34.  Do you know Garrett Allred?

A    I don't.

Q    I take it you wouldn't know what kind of licensures, if any, that he had?

A    I don't.

Q    Here you can see that the pain level is at an 8.  So it had gone up from the previous records that we looked at.  Is that fair?

A    Yes.

Q    Okay.  And she was still complaining of vomiting?

A    It appears so, yes.

Q    And it looks like here that her hemoglobin and hematocrit levels were tested and were normal?

A    Yes.

Q    Do you know who did those tests?

A    I don't.

Q    Is there anything about her vitals that are concerning?

A    Again, her heart rate is mildly elevated

43

but they're otherwise normal for her age.

Q    Okay.  And then down here it looks like Garrett Allred has the title of medical technician.  Do you know -- what does that mean?

MS. SCHIEL:  Object to foundation.

THE WITNESS:  I'm not sure.

(BY MR. MORTENSEN)

Q    Okay.  That's not a term of art or a licensure -- a licensure designation in the State of Utah, do you know?

A    Not one that I'm accustom to working with, no.

Q    And would you be concerned now that she's been vomiting for three days as a family practitioner?

MS. SCHIEL:  Object to form.

MR. BROWN:  Join.

THE WITNESS:  I think that at this point it's reasonable for her, if she's getting worse or not getting better, for her to seek medical attention.

(BY MR. MORTENSEN)

Q    And what's your understanding as far as whose responsibility it is to seek the medical attention?

MS. SCHIEL:  Object to form.  Foundation.

MR. BROWN:  Join.

44

THE WITNESS:  Well, in this case it appears that she was brought to medical by some staff but then she declined medical treatment at this time.

(BY MR. MORTENSEN)

Q    Do you think staff should have referred her to a InstaCare or to your clinic at that point in time?

A    Again, I don't think I have enough information to be able to make a definitive statement.  This could be something that could continue to be taken care of at home or it could be an entry point for her to seek further consultation.

Q    The people there at -- including you -- at Diamond Ranch Academy understood that her -- she was not with her parents, correct?

A    I think that's obvious, yes.

Q    So any parental involvement, oversight, motivation would be missing at that point in time, correct?  It would be based on what she was saying and doing herself?

A    I don't know.

MS. SCHIEL:  Object to form.  Foundation.

THE WITNESS:  I don't know if her family was contacted and brought up to speed with what was going on with her at this point.

45

(BY MR. MORTENSEN)

Q    Okay.

A    It's customary for the medical staff to send emails or reach out to parents and let them know what's going on with their patient and let them have input on what they want done.

Q    At any point --

A    But I don't know if that was done in this situation.

Q    At any point in time, did you have any contact or communication with Taylor's parents?

A    No.

Q    All right.  Here is Worwood 12.  This is a medical assessment on December 17th, at 7:59.  Looks like it's done by Cameron Hughes.  And, again, it says "Kaylee (staff) brought Taylor to medical to be assessed for vomiting.  Student reports upset stomach across lower abdomen, bilateral.  Reports BM today, formed and easy to pass."

At this -- as a family practitioner, would you have liked to have seen her at this point in time given that now it's been five days of vomiting?

A    Again, I would state that if her pain is decreasing and her examination is normal, including her vital signs, it would not be inappropriate to

June 04, 2024

GOODRIDGE vs DIAMOND RANCH ACADEMY, INC.
Danny Worwood, M.D.

46

continue to monitor her in her home situation.

Q   Okay.

A   I don't see any red flags.

Q   Let's go down to Worwood 13.  This is -- this is on December 18, 2022.  It says, "Allee brought Taylor up to medical to be assessed for reportedly vomiting during the night time with night staff.  Student denied nausea, reports discomfort stomach.  No other symptoms."

Does anything on this report cause you any concern as a family practitioner?

A   No.

Q   Okay.  When someone's vomiting for six days, is there a differential diagnosis that as a family practitioner you should go through to try to determine whether it is a viral infection or something more acute that's going on?

A   I think there's quite a broad differential diagnosis associated with the symptoms I've seen so far.

Q   And is there anything on Taylor's vitals on December 18th of 2022 that cause any concern?

A   Again, her heart rate is mildly elevated, but her vital signs are otherwise normal.  And the exam -- the evaluation, the physical evaluation that

47

was done is reassuring to me.

Q   And as a family practitioner, what would your -- would you have an opinion at this point in time as to what was causing her to vomit?

A   The differential diagnosis is still quite broad.  Still could be a gastroenteritis, could be psychosomatic, could be irritable bowel.  There's a number of things that I would consider at this point.

Q   Let me pull up another document real quick.

MS. SCHIEL:  Alan, we have been going for about an hour.  I don't know when you're planning on taking a break.

MR. MORTENSEN:  Yeah, let's take a five-minute break and then I'll get all the documents ready so that I'm not wasting everyone's time.  I appreciate that.

MS. SCHIEL:  Thanks.

MR. MORTENSEN:  Thank you.

(Whereupon, a recess was taken.)

(BY MR. MORTENSEN)

Q   Doctor, before we took the break you were testifying that there was nothing in the medical records up to this point in time that would cause you any concern -- or any undue concern to be fair, with

48

regards to Taylor's -- to Taylor's symptoms and her -- the danger of the condition she was suffering from.  Is that fair?

MS. SCHIEL:  I'll just object to the extent it misstates his testimony.  But you can answer.

THE WITNESS:  I don't know that I wouldn't say I was concerned.  If I were her parent, I would be concerned about the duration of her symptoms.  But as a family physician, I don't know that I would be ordering special tests at this point.

(BY MR. MORTENSEN)

Q   Okay.  I'm going to just share my screen here.  Can you see this, Doctor?

A   Yes.

Q   Have you seen this text before?

MS. SCHIEL:  Is there a Bates number associated with this?

MR. MORTENSEN:  Yeah.  It's Taylor 000384.  I believe we produced that.

(BY MR. MORTENSEN)

Q   Doctor, you have seen this?

A   Yes, I have.

Q   And, again, this is from Saturday, December 17, three days before Taylor died.  Had

49

you -- had you talked -- if you had seen this text or if you had talked to the person who text this to Will -- I believe it's Schroeder or Schrader, would that have caused you concern?

MS. SCHIEL:  Just object to foundation.  Form.  And to the extent it calls for speculation.

MR. BROWN:  Join.

THE WITNESS:  I don't know that the staff that are watching over the students are qualified to be able to say what requires an emergency room visit and what doesn't.  But if I were the medical staff at Diamond Ranch and received this text, I would -- I would bring Taylor in for a triage and evaluation.

And I would further state that I've had a child at a residential treatment facility.  We adopted a son that had issues prior to us -- prior to us taking his care, and he spent probably a total of three years at residential treatment facilities between the ages of ten and 16, and I feel that the care that Taylor received up to this point was appropriate.

(BY MR. MORTENSEN)

Q   If you were -- first of all, did your son ever -- was he ever at Diamond Ranch Academy?

A   No.  I wish he were.  He had some specific

50

issues relating to sexual reactivity, and they didn't have sex therapists at Diamond Ranch Academy so he didn't qualify. But I would have been very comfortable otherwise with him going to Diamond Ranch Academy, and I feel that they do a good job with the students and are head and shoulders above any of the residential treatment facilities where my son was housed.

Q   You would agree, Doctor, that in the records that we reviewed already that there was no mention of her being weak and pale, is that correct?

A   Do I agree that there was no mention of her being weak and pale in the records?

Q   Correct.

A   I think there were records that stated that she was pale.

Q   Okay.

A   And weak.

Q   So if -- if Taylor presented or if she was complaining -- strike that.

You had mentioned that you thought that a triage would be necessary given -- given this text if it came to the medical personnel's awareness. What kind of triage are you talking about? There at the clinic or taking her off site to an InstaCare or to an

51

ER?

A   I'm talking about there in the clinic.

Q   Okay. What if Taylor had -- was asking to go to the hospital?

A   If Taylor were asking for a further evaluation and to go to the hospital, I think I would counsel her, evaluate her, and if there were any question, I would proceed with further evaluation from there.

Q   Okay.

A   Appropriate evaluation. It may not need to be the emergency room. It could be the urgent care or just tests from within the clinic.

Q   I'm going to move on to Taylor 000386 through 000390. And this is a group of text messages where it looks like the weekend staff was texting about Taylor. And there it looks like an Allee said that "she's been sick since Monday and she does look pretty rough. Like very very skinny in the face area."

Would that cause you any concern?

MS. SCHIEL: Object to form and foundation.

MR. BROWN: Join.

THE WITNESS: Again, I have a hard time

52

trusting the expertise of people who are not trained in medicine. When a mother brings a child in and makes statements like this, I take them into consideration but I add them to the whole picture.
(BY MR. MORTENSEN)

Q   Okay. So you've had mothers bring kids in with similar circumstances, right?

A   Yes. Almost daily.

Q   And -- but you understood that Taylor -- Taylor didn't have her mom or her dad with her. She was dependent upon the care of the -- of the Diamond Ranch facility's staff?

A   Yes.

Q   Okay. And you would agree that staff at least was concerned about her over that weekend?

MS. SCHIEL: Just object to foundation.

MR. BROWN: Join.

THE WITNESS: So the comparison I made to a mother was that mothers are not medically trained in most situations and are not qualified to make medical assessments and that they need further triage.
(BY MR. MORTENSEN)

Q   Here it looks like Izzy is saying, "Good morning Rachel! Taylor is asking for an update on whether she is going to the hospital? She mentioned

53

that you were going to speak with PCDs/Ricky about it. Do you have an update on what she's talking about?"

So, again, you would agree that Taylor -- or at least taking Taylor to a hospital was being discussed at that point in time?

MS. SCHIEL: Just object to form. Foundation.

MR. BROWN: Join.

THE WITNESS: Yes.
(BY MR. MORTENSEN)

Q   And, again, it says, "I'm not sure where she got that from. I know a lot of the assistants and I have been worried about her. However, I never told her that she needs to go to the hospital or that I would talk to Ricky. I said I would let her PCD know she is not feeling well still."

Again, you've reviewed these texts prior to the deposition today? You've seen --

A   I reviewed some texts. I don't know if I had access to all of these texts, no.

Q   All right. And you would agree, Doctor, that, like -- that at Diamond Ranch Academy, the medical -- the medical staff does not necessarily equate to medical licensures, is that fair?

MS. SCHIEL: Objection to foundation.

54

MR. BROWN: Objection. Foundation.

THE WITNESS: I'm not -- I know that the RN and the nurse practitioner are licensed and have a -- gone through a rigorous training, but I don't know what the training and licensure is for the people outside of that.

(BY MR. MORTENSEN)

Q   Okay. Doctor, do you remember in the case of Diamond Ranch Academy versus Chelsea Filer that you provided an affidavit or a declaration in that case?

A   I don't -- I don't remember anything about a Chelsea Filer.

Q   Okay. I'll represent to you Diamond Ranch Academy was suing her for defamation in federal court and it looks like that -- I looked on the docket this morning, I found this declaration that you had filled out.

My question is, down here in paragraph 7 it says, "These observations paint a behavioral picture that will be examined by an experienced physician," and then it's Xed out and it says clinician. Do you know why that word was Xed out in your affidavit?

MS. SCHIEL: I just need to object to foundation. He doesn't remember this patient, he

55

doesn't remember -- you haven't laid any foundation that he signed this or anything or provided more context, so I just need to object to foundation and form.

(BY MR. MORTENSEN)

Q   Doctor, is that your signature there?

A   That is my signature.

Q   Do you dispute signing this?

A   I do not recall ever seeing this document or having any input on this document or signing it.

Q   Okay. And let me just ask you, is there -- does paragraph 7, does that refresh your memory at all about anything that you were testifying to in this declaration?

A   Again, I don't have any recollection of this. Doesn't ring any bells for me.

Q   Okay. So -- well, strike that. I'll move on.

Doctor, how did you find out that Taylor Goodridge had passed away?

A   On the day after her death, I was scheduled to have a clinic at Diamond Ranch in the morning, and I saw that she was on my schedule and Cameron explained that I wouldn't be seeing her because she had died the day before.

56

Q   And did Cameron explain any of the circumstances of her passing away?

A   He recounted his version of what happened up until the day -- the time that she passed away.

Q   What was his version that he expressed to you?

A   He explained that she had been having symptoms for a little over a week of nausea and abdominal pain, but had other things going on in her life, that she was supposed to have graduated from Diamond Ranch and gone home, but for some reason her family wasn't ready to take her home and was making other plans and asked if she could stay there while they made those plans and that she was upset about that; and that her vital signs were mostly normal and that her symptoms varied widely from day-to-day but that on the day that she passed away, they got acutely worse and that she decompensated and became unresponsive on the way to the ER.

Q   Was that the extent of your conversation?

A   Yes.

Q   Was there any --

A   Well, there were -- he mentioned that they had drawn some labs sometime before her demise -- I don't know if it was the day of or the day before or a

57

few days before, but because of the labs having to be sent out to be analyzed, they weren't able -- they didn't get the results back until after she had already passed away.

Q   Do you know, is the medical clinic staffed over the weekend? Is there -- is Brooks Wiley or Cameron Hughes there?

MS. SCHIEL: I'll just object to foundation.

MR. BROWN: Join.

THE WITNESS: I don't know.

(BY MR. MORTENSEN)

Q   Did you have any other conversations with anyone else at Diamond Ranch Academy about Taylor's passing?

A   Yeah. I talked with Brooks Wiley and -- after I had reviewed the notes of what had gone on trying to figure out if there were any red flags before her decompensation -- and he at one point showed me some of the texts that had gone back and forth between the staff.

Q   And what did he say about those texts?

A   What did I say or what did he say?

Q   What did he say to you?

A   He told me that he wasn't aware of those

58

texts. He was not made aware of those texts.

Q   And did you -- what did you say to him?

A   I don't recall the exact words, but I told him that in reviewing what I saw as far as her evaluations and vital signs, that I -- I didn't recognize any red flags that would have prompted me to send her to the emergency room until the day of her passing.

Q   And would the texts -- if they had been seen at the time that they were being sent back and forth, would that have raised any red flags in your mind?

A   If I were aware of them, I would have intervened, yes.

Q   And you would have intervened either by coming to the facility or having her go to a InstaCare or to the ER?

A   Again, this is all conjecture because it didn't happen to me, I was not aware. But I would evaluate her further. I would like to lay on her -- lay eyes on her myself, but in -- because I wouldn't want her to wait to be able to see me in clinic, I might send her to an acute care clinic or to an emergency room.

Q   Was there ever any blood work done that --

59

at Diamond Ranch Academy that you've seen that evaluated her white blood cell count?

A   Only the results that were obtained after her death.

Q   And what did those show?

A   She had a considerably elevated elevation in her white blood cell count.

Q   And what did that indicate?

A   The breakdown of the specific types of white blood cells and the elevation of her total white blood cell count would suggest that she had a significant infection.

Q   And was there anything at -- anything preventing Diamond Ranch Academy's medical clinic from doing blood work earlier than it did?

MS. SCHIEL:  Just object to form and foundation. And to the extent it calls for speculation.

MR. BROWN:  Join.

MR. THOMPSON:  Join.

THE WITNESS:  Can you repeat the question?

(BY MR. MORTENSEN)

Q   Yeah. Is there anything at the -- was there anything at the medical clinic that would have prevented them from doing that blood work earlier in

60

the course of her care and treatment?

MS. SCHIEL:  Same objections.

THE WITNESS:  Not that I'm aware of.

(BY MR. MORTENSEN)

Q   They were able to do it the day she passed, they could have done it earlier in that process, correct?

MS. SCHIEL:  Object to form. And to the extent it calls for speculation.

MR. BROWN:  Join.

MS. SCHIEL:  And foundation.

THE WITNESS:  Yeah, it could have done -- been done earlier.

(BY MR. MORTENSEN)

Q   Did you ever talk to Ricky Dias about Taylor's passing?

A   Not to my recollection.

Q   Did you ever talk to anyone else at Diamond Ranch Academy about Taylor's passing?

A   Not to my recollection.

Q   And I believe you said that you had a -- a social relationship -- was it with Brooks Wiley?

A   Yes.

Q   Okay. What's your relationship with him?

MS. SCHIEL:  Object to form.

61

THE WITNESS:  So I first met Brooks Wiley when he was a registered nurse working at Diamond Ranch, and I became aware that he was getting his certification as a nurse practitioner. He asked if he could do part of his clinical rotations with me in my clinic, and I welcomed him. So I became his preceptor and teaching him in my practice, and we spent a few months while he was doing his clinical rotations together. And throughout that we developed a friendship and continue to have a friendship.

(BY MR. MORTENSEN)

Q   You had said that your son had been in some residential care facilities. If your son had presented with -- with -- had been vomiting like Taylor was, would you have wanted to have been called?

A   Yes.

Q   Would you have wanted to have some input as to whether your son went to -- well, input as to what the medical care and treatment would be?

A   Yes.

MS. SCHIEL:  I would just object to the extent it calls for speculation.

THE WITNESS:  So I answered "yes."

(BY MR. MORTENSEN)

Q   Okay. Were there any changes in Diamond

62

Ranch's policies and procedures after Taylor passed?

A    I don't know.

MS. SCHIEL:  Object to foundation.

THE WITNESS:  Yeah, I don't know.

(BY MR. MORTENSEN)

Q    You're not aware of any?

A    Yeah, I'm not -- I was never instructed on a change in policy, and I don't create policies so I don't know.

Q    Did you ever talk to -- to the staff at Diamond Ranch Academy about why they didn't call you over the weekend or the week before?

A    No.

Q    And you understand as having a child in one of these facilities that the parents are relying on the staff there to keep a good lookout after your -- after your child, is that fair?

A    I think that's reasonable, yes.

Q    Had they -- I'm going to ask a question and I think I already know what your answer's going to be, but I need to ask it because it's my one chance. Had they taken Taylor to the hospital the morning of the 20th, do you think the outcome would have been any different?

MS. SCHIEL:  Calls for speculation.  Lack

63

of foundation.

MR. BROWN:  Join.

THE WITNESS:  Was the 20th the day of her demise?

MR. MORTENSEN:  Yes.

THE WITNESS:  It's possible that administration of IV antibiotics and appropriate treatment could have changed the outcome.

(BY MR. MORTENSEN)

Q    And given her condition and her white blood cell count, time was of the essence at that point in time, correct?

A    The white blood cell count wasn't available at that time.

Q    Right.  But given how sick she was, time was of the essence as far as getting her antibiotics?

MS. SCHIEL:  Was that a question?

MR. MORTENSEN:  Yes.

MS. SCHIEL:  I'd just object to foundation and form.  And calls for speculation.

MR. BROWN:  I'll join.

THE WITNESS:  I think that, yeah, time was definitely an issue.

MR. MORTENSEN:  Why don't we take a two-minute break and I might be finished and we can --

64

I can pass the witness.

(Whereupon, a recess was taken.)

(BY MR. MORTENSEN)

Q    Doctor, were you aware of any other deaths of children, young adults, at the Diamond Ranch Academy while you were providing services there?

A    I'm aware of one suicide -- death by suicide that occurred there, but I -- but, again, I wasn't at all involved in that and only am aware peripherally.  I don't know any details.

Q    Have you been involved at all in attempting to begin a new academy there, the RAFA Academy, at the Diamond Ranch Academy?

A    No.  I'm not aware of anything like that.

MR. MORTENSEN:  All right.  And, again, this is my one chance to talk to you so I'm going to ask the rest -- I just have a couple of follow-up questions but I ask that we have an agreement that I could ask them under seal.  I want to ask how the litigation process has impacted Dr. Worwood.

THE WITNESS:  Candidly, I -- it's made me very wary.

MR. MORTENSEN:  Yeah.

THE WITNESS:  I've had a very successful career I feel.  I've practiced in a very respected

65

way.  I feel endeared by my community, I felt trusted by my community.  And to end my career with a lawsuit, it puts a major blemish on it.

(BY MR. MORTENSEN)

Q    Has anyone mentioned to you that -- anything about the pre-litigation findings?

MS. SCHIEL:  Alan, I am going to object that anything about the pre-litigation findings or panel, anything like that is going to be privileged and confidential, and I'm going to instruct my client not to answer that to preserve that privilege.

MR. MORTENSEN:  And I would just respond that you filed a motion to dismiss this case, and I want -- one of the factors is the harm that Dr. Worwood has undergone, and so I'd like to know that so that I can respond to your motion.

MS. SCHIEL:  My objection and instruction stands, and if we can -- once that motion is ruled on, then we can revisit this but...

MR. MORTENSEN:  I'd like to present it to the judge so the judge could actually have an educated ruling based on what's actually happened here.

MS. SCHIEL:  I'm unwilling to withdraw my objection to the extent that that would waive any potential claim for privilege or the fact that that



**66**

whole thing was confidential.

MR. MORTENSEN: And that's why I was saying I would like to do it under seal so that -- I understand your objection, and I think we can segregate the end of the deposition out from that.

MS. SCHIEL: If you want to change it to not mention the pre-litigation panel findings, I think that's reasonable. But anything that has to do with the pre-litigation panel findings I would argue is confidential and privileged.

MR. MORTENSEN: Okay.

(BY MR. MORTENSEN)

Q   Let me ask it this way -- and I appreciate your counsel's instructions. Has the press from the pre-litigation hearing impacted you at all?

A   To be honest, I'm not aware of much of the press that's gone on.

Q   Okay.

A   So that has had minimal impact.

MR. MORTENSEN: Okay. That's all the questions I have. Thank you. We can pass the witness.

MR. FORD: No questions from me.

MR. THOMPSON: I'll go.

**67**

EXAMINATION

BY MR. THOMPSON:

Q   Dr. Worwood, I have a few questions for you. My name's Kyle Thompson. I represent Brooks Wiley.

You mentioned that you know Mr. Wiley and that he is a personal friend of yours, is that true?

A   He is a dear, personal friend of mine.

Q   Do you have an opinion of Mr. Wiley's professional capabilities?

A   Yes.

MR. MORTENSEN: Object to the form.

MR. THOMPSON: You can answer.

THE WITNESS: Yes. I feel Brooks is very well-trained and qualified to practice as an independent nurse practitioner, and in some ways exceeds my expertise, especially when it comes to prescribing psychotropic medications.

(BY MR. THOMPSON)

Q   Did the incident involving Taylor Goodridge impact your opinion of him in any way?

MS. SCHIEL: Just object to the form.

MR. MORTENSEN: Join.

MR. THOMPSON: Go ahead.

**68**

THE WITNESS: No.

(BY MR. THOMPSON)

Q   You've been through certain medical records with Mr. Mortensen today, correct?

A   Yes.

Q   I'm not sure whether you said that you reviewed those in preparation for your deposition or not, but had you reviewed those medical records that we went over prior to this deposition?

A   Yes. I reviewed them the day after Taylor's demise, I reviewed them again a few months later when the -- when they were sent to me by my counsel, and then I reviewed them again with her last week in preparation for this deposition.

Q   Okay. Is there anything that you've reviewed in those medical records that indicates to you that Mr. Wiley did anything wrong in his treatment of Ms. Goodridge in the week leading up to her death?

MR. MORTENSEN: Object to the form. Lack of foundation.

MS. SCHIEL: I'll join.

THE WITNESS: No.

MR. THOMPSON: Thank you. Appreciate it, sir. Those are all my questions for now.

MR. BROWN: I'll go next.

**69**

EXAMINATION

BY MR. BROWN:

Q   My name's Bryson Brown. I represent Diamond Ranch Academy in this litigation. Just had a few follow-up questions, and I apologize, guys, if I'm jumping around. I'll try not to be redundant and waste your time.

I believe you previously had mentioned that prior to Taylor Goodridge's death you had seen some materials that had listed you as the medical director of Diamond Ranch Academy, is that correct?

A   Yes.

Q   Okay. What were those materials that you had seen?

A   I think it was -- I had a friend who was considering a residential treatment facility for their child and they -- it was a friend from college, and they contacted me when they saw the website and saw that I was listed as the medical director and asked me what my opinion of -- was of Diamond Ranch and would I send my child there if I were in their situation. And that's -- that's the only time I saw my name as the medical director.

Q   Okay.  And do you have a -- could you tell us approximately what the time frame was when you saw that on the website?  And, you know, if you can't give a specific date, your best estimate would be fine.

MS. SCHIEL:  I'll just object to the extent it -- oh, my goodness -- misstates the witness's testimony.  Sorry.

THE WITNESS:  It was probably a year and a half, two years prior to Taylor's death.

(BY MR. BROWN)

Q   And maybe to clarify what was said before, did you actually see that on the website or did you just receive a report from a third party that it was on the website?

A   I just heard that from a third party.

Q   Okay.  And after hearing that from a third party, did you go to the website itself and verify that you were listed as the medical director?

A   No.

Q   Why not?

A   It wasn't important to me.

Q   And did you have any conversations with anyone at Diamond Ranch Academy about -- well, let me back up.  Strike that.  Let me ask the question.

At this point in time, did you believe

that you were, in fact, the medical director?

MS. SCHIEL:  Just object to form and foundation.

THE WITNESS:  I knew that I was the only MD that was seeing students at that time, and I knew that Brooks was the administrative medical director of the clinic, and I didn't see any harm in me being listed as the medical director as long as it -- I wasn't contracted to perform any additional duties.  I guess I just didn't understand the repercussions of being listed as the medical director at that time.

(BY MR. BROWN)

Q   Okay.  And in any event, at that time when it was mentioned to you that you were listed on the website as being the medical director, you did not speak with anyone at Diamond Ranch asking for that to be removed, correct?

A   Correct.

MS. SCHIEL:  Just object to form and foundation.

(BY MR. BROWN)

Q   Were there any other instances other than that where it was brought to your attention that you had been listed as a medical director in connection with Diamond Ranch?

MS. SCHIEL:  Object to the extent it's been asked and answered.

THE WITNESS:  Not to my recollection.

(BY MR. BROWN)

Q   Okay.  And did I unders- -- did I hear you correctly that you were affiliated with Diamond Ranch Academy from 2008 through 2023?

A   I'm not sure of the year of the beginning of my association with Diamond Ranch Academy, but going back I estimate that it was 2008.

Q   Okay.  And in -- I'm going to have a series of questions that just pertains to that entire window of time that you were affiliated with or associated with Diamond Ranch Academy.  At any point during that time frame did you ever provide training to staff at the -- at Diamond Ranch Academy?

MS. SCHIEL:  Object to form.

THE WITNESS:  There was one episode where we got all the therapists together and I instructed them on using antidepressant medication and how I determine what antidepressant medication is most appropriate depending on the situation.  But at no time did I have a formal training session with the medical staff.

(BY MR. BROWN)

Q   Okay.  And when did this instruction to the therapists about antidepressants occur?

A   It was before they moved to their new facility.  They were still up at -- in Gould Wash.  So I don't remember when they moved to the new facility, but I would estimate it was maybe 2010, 2011.

Q   Okay.  And you made a distinction in your answer between formal training and what you provided.  So what's that distinction in your mind?  What distinction are you trying to make there?

A   There were many times when I would instruct the MA on -- for example, I wanted them to clean the exam table appropriately between patients and so I would instruct them that this needs to be done or I want a weight done with the vital signs when I'm seeing them in the clinic.  So there are little moments of learning that I would give, but there was no time when I said -- where I feel like I effected the policy at Diamond Ranch.

Q   Okay.  And were those little moments of training that you'd give to staff while you were doing your biweekly visits, was that something that was ongoing and occurring from 2008 through 2023?

MS. SCHIEL:  Object to form.

THE WITNESS:  Yeah.  I'm a teacher and

74

instructor in my nature, and so I'm happy to try and help people learn what I feel is the best way to do things, yes.

(BY MR. BROWN)

Q    Okay.  At any point in that time frame when you were affiliated with Diamond Ranch Academy, did you participate in -- or give input in any hiring decisions with respect to the medical staff?

A    No.

Q    As far as you're aware, did you give any input or suggestions with respect to the facility's policies and procedures?

MS. SCHIEL:  Object to the extent it's been asked and answered.

THE WITNESS:  No.

(BY MR. BROWN)

Q    Did you ever give any recommendations or input with respect to how the medical team should be staffed?

A    After the event with Taylor Goodridge, there were -- there was a lot of turmoil in the medical staff and people were looking for other jobs and new people were being hired.  And I called Ricky Dias and expressed my concern that he was firing good people and hiring -- that he needed to be cautious

75

about firing good people and hiring untrained people.

Q    And who were the good people that you feared that Ricky was going to fire?

A    Not just firing, but that he was losing good employees because of the turmoil that was going on and statements that were being made and fingers that were being pointed.  Kayla -- I think her last name's Lewis -- was one of them.  Nanette -- I don't know her last name -- was also a very good employee I felt.  Cameron was another one.  And then Brittany Wright was another one.

Q    At least based upon your interactions with those employees you just listed, they were well-qualified and knew what they were doing?

A    I don't know what their qualifications were --

MR. MORTENSEN:  Object to the form. Sorry, wanted to get the objection in.  Go ahead.

MS. SCHIEL:  Yeah, object to form and foundation.

THE WITNESS:  I don't know exactly what their qualifications were, but in my experience with working with them, I felt very comfortable that they knew what they were doing.

(BY MR. BROWN)

76

Q    And, again, you were working with those employees you just listed in the medical setting at the clinic that you were going to every other week, is that correct?

A    Yes.

Q    So other than what you just described -- and you don't have to rehash what we just went over, but were there any other situations where you gave input on how staffing should be done at Diamond Ranch Academy's medical facility?

A    No.

MS. SCHIEL:  Object to form.

(BY MR. BROWN)

Q    Earlier in the deposition we had looked at some medical records and we'd looked at the medical records up through December 18th of 2022.  And I believe at that point you testified that based upon those medical records, you would not have ordered any, quote, "special tests," close quote.  Do you recall that testimony?

A    Yes.

Q    Okay.  When you said "special tests," what did you mean by that?

A    I meant lab work, imaging.

Q    Would that term "special tests" have

77

included tests to look at white blood cell counts?

A    Yes.  That's included in lab work.

Q    And then I believe there was some testimony earlier that had the staff at Diamond Ranch Academy got Taylor Goodridge to the hospital on the morning of December 20th, I believe the term you used, it was possible that that could have made a difference in whether or not she survived.  Was that your testimony?

A    Yes.

Q    Okay.  Can you -- now you previously used the word "possible."  Can you testify today that based upon what you've reviewed that had she been there in the morning on December 20th, it would have been probable that she would have had a different outcome?

MS. SCHIEL:  I'll just object to form. Foundation.  And to the extent it calls for speculation.

MR. MORTENSEN:  Join.

THE WITNESS:  Yeah, that's an unknown.

(BY MR. BROWN)

Q    Do you have any opinion one way or the other as to whether had Taylor Goodridge been taken to the hospital on, let's say, December 17th of 2022, as to whether there would have been a different outcome?

June 04, 2024

GOODRIDGE vs DIAMOND RANCH ACADEMY, INC.
Danny Worwood, M.D.

78

MS. SCHIEL: Same objections.

MR. MORTENSEN: Join.

THE WITNESS: There's no way of knowing.

(BY MR. BROWN)

Q    So just to be clear, you do not have an opinion on that, correct?

A    Correct.

Q    And I guess the last area of follow-up I wanted to hit is, it sounds like, at least based upon the medical records from Diamond Ranch Academy through December 18th of 2022, that you did not feel like you needed to have been consulted concerning Taylor Goodridge, is that fair?

A    Yes.

Q    Okay. But then I think towards the end of your examination by Mr. Mortensen that you said that if -- had you seen certain text messages, you would have wanted to be consulted?

MS. SCHIEL: Just object to the extent it misstates his testimony.

MR. BROWN: And if I misstated your testimony, let me know. I don't want to do that.

MR. MORTENSEN: Objection. Asked and answered.

THE WITNESS: Anytime a concerned party

79

expresses that someone needs an emergency room, it needs to be taken seriously and triaged appropriately not by a layperson --

(BY MR. BROWN)

Q    Okay.

A    -- but by someone who has qualification and experience.

Q    Okay. And so would an appropriate triage in that scenario be to have Taylor seen by, for instance, Brooks Wiley?

A    Yes.

Q    Okay. So just to extend that hypothetical further, let's say that you had seen the text messages but then learned that subsequently Taylor was examined by Brooks Wiley or by the medical staff at Diamond Ranch Academy, would you have felt the need to then see her and lay eyes on her yourself to determine it wasn't necessary?

MS. SCHIEL: I'll just object to incomplete hypothetical. And to the extent it calls for speculation. And foundation.

MR. MORTENSEN: Join.

MR. BROWN: And you can go ahead and answer if my question was intelligible.

THE WITNESS: If she was triaged

80

appropriately, I would feel confident in that decision.

(BY MR. BROWN)

Q    Okay. And did you see anything in the medical records that you've reviewed suggesting that Taylor was not triaged appropriately on December 18th of 2022?

A    No, I have not.

MR. BROWN: Okay. I have no further questions. Thank you.

MS. SCHIEL: I just have just a couple quick follow-up questions. Alan, do you have anymore?

MR. MORTENSEN: Yeah, I do. Do you want me to ask them first, Cami?

MS. SCHIEL: Yeah.

MR. MORTENSEN: Michael, did you have any questions?

MR. FORD: No questions. Thank you.

FURTHER EXAMINATION

BY MR. MORTENSEN:

Q    What is an appropriate triage?

MS. SCHIEL: Object to form.

THE WITNESS: Appropriate triage is a

81

face-to-face visit with a qualified provider, vital signs, physical examination.

(BY MR. MORTENSEN)

Q    And is there a line of demarcation when a child is throwing up repeatedly over the course of several days as to when something more needs to be done to find out what's causing the vomiting?

MS. SCHIEL: Just object to the form and to the extent it's an incomplete hypothetical.

MR. BROWN: Join.

THE WITNESS: I have had patients who throw up for months, and it's not the duration of how long someone is throwing up but it's the effects that it's having on their body. Are they losing weight? Are there other variations in their vital signs that are concerning? Are there other elements of the story that can explain why they have a cyclic vomiting syndrome? So I am not aware of any guideline that says if a child throws up every day for a certain period of time, that there's a parameter that determines that they need further evaluation.

MR. MORTENSEN: Okay. That's all I have. Thank you.

FURTHER EXAMINATION

82

BY MS. SCHIEL:

Q Thanks. Okay. I'll ask just a couple follow-up ones.

Dr. Worwood, is it fair to say that you did not receive any notice of Ms. Goodridge's illness at any time in December of 2022 until after she had passed away?

A Yes.

Q Would you agree that her vital signs did not indicate at any point, based on what you can see, that she was going septic?

A Correct.

Q Would you agree that her death was unexpected based on the course of the illness at least up until the 20th?

MR. MORTENSEN: Object to the form.

THE WITNESS: Yes.

(BY MS. SCHIEL)

Q Are you aware of any valid reasons to not send Ms. Goodridge to the emergency room at least prior to December 20, 2022?

MR. BROWN: Object to the form.

THE WITNESS: No, I'm not aware of any valid reasons.

83

(BY MS. SCHIEL)

Q Is there -- are there any reasons that a provider may choose not to send a sick patient to the emergency room?

MR. THOMPSON: Form. Calls for speculation.

MR. BROWN: Join.

MR. MORTENSEN: Join.

THE WITNESS: I think that it's very important to triage patients before sending them to the emergency room. I think that the emergency room is overwhelmed with subacute problems that can be taken care of at home or in a physician's office without raising it to the level of priority that's available in the emergency room. I think that the cost of medical tests, whether it be labs or imaging, always needs to be considered in -- especially with something like vomiting and abdominal pain, which is so common. I think that it's important for a clinical provider to perform adequate evaluation and triage in their office before deciding whether to spend thousands or hundreds of thousands of dollars on tests that may be unnecessary. I think you also need to consider the psycho-bio-social environment of the patient and what elements of that could be affecting

84

their well-being.

There's an idiom in medicine that when you hear hoof beats, think of horses, not zebras. Peritonitis -- spontaneous peritonitis is a zebra. It doesn't happen very often. I can think of maybe one time in my career of 30 years outside of this case with Taylor where a bacterial peritonitis was found. It's not a common occurrence. And I think that it was reasonable to continue to carefully and closely monitor Taylor over the days preceding her death. It's possible that she would have survived had she gone to the emergency room or had other tests earlier, but there's no guarantee. It is a tragedy that Taylor passed away. It's a tragedy that she had spontaneous bacterial peritonitis. But I don't know had I seen her myself in my own clinic in the week or two preceding her death, I don't see anything in the records that would have triggered the diagnosis of peritonitis.

(BY MS. SCHIEL)

Q Thank you. And it sounds like, based on your conversations with Brooks and with Cameron and the other medical staff, that the reasons you listed were included in the decision to not send her to the emergency room prior to December 20, 2022, is that

85

fair?

A Yes.

MS. SCHIEL: That is all the questions I have. Thank you. Any other follow-up questions?

MR. MORTENSEN: I just have a few follow-up.

FURTHER EXAMINATION

BY MR. MORTENSEN:

Q The condition that Taylor Goodridge was suffering from was not a subacute problem, is that fair to say? She died.

MS. SCHIEL: I'll just object to form and foundation.

MR. THOMPSON: Join.

MR. BROWN: Join.

THE WITNESS: Death is not a subacute problem. But being able to predict her death was next to impossible, based on what I saw.

(BY MR. MORTENSEN)

Q An emergency room would be much more capable of diagnosing that problem, correct, than a medical clinic at a troubled teen industry residential treatment center that doesn't have a doctor or

apparently some of the times no people with real licensures there.  Is that fair to say?

MR. THOMPSON:  Form.

MS. SCHIEL:  Yeah, I'll just object to form.  Foundation.  To the extent it calls for speculation.  To the extent it calls for expert testimony.  He's not a ER doc.

MR. BROWN:  I'll join in all those objections and also state that it assumes facts not in evidence.

MS. SCHIEL:  Join.

THE WITNESS:  An emergency room would be a great place to diagnose bacterial peritonitis.  But if the emergency room is full of patients who have gastroenteritis or cyclic vomiting syndrome or psychosomatic vomiting, they're not going to have time to see the patient with peritonitis.

(BY MR. MORTENSEN)

Q    You don't have any opinions or knowledge about how busy the ER was at the time that -- during this week time -- week period of time that -- strike that.

You don't have any knowledge of how busy the ERs were at this point in time?

MS. SCHIEL:  Just object to form.

87

Foundation.

THE WITNESS:  Yeah, I don't think that was a factor that was being considered.

(BY MR. MORTENSEN)

Q    How much were the medical tests that were done that -- or the blood tests that were done to show her elevated white blood cell count?  How much would that cost?

MS. SCHIEL:  Object to form and foundation.

MR. BROWN:  Join.

THE WITNESS:  Yeah, I would be speculating.  I don't know.  I think you could look it up online and see what the tests would cost.

(BY MR. MORTENSEN)

Q    Well, Doctor, you said that they -- she could have incurred hundreds of thousands of dollars just trying to diagnose the problem.  And the blood tests at least diagnosed a significant problem, correct?

MR. THOMPSON:  Misstates testimony.

MS. SCHIEL:  Misstates the testimony.

THE WITNESS:  No, I didn't say that.  I said that thousands and hundreds of thousands of dollars are spent in unnecessary tests, and emphasized

88

that it was necessary to do appropriate triage for those tests.

(BY MR. MORTENSEN)

Q    And you would agree that at least some of the staff was viewing Taylor that she was losing weight; her face was skinny?

MS. SCHIEL:  I'll object to form and foundation.

MR. THOMPSON:  Join.

MS. SCHIEL:  And to the extent that question assumes facts not in evidence.

MR. THOMPSON:  Join.

MR. BROWN:  I'll join in those objections.  Also misstates the text.

THE WITNESS:  I feel that that's a subjective assessment performed by somebody who's not qualified to make objective assessments.  Weight loss is an objective assessment determined by weight.

(BY MR. MORTENSEN)

Q    Were they monitoring her weight in the records?

A    I saw two weights in the days preceding her death.

Q    And what did those show?

A    I think one was a weight of 159.3 and the

89

other was a weight of 158.

Q    So couple pounds difference?

A    Just over a pound.

MR. MORTENSEN:  All right.  That's all I have.  Thank you.

MR. BROWN:  Doctor, I have one follow-up question based upon that.

FURTHER EXAMINATION

BY MR. BROWN:

Q    I'm going to throw at you a hypothetical so I will probably draw some objections.  But let's just say hypothetically that a blood test had been ordered on December 17th of 2022.  Can you say with a reasonable degree of medical certainty that that blood test would have shown elevated white blood cell count?

MR. MORTENSEN:  Object to the form.

MS. SCHIEL:  I'll object to incomplete hypothetical.  To the extent it calls for speculation Form.  Foundation.

MR. MORTENSEN:  Join.

THE WITNESS:  No.

MR. BROWN:  That's all I have.

MR. MORTENSEN:  And I've obviously got

another one now.

FURTHER EXAMINATION

BY MR. MORTENSEN:

Q   On December 17, 2022, had that blood test been administered and it came back showing a significant elevation of white blood cells, she would have been transferred to the ER, correct?

MS. SCHIEL:  Objection.  Incomplete hypothetical.  Form.  Foundation.  Calls for speculation.

THE WITNESS:  If I were involved in making that decision, yes, she would have been transferred to the emergency room.  And I believe -- and, again, it's speculation, but I believe Cameron and Brooks would have transferred her if they had had those results on the 17th.

MR. MORTENSEN:  Thank you.  That's all I have.

MR. THOMPSON:  No questions.

MR. BROWN:  Nothing else from me.

MR. FORD:  All right.  I think we're done.

MS. SCHIEL:  We can go off the record.

(Whereupon, an off-the-record discussion was held.)

(Deposition concluded at 11:31 a.m.)

Original transcript was filed with Mr. Mortensen.

Reading copy was sent to Ms. Schiel.

C E R T I F I C A T E

STATE OF UTAH          )
COUNTY OF _____ )

I HEREBY CERTIFY that I have read the foregoing testimony and the same is a true and correct transcription of said testimony with the exception of the following corrections listed below giving my reasons therefor.

_____
DANNY WORWOOD, M.D.

Subscribed and sworn to at _____,

this _____ day of _____, 2024.

_____
NOTARY PUBLIC
My commission expires:

_____

C E R T I F I C A T E

STATE OF UTAH          )
COUNTY OF SALT LAKE  )

THIS IS TO CERTIFY that the deposition of DANNY WORWOOD, M.D. was taken before me, AMBER PARK, a Certified Shorthand Reporter in and for the State of Utah.

That the said witness was by me, before examination, duly sworn to testify the truth, the whole truth, and nothing but the truth in said cause.

That the testimony was reported by me in Stenotype and thereafter transcribed by computer under my supervision, and that a full, true, and correct transcription is set forth in the foregoing pages.

I further certify that I am not of kin or otherwise associated with any of the parties to said cause of action, and that I am not interested in the event thereof.

WITNESS MY HAND on June 25, 2024.

_____

June 04, 2024

GOODRIDGE vs DIAMOND RANCH ACADEMY, INC.
Danny Worwood, M.D.

**(**

**(j)** 26:10

**0**

**000384** 48:19
**000386** 51:14
**000390** 51:15

**1**

**1** 31:20
**10** 19:11 40:13
**1099** 19:5
**11** 42:3
**11:31** 91:2
**12** 36:11,23 37:18,22 40:7 45:13
**12th** 40:8
**13** 46:4
**13th** 38:4 40:21
**15** 41:5
**158** 89:1
**159.3** 88:25
**15th** 42:5
**16** 8:17 49:19
**17** 48:25 90:6
**17th** 45:14 77:24 89:15 90:18
**18** 46:5
**18th** 46:22 76:16 78:11 80:6
**19** 35:21
**1981** 7:4
**1996** 7:19,21

**2**

**2** 33:17
**20** 41:5 82:22 84:25
**2003** 8:11
**2008** 15:13,15 72:7,10 73:23
**2010** 73:6
**2011** 73:6
**2021** 10:9 29:18 31:14
**2022** 27:14 33:22 35:7,16, 21 36:1,11,23 38:4 40:8 42:5 46:5,22 76:16 77:24 78:11 80:7 82:7,22 84:25

89:15 90:6
**2023** 9:3 15:16 19:7,8 72:7 73:23
**2024** 4:1
**20th** 27:14 62:23 63:3 77:6, 14 82:16
**22** 10:9
**24th** 31:14
**26** 33:22
**28th** 29:18
**2nd** 35:6,16

**3**

**30** 84:6
**3rd** 36:1

**4**

**4** 4:1 35:20

**5**

**5** 35:25
**50** 41:25
**5:34** 42:5
**5:40** 37:14 40:11

**6**

**6** 36:10
**6:22** 40:7

**7**

**7** 37:12 54:18 55:12
**72** 16:9
**7:59** 45:14

**8**

**8** 38:3 42:12

**9**

**9** 40:6
**9:02** 4:1
**9:22** 35:7
**9:41** 31:14

**A**

**a.m.** 4:1 31:14 35:7 91:2
**abdomen** 45:18
**abdominal** 56:9 83:18
**abnormalities** 16:2
**Absolutely** 15:4
**academy** 6:14 10:8,19 11:2,4,10,17,21 12:6,8,10, 14,16,18,22 15:11,15,19, 25 16:20,23,25 17:7,16,20, 22 18:1,11,14,24,25 19:3, 5,9 20:5,14,21,23 21:8,11, 16,18 23:9,13 24:13,16,22, 25 25:1,9 26:3,14 27:22 28:11 29:4 34:3 36:23 44:14 49:24 50:2,5 53:22 54:9,14 57:14 59:1 60:19 62:11 64:6,12,13 69:6,13 70:23 72:7,9,14,16 74:6 77:5 78:10 79:16
**Academy's** 26:21 33:8 59:14 76:10
**access** 53:20
**accommodate** 5:17 33:1
**account** 18:9
**accustom** 43:11
**acute** 16:1,6,7,16 19:15,21 20:7 21:12 25:12 46:17 58:23
**acutely** 56:17
**add** 52:4
**additional** 71:9
**address** 20:15
**addressing** 19:23
**adequate** 83:20
**administered** 90:7
**administration** 63:7
**administrative** 71:6
**admission** 15:23
**admitting** 29:17
**adopted** 49:15
**adults** 64:5
**advertising** 26:14
**affecting** 83:25
**affidavit** 54:10,23
**affiliated** 8:6 72:6,13 74:6
**age** 43:1
**ages** 49:19
**agree** 12:4 13:1 22:23 50:9,12 52:14 53:3,21 82:10,14 88:4

**agreed** 12:19 29:12
**agreement** 13:4 17:25 64:18
**agreements** 17:18,20
**ahead** 67:25 75:18 79:23
**aim** 28:22
**Alan** 31:18 47:11 65:7 80:12
**Allee** 46:5 51:17
**allergies** 32:25
**Allred** 42:4,6 43:3
**Amber** 5:9,13 39:2
**analyzed** 57:2
**ankle** 36:2
**ankles** 16:2
**annual** 19:12
**answer's** 62:20
**anti-hiv** 32:5
**antibiotics** 63:7,16
**antidepressant** 72:20,21
**antidepressants** 73:2
**anymore** 80:12
**Anytime** 78:25
**apologize** 6:1 69:7
**apparently** 86:1
**appearance** 41:23
**appears** 42:17 44:2
**appetite's** 41:24
**appropriately** 73:13 79:2 80:1,6
**approximately** 70:2
**April** 8:19 9:3 15:16 35:21
**area** 25:17,21 34:15 51:20 78:8
**argue** 66:9
**Armory** 8:4
**Army** 8:6,10
**art** 43:8
**assess** 21:11
**assessed** 37:15 45:17 46:6
**assessment** 36:1,11,13, 23,25 37:13,18 40:17,22 42:4 45:14 88:16,18
**assessments** 26:9 52:21 88:17
**assistant** 16:23 34:6
**assistants** 39:13 53:12
**assisted** 26:9
**association** 72:9

June 04, 2024

GOODRIDGE vs DIAMOND RANCH ACADEMY, INC.
Danny Worwood, M.D.

assumes 86:9 88:11

attempting 64:12

attend 28:4

attended 6:22

attention 43:19,23 71:23

attorneys 6:4

audible 5:22

author 36:12

autopsy 6:6

average 20:18

aware 20:2 24:17 25:20
57:25 58:1,13,19 60:3 61:3
62:6 64:4,7,9,14 66:16
74:10 81:18 82:20,24

awareness 50:23

awkward 6:1

awkwardness 31:10

**B**

back 10:8,13 19:7 31:1
36:2 39:3 40:7 57:3,20
58:10 70:24 72:10 90:7

background 6:19

bacterial 84:7,15 86:13

based 22:14,15,21 29:2
32:18 35:23 41:21,22,23
44:19 65:22 75:12 76:17
77:12 78:9 82:11,15 84:21
85:20 89:7

baseline 23:4

bases 8:10

basic 28:2

basis 29:7

Bates 31:19 33:16 48:17

bay 33:21 38:4

beats 84:3

begin 64:12

beginning 72:8

behalf 26:23

behavior 24:3

behavioral 54:19

bells 55:16

Belvoir 7:2,17

Bethesda 6:23 7:13,14

bigger 31:24

bilateral 45:18

bill 19:1 24:17

bit 5:25 9:11 18:10,12
36:20

biweekly 73:22

blemish 65:3

blood 41:10 58:25 59:2,7,
10,11,15,25 63:11,13 77:1
87:6,7,18 89:14,16,17
90:6,8

BM 45:18

board 7:21

boarding 24:21

body 81:14

bottom 27:7 29:24 34:24

bowel 47:7

box 30:2

break 5:15 31:2 47:13,15,
22 63:25

breakdown 59:9

breakfast 41:25

breaks 5:17

Brigham 6:22

bring 21:14,16 29:7 49:13
52:6

brings 52:2

Brittany 75:10

broad 46:18 47:6

Brooks 17:14 18:22 20:4,
24 21:2,4,6,9 30:4,18 36:7
57:6,16 60:22 61:1 67:5,15
71:6 79:10,15 84:22 90:16

brought 37:14 44:2,24
45:16 46:5 71:23

Brown 17:2,10 20:1 23:1,
16 27:19 29:9 34:21 35:2
38:24 40:19 43:16,25 49:7
51:24 52:17 53:8 54:1
57:10 59:19 60:10 63:2,21
68:25 69:4,5 70:10 71:12,
21 72:4,25 74:4,16 75:25
76:13 77:21 78:4,21 79:4,
23 80:3,9 81:10 82:23 83:7
85:17 86:8 87:11 88:13
89:6,11,24 90:22

Bryson 69:5

businesses 17:19

busy 86:20,23

BYU 7:11

**C**

California 8:3

call 4:13 18:18 19:16
20:10,13,21,25 21:21
36:22 37:17 62:11

called 4:4 21:6,7,10 61:15
74:23

calling 20:6

calls 49:6 59:17 60:9 61:22
62:25 63:20 77:17 79:20
83:5 86:5,6 89:20 90:11

Cameron 38:14 39:4,7,23,
24 45:15 55:24 56:1 57:7
75:10 84:22 90:16

Cami 80:14

campus 34:14,15,18

Candidly 64:21

capabilities 67:11

capable 40:2 85:23

care 12:11 16:1,6,7,9,16
21:12,22 24:21 25:2,4,12
26:11,15 27:11 28:22
29:11 38:10,12,13 39:7
41:15,18 44:11 49:17,20
51:12 52:11 58:23 60:1
61:13,19 83:13

career 64:25 65:2 84:6

careful 15:2

carefully 84:9

Carma 14:3

cart 36:3

case 6:11 44:1 54:8,10
65:13 84:6

catastrophic 22:22

caused 37:1 40:25 49:4

causing 47:4 81:7

cautious 74:25

cell 59:2,7,11 63:11,13
77:1 87:7 89:17

cells 59:10 90:8

center 8:4 25:25 85:25

certainty 89:16

certification 61:4

certified 7:21

chance 62:21 64:16

change 9:22 62:8 66:6

changed 9:20 63:8

charge 16:16

Chelsea 54:9,12

chemistry 6:21

child 28:3 49:15 52:2
62:14,17 69:19,23 81:5,19

children 64:5

choose 83:3

chronological 31:10
33:18

circumstances 52:7 56:2

claim 65:25

clarification 25:3 38:21

clarify 70:11

clean 5:24 73:13

clear 9:11 78:5

client 65:10

clinic 8:18 16:1 18:21
21:12,14,16 25:12 28:11
39:10,18 41:4 44:6 50:25
51:2,13 55:22 57:5 58:22,
23 59:14,24 61:6 71:7
73:16 76:3 84:16 85:24

clinical 8:23 33:13 61:5,8
83:19

clinician 54:22

close 76:19

closely 84:9

college 69:19

Colorado 8:7,8

comfort 39:19

comfortable 20:6 32:22
39:23,25 50:4 75:23

common 41:16 83:19 84:8

communication 45:11

community 65:1,2

comparable 28:11

compared 28:1

comparison 52:18

complaining 42:15 50:20

complaints 35:22

completed 6:21 7:1 30:4

composed 27:9,21

concern 37:1 40:4,25 41:3
46:11,22 47:25 49:4 51:21
74:24

concerned 43:13 48:8,9
52:15 78:25

concerns 32:17

concluded 91:2

condition 48:2 63:10
85:11

conditions 23:7

confident 80:1

confidential 15:3 65:10
66:1,10

congregate 24:21 25:2,4

conjecture 58:18

connection 71:24

conscientious 40:2

considerably 59:6

consideration 52:4

considered 83:17 87:3

consisted 27:15

consultation 16:12 38:1
44:12

consulted 78:12,18
contact 12:18 45:11
contacted 21:3 37:2,22 38:9 44:24 69:20
contest 12:3
context 55:3
continuation 40:11
continue 18:10 38:12 44:10 46:1 61:10 84:9
contract 10:24
contracted 10:18,22 17:13 29:10 71:9
contractor 27:21
conversation 56:20
conversations 57:13 70:22 84:22
copy 26:2 91:6
correct 5:3 7:13,15 9:4 10:9 22:7,20 23:10 25:17 31:15 32:6 38:5 40:14 44:15,19 50:11,14 60:7 63:12 68:4 69:13 71:17,18 76:4 78:6,7 82:13 85:23 87:20 90:9
correction 25:10
correctly 72:6
cost 83:16 87:8,14
cough 34:13
counsel 5:16 51:7 68:13
counsel's 10:14 66:14
count 59:2,7,11 63:11,13 87:7 89:17
counts 77:1
couple 22:12 64:17 80:11 82:3 89:2
court 38:21 54:14
cover 18:2,4
covered 17:24
create 62:8
credentials 34:10
culture 9:22
customary 45:3
cyclic 81:17 86:15

**D**

dad 52:10
daily 52:8
danger 48:2
Danny 4:3,12,14,15
date 70:4
dated 29:17 31:13 36:11

day 28:14 55:21,25 56:4, 17,25 58:7 60:5 63:3 68:10 81:19
day-to-day 29:7 56:16
days 18:17,19 41:9,14 43:14 45:22 46:14 48:25 57:1 81:6 84:10 88:22
DC 8:9
deal 24:13
dealt 12:21
dear 67:9
death 6:8 11:22 55:21 59:4 64:7 68:18 69:11 70:9 82:14 84:10,17 85:18,19 88:23
deaths 64:4
December 27:14 36:11,23 37:18,22 38:4 40:7,8 42:5 45:14 46:5,22 48:25 76:16 77:6,14,24 78:11 80:6 82:7,22 84:25 89:15 90:6
deciding 83:21
decision 80:2 84:24 90:14
decisions 74:8
declaration 54:10,16 55:14
declined 44:3
decompensated 56:18
decompensation 57:19
decreasing 45:24
defamation 54:14
defer 39:17
definition 25:7
definitive 44:9
degree 6:21,25 89:16
demarcation 81:4
demise 56:24 63:4 68:11
denied 46:8
Dennis 17:13 18:22
department 26:23,25 27:9,16
depended 30:10
dependent 52:11
depending 72:22
depends 39:19 41:18
deposition 4:17,21 5:25 6:3 13:1 30:24 53:18 66:5 68:7,9,14 76:14 91:2
derived 19:8
description 26:24
designation 43:9
details 64:10

determine 39:6 46:16 72:21 79:17
determined 41:21 88:18
determines 81:21
developed 39:22 61:9
diagnose 86:13 87:18
diagnosed 87:19
diagnosing 85:23
diagnosis 41:16 46:14,19 47:5 84:18
Diamond 6:14 10:8,19 11:1,4,10,17,21 12:6,8,9, 14,16,18,20,22 15:11,15, 19,25 16:20,23,24 17:7,15, 20,21 18:1,11,13,23,25 19:3,4,9,12 20:5,14,21,22 21:8,11,15,18 23:3,9,13, 20,23 24:12,15,22,24 25:1, 9 26:3,13,21 27:8,15,22 28:10 29:4,13 33:7,10 34:3 36:22 44:14 49:12,24 50:2, 4 52:11 53:22 54:9,13 55:22 56:11 57:14 59:1,14 60:19 61:2,25 62:11 64:5, 13 69:6,13,22 70:23 71:16, 25 72:6,9,14,16 73:19 74:6 76:9 77:4 78:10 79:15
diaphoretic 42:2
Dias 60:15 74:24
died 27:13 48:25 55:25 85:13
difference 16:6 77:7 89:2
differential 46:14,18 47:5
difficult 9:16
difficulty 33:19
digitally 30:1 36:7
directly 18:25 19:4 25:14
director 8:24 10:8,19,24, 25 11:1,4,10,18,22 12:6,7, 19,21 34:14,15,19 69:13, 21,25 70:18 71:1,6,8,11, 15,24
disclosure 31:5
disclosures 6:11 30:22 31:21
discomfort 46:8
discussed 53:5
discussion 90:25
dismiss 65:13
dispute 55:8
distinction 73:7,9,10
doc 86:7
docket 54:15
doctor 4:9,13,15,16 6:2,18 25:24 26:20 29:2,16 31:4 47:22 48:14,22 50:9 53:21

54:8 55:6,19 64:4 85:25 87:16 89:6
document 24:11 25:24 27:3 29:18,20,23 30:5 31:5 35:8 36:7 38:5 40:14 47:9 55:9,10
documents 6:15 31:2,11 33:20 47:15
dollars 83:22 87:17,25
drafted 27:5
drafting 27:3 28:8
draw 89:13
drawn 56:24
dry 42:1
due 38:19
duly 4:4
duration 48:9 81:12
duties 71:9
duty 8:2

**E**

earlier 30:6 32:4 59:15,25 60:6,13 76:14 77:4 84:12
ears 33:2
earwax 33:2
easiest 33:18
easily 37:25
easy 45:19
eat 41:25
educated 65:21
educational 6:19
Edward 6:24
effected 73:18
effects 81:13
efforts 15:7
elements 81:16 83:25
elevated 41:2 42:25 46:23 59:6 87:7 89:17
elevation 59:6,10 90:8
emails 45:4
emergency 49:10 51:12 58:7,24 79:1 82:21 83:4, 11,15 84:12,25 85:22 86:12,14 90:15
emergent 21:22
emphasized 87:25
employed 16:24 17:7,8,9
employee 17:15 75:9
employees 16:19 75:5,13 76:2

June 04, 2024

GOODRIDGE vs DIAMOND RANCH ACADEMY, INC.
Danny Worwood, M.D.

employer 17:22,24
employment 8:22
end 15:7 65:2 66:5 78:15
endeared 65:1
enters 27:12
entire 27:22 72:12
entry 44:11
environment 38:11 83:24
episode 72:18
equate 53:24
equine 26:8
ER 21:23 51:1 56:19 58:17
 86:7,20 90:9
ERS 86:24
essence 63:11,16
estimate 22:2 70:4 72:10
 73:6
evaluate 51:7 58:20
evaluated 59:2
evaluation 37:6 38:1
 39:23 46:25 49:13 51:6,8,
 11 81:21 83:20
evaluations 39:11 58:5
event 71:13 74:20
Eventually 18:6
everyone's 47:16
evidence 10:11 86:10
 88:11
exact 15:12 22:1 58:3
exam 32:11 33:1 46:25
 73:13
examination 4:6 32:18
 45:24 67:1 69:2 78:16
 80:20 81:2,25 85:8 89:9
 90:3
examinations 28:5
examined 4:4 54:20 79:14
exceeds 67:18
exit 28:25
exited 8:10
expect 27:1
expedited 16:8
experience 28:10 39:7
 75:22 79:7
experienced 27:10 54:20
expert 86:6
expertise 52:1 67:18
explain 56:1 81:17
explained 32:8 55:24 56:7
exposures 23:22 24:8
expressed 56:5 74:24

expresses 79:1
extend 79:12
extent 11:14 48:5 49:6
 56:20 59:17 60:9 61:22
 65:24 70:6 72:1 74:13
 77:17 78:19 79:20 81:9
 86:5,6 88:10 89:20
extra 38:1
eyes 58:21 79:17

F

face 51:19 88:6
face-to-face 81:1
facilities 24:22 25:2,14,15
 49:18 50:7 61:13 62:15
facility 49:15 58:16 69:18
 73:4,5 76:10
facility's 52:12 74:11
fact 23:6 65:25 71:1
factor 87:3
factors 65:14
facts 10:10 86:9 88:11
faculty 8:5
fair 7:7 12:4 15:14 22:17
 28:18 29:8 32:9 36:8 42:13
 47:25 48:3 53:24 62:17
 78:13 82:5 85:1,13 86:2
family 7:1,22 8:13 21:13,
 19 26:8 28:2,12,17,23
 37:1,20 38:8,11,17 39:10
 41:1,12 43:14 44:23 45:20
 46:11,15 47:2 48:10 56:12
fastest 31:11
feared 75:3
February 35:6,16
federal 54:14
fee 18:4
feel 12:2 39:23,25 49:19
 50:5 64:25 65:1 67:15
 73:18 74:2 78:11 80:1
 88:15
feeling 41:7 53:16
felt 9:13,16 20:5,6 23:24
 29:11 32:21 36:19 65:1
 75:10,23 79:16
figure 57:18
filed 65:13 91:4
Filer 54:9,12
filled 29:22 34:17 54:16
find 30:23 31:1 55:19 81:7
finding 33:19
findings 41:16 65:6,8
 66:7,9

fine 4:15 70:4
fingers 75:6
finish 5:7,11 7:18
finished 63:25
finishing 7:20,24
fire 75:3
firing 74:24 75:1,4
five-minute 47:15
flags 37:7 46:3 57:18 58:6,
 11
follow-up 64:17 69:7 78:8
 80:12 82:4 85:4,6 89:6
food 32:25
FORD 38:22 66:23 80:18
 90:23
form 15:20 19:10,25 22:25
 23:16 24:5 26:16 27:17
 28:20 29:9 32:13 37:3
 38:23 43:15,24 44:22 49:6
 51:22 53:6 55:4 59:16
 60:8,25 63:20 67:13,23
 68:19 71:2,19 72:17 73:24
 75:17,19 76:12 77:16
 80:24 81:8 82:17,23 83:5
 85:14 86:3,5,25 87:9 88:7
 89:18,21 90:11
formal 24:15 72:23 73:8
formative 7:9
formed 45:19
Fort 7:2,17 8:3
Fotu 12:23
found 9:15 54:16 84:7
foundation 11:12 17:1,10
 19:18,25 23:17 24:6 25:18
 26:17 27:18 28:21 34:20
 35:2 38:22,23 40:18 43:5,
 24 44:22 49:5 51:23 52:16
 53:7,25 54:1,25 55:1,3
 57:9 59:17 60:11 62:3
 63:1,19 68:20 71:3,20
 75:20 77:17 79:21 85:15
 86:5 87:1,10 88:8 89:21
 90:11
frame 16:13 20:10 70:2
 72:15 74:5
friend 67:8,9 69:17,19
friendship 61:10
full 86:14
fully 30:19

G

Garrett 42:4,5 43:3
gastroenteritis 37:25
 41:17 47:6 86:15

gave 35:12,13 76:8
General 8:7
generally 4:25
George 8:18 33:15
get all 47:15
give 5:21 6:18 11:16 26:24
 30:17,22 38:17 39:21 70:3
 73:17,21 74:7,10,17
good 4:9 50:5 52:23 62:16
 74:24 75:1,2,5,9
goodness 70:6
Goodridge 6:7 22:10
 27:13 32:12 38:18 55:20
 67:22 68:18 74:20 77:5,23
 78:13 82:21 85:11
Goodridge's 11:22 69:11
 82:6
Gould 73:4
graduate 7:3
graduated 6:20 56:10
great 41:3 86:13
grew 7:7
ground 5:6
group 26:8 51:15
guarantee 84:13
guess 71:10 78:8
guideline 81:18
guys 69:7

H

half 70:9
handwritten 6:12
happen 21:25 58:19 84:5
happened 56:3 65:22
happy 74:1
hard 51:25
harm 65:14 71:7
Hawaii 8:4
head 5:19 50:6
headache 34:13
health 6:23 9:15,18,19
 18:2 23:3,7 24:4 32:17
 33:3
healthcare 18:6 28:4 29:6
healthy 22:23
hear 72:5 84:3
heard 70:15
hearing 66:15 70:16
heart 41:2,5 42:25 46:23
held 91:1

June 04, 2024

GOODRIDGE vs DIAMOND RANCH ACADEMY, INC.
Danny Worwood, M.D.

helping 39:6
hematocrit 42:19
hemoglobin 42:18
Herbert 6:24
Hernandez 36:12,13
high 6:20 7:3,5,6
highest 27:11
HIPAA 15:5
hired 74:23
hiring 74:7,25 75:1
history 29:17 41:24
hit 78:9
HIV 23:22,24 24:1 32:22,24
home 38:13 41:15 44:11 46:1 56:11,12 83:13
honest 66:16
honesty 9:7
hoof 84:3
horrible 28:25
horses 84:3
hospice 8:24
hospital 21:22 51:4,6 52:25 53:4,14 62:22 77:5, 24
hour 47:12
hours 16:9 18:15
housed 50:8
Hughes 38:14 39:4 45:15 57:7
huh-uhs 5:19
hundreds 83:22 87:17,24
Hurricane 8:11,14 25:17 33:13
hurt 36:19
hypothetical 79:12,20 81:9 89:12,20 90:11
hypothetically 89:14

**I**

idiom 84:2
ill 28:3
illness 82:6,15
imaging 76:24 83:16
impact 66:19 67:22
impacted 64:20 66:15
impetus 9:7
important 12:3 70:21 83:10,19
impossible 85:20

impression 40:10
inappropriate 10:15 45:25
inaudible 38:19
incident 36:18 67:21
included 77:1,2 84:24
including 19:7 44:13 45:24
income 19:8,12
incomplete 79:20 81:9 89:19 90:10
incurred 87:17
independent 22:9,18 27:20 30:18 35:15 67:17
individual 26:8 39:20
individuals 27:15 38:19
industry 24:21 85:24
infection 23:22 46:16 59:12
information 33:6,12 34:17,18 36:21 37:16 44:9
initial 6:11 30:21 31:4,21
initially 17:23 23:20
injured 28:3
input 33:7,10 39:21 45:6 55:10 61:17,18 74:7,11,18 76:9
Instacare 44:6 50:25 58:16
instance 79:10
instances 71:22
instruct 65:10 73:12,14
instructed 62:7 72:19
instruction 65:17 73:1
instructions 66:14
instructor 74:1
insurance 18:8 19:1
intake 30:7,17,20
intelligible 79:24
intentions 29:13
interaction 23:19
interactions 75:12
Intermountain 18:2,6
intervened 58:14,15
intolerance 32:25
involved 12:13 15:10 38:9 64:9,11 90:13
involvement 15:15 27:2 28:7 35:22 36:3 44:17
involving 67:21
irrigated 33:2

irritable 47:7
Irwin 8:3
issue 24:4 63:23
issues 23:4 29:6 33:4 49:16 50:1
IV 63:7
Ivins 9:1
Izzy 52:23

**J**

January 33:22
jerk 5:23
job 50:5
jobs 74:22
join 17:2,11 20:1 23:1,18 27:19 34:21 35:3 38:24 40:19 43:16,25 49:7 51:24 52:17 53:8 57:10 59:19,20 60:10 63:2,21 67:24 68:21 77:19 78:2 79:22 81:10 83:7,8 85:16,17 86:8,11 87:11 88:9,12,13 89:22
judge 65:21
jump 30:21
jumping 69:8
June 4:1
jury 16:5

**K**

Kayla 33:22,24,25 34:25 36:6 37:13 40:12 75:7
Kaylee 45:16
kid 22:24
kids 52:6
kind 9:22 24:17 26:24 42:8 50:24
knee 35:9,12
knew 33:24 34:1 40:1 71:4, 5 75:14,24
knowing 78:3
knowledge 34:7 86:19,23
Kyle 67:5

**L**

lab 76:24 77:2
labs 56:24 57:1 83:16
Lack 62:25 68:19
laid 55:1
lawsuit 4:22 9:6,10,21 10:1 65:2

lawyer 30:24
lawyers 30:25
lay 58:20,21 79:17
layperson 79:3
leading 68:18
learn 74:2
learned 79:14
learning 73:17
level 39:19 42:11 83:14
levels 42:19
Lewis 33:22,23 34:25 36:6 37:13 40:12 75:8
liability 17:24 18:2,5,8
license 10:4
licensed 27:10 28:4 54:3
licensure 43:9 54:5
licensures 42:9 53:24 86:2
life 23:14 56:10
Likewise 5:10
list 11:17 26:6
listed 11:3,9,20 35:7,8 37:10 69:12,21 70:18 71:8, 11,14,24 75:13 76:2 84:23
literature 11:7
litigation 64:20 69:6
lived 8:7
local 25:21
long 5:16 18:3 32:23 71:8 81:13
long-term 23:14 24:4
longer 9:13 18:7 32:23
looked 42:13 54:15 76:14, 15
lookout 62:16
losing 75:4 81:14 88:5
loss 88:17
lot 8:2 53:12 74:21
lower 45:18

**M**

M.D. 4:3
MA 73:12
made 9:11 21:10 38:25 39:24 52:18 56:14 58:1 64:21 73:7 75:6 77:7
major 33:3 65:3
make 5:18 15:7 21:10 25:10 28:13 31:24 44:9 52:20 73:10 88:17

makes 52:3

making 56:12 90:13

manage 18:7

management 16:3

manager 34:25

manual 25:25 26:7

Maryland 6:24

MAS 39:20

materials 69:12,15

MD 71:5

means 35:1

meant 25:19 76:24

medical 6:10,14,25 7:12 8:4,14,18,24,25 9:2 10:8, 19,24,25 11:1,4,10,17,21 12:5,7,11 15:22 16:22 17:23 18:2,5 19:22 20:15, 22 24:25 26:10,15,23,25 27:9,10,16,22,25 28:1,2,3, 11,12,17 29:4 33:8 34:25 35:25 36:11 37:13,14,17 39:13 41:18 42:4 43:3,19, 22 44:2,3 45:3,14,16 46:6 47:23 49:11 50:23 52:20 53:23,24 57:5 59:14,24 61:19 68:3,8,16 69:12,21, 25 70:18 71:1,6,8,11,15,24 72:24 74:8,18,22 76:2,10, 15,18 78:10 79:15 80:5 83:16 84:23 85:24 87:5 89:16

medically 52:19

medication 23:21 72:20, 21

medications 16:3 67:19

medicine 6:25 7:1,25 8:21,23 9:14 32:5 52:2 84:2

meeting 35:16

memory 22:9,13,14,15 35:15 55:13

menstrual 16:2

mental 23:4,7

mention 50:11,12 66:7

mentioned 50:21 52:25 56:23 65:5 67:7 69:10 71:14

messages 51:15 78:17 79:13

met 61:1

Michael 80:16

mildly 42:25 46:23

military 7:12 8:1,11 25:5

mind 4:13 9:12 31:18 58:12 73:9

mine 67:9

minimal 66:19

minutes 41:5

missing 44:18

mission 27:11

misstated 78:21

misstates 48:5 70:6 78:20 87:21,22 88:14

Mitchell 17:13 18:22

mom 52:10

moments 73:17,20

Monday 51:18

monitor 46:1 84:10

monitoring 88:20

month 18:13,16 20:19

months 61:8 68:11 81:12

morning 4:9 40:21 52:24 54:16 55:23 62:22 77:6,14

Mortensen 4:8 10:12,20 11:13 15:1,4,9 16:4 17:4, 17 19:13,19,20 20:11 23:5, 25 24:9 25:22 26:19 27:23 28:24 29:1,15 31:20,22 32:14,16 33:5 34:23 35:5 37:8 39:2,9 40:23 43:7,20 44:4 45:1 47:14,19,21 48:12,19,21 49:22 52:5,22 53:10 54:7 55:5 57:12 59:22 60:4,14 61:11,24 62:5 63:5,9,18,24 64:3,15, 23 65:4,12,20 66:2,11,12, 20 67:13,24 68:4,19 75:17 77:19 78:2,16,23 79:22 80:13,16,22 81:3,22 82:17 83:8 85:5,10,21 86:18 87:4,15 88:3,19 89:4,18, 22,25 90:5,19 91:4

mother 52:2,19

mothers 52:6,19

motion 65:13,16,18

motivation 44:18

move 35:6 40:13 42:3 51:14 55:17

moved 73:3,5

moving 35:20,25 36:10

multiple 37:15 38:19

## N

name's 67:5 69:5 75:8

Nanette 75:8

nature 74:1

nausea 46:8 56:8

necessarily 38:1 53:23

needed 23:24 29:11 32:23 33:2 74:25 78:12

negative 32:24

night 46:7

nods 5:19

Noelia 36:12,13

normal 37:24 42:19 43:1 45:24 46:24 56:15

note 31:13 35:19,21

notes 6:7,8,9,12,13 22:12, 14,16,19,21 57:17

notice 82:6

noticed 9:21

notif- 34:14

notified 34:15

November 31:14 36:1

number 22:1 31:19 33:16 47:8 48:17

nurse 12:15,25 16:18,24 17:6 30:14,16 34:5,8,9 38:17 40:2 54:3 61:2,4 67:17

nurses 39:5,11,13

## O

oath 4:10 5:2

object 10:10 11:11 15:20 17:1 19:10,17,24 22:25 23:16 24:5 25:18 26:16 27:17 29:9 32:13 34:20 37:3 40:18 43:5,15,24 44:22 48:4 49:5 51:22 52:16 53:6 54:24 55:3 57:8 59:16 60:8,25 61:21 62:3 63:19 65:7 67:13,23 68:19 70:5 71:2,19 72:1,17 73:24 74:13 75:17,19 76:12 77:16 78:19 79:19 80:24 81:8 82:17,23 85:14 86:4, 25 87:9 88:7 89:18,19

objection 28:20 32:20 38:22 53:25 54:1 65:17,24 66:4 75:18 78:23 90:10

objections 10:13 38:25 60:2 78:1 86:9 88:13 89:13

objective 88:17,18

obligation 5:2

observation 33:21 38:4

observations 54:19

obtained 6:25 18:8 59:3

obvious 44:16

occur 20:17 73:2

occurred 22:6 64:8

occurrence 84:8

occurring 73:23

October 29:18

off-the-record 90:25

offered 26:14 28:2

office 8:6 83:13,21

on-site 26:10,14 28:1

ongoing 16:10 73:23

online 87:14

opening 12:17

operating 28:17

opinion 47:3 67:10,22 69:22 77:22 78:6

opinions 86:19

opposed 4:23 6:11 16:25 39:12

order 18:9 31:10 33:18

ordered 76:18 89:15

ordering 48:11

ordinary 20:20,24

organization 8:25

Original 91:4

outcome 62:23 63:8 77:15,25

oversight 44:17

overwhelmed 83:12

## P

p.m. 40:7

PA 16:18 17:12 18:22 30:14

paid 10:25 12:5 18:9,23,24 19:4 25:14

pain 35:12,23 42:11 45:23 56:9 83:18

paint 54:19

pale 34:13 42:1 50:11,13, 16

panel 65:9 66:7,9

paragraph 27:8 54:18 55:12

parameter 81:20

parent 26:25 48:8

parental 26:9 44:17

parents 44:15 45:4,11 62:15

part 8:5 9:7 17:24 61:5

participate 74:7

participation 15:23

parties 13:5

party 4:22 70:13,15,17 78:25

**PAS** 17:5

**pass** 45:19 64:1 66:21

**passed** 26:22 34:18 55:20 56:4,17 57:4 60:6 62:1 82:8 84:14

**passing** 56:2 57:15 58:8 60:16,19

**past** 19:6

**patient** 12:15,25 15:5,6 30:8 45:5 54:25 83:3,25 86:17

**patients** 9:15,16 12:17 18:1 28:23 39:6 73:13 81:11 83:10 86:14

**pattern** 20:18

**patterns** 5:25

**pay** 18:5,25

**paycheck** 18:6

**payers** 19:2

**payments** 18:3

**PCD** 53:15

**PCDS/RICKY** 53:1

**pending** 5:17

**people** 5:10 21:2,4 29:3 41:13 44:13 52:1 54:5 74:2,22,23,25 75:1,2 86:1

**percent** 19:11 41:25

**perform** 28:5 30:19 71:9 83:20

**performed** 37:5 40:21 88:16

**period** 8:9 35:18 81:20 86:21

**peripherally** 64:10

**peritonitis** 84:4,7,15,19 86:13,17

**permission** 11:16 17:22

**person** 49:2

**personal** 18:9 39:7 67:8,9

**personally** 16:19

**personnel's** 50:23

**pertaining** 6:7

**pertains** 72:12

**philosophy** 27:25

**phone** 36:22 37:17

**physical** 29:17 46:25 81:2

**physicals** 15:23,24 30:7, 17

**physician** 12:17 16:11,23 29:11 34:6 48:10 54:21

**physician's** 16:12 83:13

**picture** 52:4 54:20

**place** 23:9 86:13

**planning** 47:12

**plans** 56:13,14

**point** 5:14 32:18 38:10 43:17 44:6,11,18,25 45:7, 10,21 47:3,8,24 48:11 49:20 53:5 57:19 63:12 70:25 72:14 74:5 76:17 82:11 86:24

**pointed** 75:7

**policies** 12:10 19:14 25:25 62:1,8 74:12

**policy** 20:3 26:6 62:8 73:19

**poor** 41:24

**position** 25:12 34:2

**possibility** 24:8

**potential** 23:22 24:8 65:25

**potentially** 25:7

**pound** 89:3

**pounds** 89:2

**practice** 8:14,20 9:2,23 17:23 21:13 28:2,12,17,23 33:13 37:5 38:11,17 39:10 41:13 61:7 67:16

**practiced** 7:25 8:12 64:25

**practicing** 9:14 18:10

**practitioner** 7:22 16:18 30:14,16,19 34:6 37:1,21 38:8 41:1 43:14 45:20 46:11,15 47:2 54:3 61:4 67:17

**practitioners** 17:6

**pre-litigation** 65:6,8 66:7, 9,15

**preceding** 6:8 84:10,17 88:22

**preceptor** 61:6

**predict** 85:19

**prefer** 4:14

**preparation** 68:7,14

**prepare** 6:2

**preparing** 6:5

**prescribing** 67:19

**present** 23:12 65:20

**presented** 50:19 61:14

**preserve** 65:11

**press** 66:14,17

**pretty** 51:19

**prevent** 23:21

**prevented** 59:25

**preventing** 59:14

**previous** 42:12

**previously** 69:10 77:11

**prior** 10:1 11:22 19:7 23:23 30:10 49:16 53:17 68:9 69:11 70:9 82:22 84:25

**priority** 39:6 83:14

**privilege** 65:11,25

**privileged** 15:3 65:9 66:10

**probable** 77:15

**probation** 10:5

**problem** 85:12,19,23 87:18,19

**problems** 15:24 16:10 20:7,15 29:8 30:23 83:12

**procedure** 21:2

**procedures** 12:10 19:15 25:25 26:6 62:1 74:12

**proceed** 51:8

**process** 5:1 9:11 60:7 64:20

**produced** 48:20

**professional** 67:11

**professionals** 27:10

**program** 27:12

**progressed** 9:22

**prompted** 58:6

**prophylactics** 24:2

**prophylaxis** 23:21,24 32:23

**protected** 13:4

**protecting** 10:14

**protocol** 19:22

**provide** 10:17 19:2 24:13 25:1 27:11 28:5 72:15

**provided** 6:10 24:25 26:2, 6,7 27:25 39:16 54:10 55:2 73:8

**provider** 23:23 81:1 83:3, 20

**providers** 16:22 28:5 29:5

**providing** 64:6

**psycho-bio-social** 83:24

**psychological** 26:9

**psychosomatic** 47:7 86:16

**psychotropic** 67:19

**pull** 24:11 47:9

**purposes** 13:1

**put** 10:4 12:18 23:21

**puts** 65:3

**putting** 9:17 12:10 24:3 29:16

---

**Q**

**qualification** 79:6

**qualifications** 36:15 75:15,22

**qualified** 23:8 28:13 30:16,19 38:16 39:5 49:9 52:20 67:16 81:1 88:17

**qualify** 50:3

**quality** 27:11

**question** 5:7,12,17 10:17 17:3 31:9 32:15 39:1 51:8 54:18 59:21 62:19 63:17 70:24 79:24 88:11 89:7

**questions** 5:2 20:7 31:7 64:18 66:21,23 67:4 68:24 69:7 72:12 80:10,12,17,18 85:3,4 90:21

**quick** 47:10 80:12

**quickly** 30:25

**quote** 76:19

---

**R**

**Rachel** 52:24

**RAFA** 64:12

**raised** 58:11

**raising** 83:14

**Ranch** 6:14 10:8,19 11:1,4, 10,17,21 12:6,8,9,14,16, 18,20,22 15:11,15,19,25 16:20,23,24 17:7,15,20,21 18:1,11,13,23,25 19:3,4,9, 12 20:5,14,21,23 21:8,11, 15,18 23:3,9,13,20,23 24:12,16,22,25 25:1,9 26:3,14 27:22 28:10 29:4 33:7,10 34:3 36:22 44:14 49:12,24 50:2,4 52:12 53:22 54:9,13 55:22 56:11 57:14 59:1,14 60:19 61:3 62:11 64:5,13 69:6,13,22 70:23 71:16,25 72:6,9,14, 16 73:19 74:6 76:9 77:4 78:10 79:16

**Ranch's** 26:21 27:9,15 29:13 62:1

**rashes** 16:2

**rate** 41:2,6 42:25 46:23

**reach** 45:4

**reactivity** 50:1

**read** 29:20 39:2 40:9

**Reading** 91:6

**ready** 47:16 56:12

**real** 47:9 86:1

June 04, 2024

GOODRIDGE vs DIAMOND RANCH ACADEMY, INC.
Danny Worwood, M.D.

reality 41:12

reason 35:18 56:11

reasonable 20:9 43:18
62:18 66:8 84:9 89:16

reasons 82:20,25 83:2
84:23

reassuring 47:1

recall 6:17 21:5 26:4 35:11
55:9 58:3 76:19

receive 36:21 37:16 70:13
82:6

received 24:15 49:12,20

recess 47:20 64:2

recognize 58:6

recollection 22:18 55:15
60:17,20 72:3

recommend 21:13

recommendations 28:6
74:17

recommended 35:14

record 4:11 5:24 10:14
33:8 90:24

records 6:10 42:12 47:24
50:10,13,15 68:4,8,16
76:15,16,18 78:10 80:5
84:18 88:21

recounted 56:3

red 37:6 46:3 57:18 58:6,11

redundant 69:8

referenced 32:5

referred 44:5

referring 23:8

refresh 55:12

registered 38:17 39:5,11,
13 61:2

rehash 76:7

relating 50:1

relationship 15:19 20:5
60:22,24

release 13:2

relied 29:7

relying 29:3 62:15

remember 12:23 14:2,3
21:3 22:1 35:17,18 54:8,
11,25 55:1 73:5

remind 5:13

removed 71:17

repeat 17:3 39:1 41:4,8
59:21

repeatedly 81:5

repercussions 71:10

report 6:6 38:7 46:10
70:13

reported 37:22

reportedly 46:6

reporter 38:21

reports 45:17,18 46:8

represent 35:11 54:13
67:5 69:5

request 10:16

require 41:18

requires 49:10

residency 7:1,16,18,20,24
8:5

residential 25:24 26:7
49:15,18 50:7 61:13 69:18
85:24

respect 15:5 74:8,11,18

respected 64:25

respond 65:12,16

responsibility 9:17,18
16:17 18:7 29:12 30:9,13
43:22

responsible 9:15

rest 64:17

results 57:3 59:3 90:17

retire 9:8

retired 8:19,20,21,23 9:2,8

retirement 9:5

reveal 32:12

review 22:14,15,18,21

reviewed 6:6,7,16 35:19
50:10 53:17,19 57:17 68:7,
8,10,11,13,16 77:13 80:5

reviewing 58:4

revisit 65:19

revoked 10:4

Richfield 7:6,8

Ricky 53:15 60:15 74:23
75:3

rights 15:5 24:18

rigorous 54:4

ring 55:16

rise 41:6

risk 9:14 23:15

risky 24:3

RN 54:3

Rocky 9:1

rolled 36:3

room 49:10 51:12 58:7,24
79:1 82:21 83:4,11,15
84:12,25 85:22 86:12,14
90:15

rotations 61:5,8

rough 51:19

rule 5:12

ruled 65:18

rules 5:6

ruling 65:22

run 21:7 39:15

---

## S

Saturday 48:24

scenario 79:9

schedule 55:23

scheduled 55:22

Schiel 10:10 11:11 15:2,20
17:1,11 19:10,17,24 22:25
23:18 24:5 25:18 26:16
27:17 28:20 31:18 32:13,
20 34:20 35:3 37:3 38:23
40:18 43:5,15,24 44:22
47:11,18 48:4,17 49:5
51:22 52:16 53:6,25 54:24
57:8 59:16 60:2,8,11,25
61:21 62:3,25 63:17,19
65:7,17,23 66:6 67:23
68:21 70:5 71:2,19 72:1,17
73:24 74:13 75:19 76:12
77:16 78:1,19 79:19 80:11,
15,24 81:8 82:2,19 83:1
84:20 85:3,14 86:4,11,25
87:9,22 88:7,10 89:19
90:10,24 91:6

school 6:20,24 7:3,5,6,12
8:25

schools 24:21 25:8

Schrader 49:3

Schroeder 49:3

Sciences 6:23

screen 25:23 29:16 48:13

screenshot 26:21

scroll 29:24 30:1 31:8

seal 64:19 66:3

seek 16:11 43:19,22 44:12

segregate 66:5

send 45:4 58:7,23 69:23
82:21 83:3 84:24

sending 83:10

sense 39:22

separate 40:22

septic 82:12

series 72:12

services 6:23 7:12 19:2
25:1 26:6,7 27:25 28:1
64:6

session 72:23

set 18:17,19 20:18 41:4

setting 76:2

sex 50:2

sexual 50:1

share 25:23 30:12 48:13

shared 16:17 30:9

shortly 26:22

shoulder 35:23

shoulders 50:6

show 5:20 26:20 59:5 87:6
88:24

showed 57:20

showing 90:7

shown 89:17

sick 33:21 38:3 41:13
51:18 63:15 83:3

signature 55:6,7

signed 10:24 30:2 36:7
55:2

significant 59:12 87:19
90:8

signing 55:8,10

signs 37:24 41:4,8 45:25
46:24 56:15 58:5 73:15
81:2,15 82:10

similar 25:9 37:6 52:7

sir 68:24

site 50:25

situation 16:8 19:16,22,23
20:22 22:23 24:2 45:9 46:1
69:23 72:22

situations 20:13 21:6
23:13,14 52:20 76:8

skin 42:1

skinny 51:19 88:6

small 18:4

social 20:4 60:22

someone's 46:13

son 49:16,23 50:7 61:12,
13,18

sore 34:12 35:9

sounds 78:9 84:21

space 15:22

speak 29:12 53:1 71:16

speaking 5:8 6:3 38:20

special 21:10 48:11 76:19,
22,25

specific 20:3 33:3 49:25
59:9 70:4

speculating 87:13

speculation 49:6 59:18
60:9 61:22 62:25 63:20

June 04, 2024

GOODRIDGE vs DIAMOND RANCH ACADEMY, INC.
Danny Worwood, M.D.

77:18 79:21 83:6 86:6 89:20 90:12,16

**sped** 9:10

**speech** 5:25

**speed** 44:24

**spend** 18:13 83:21

**spent** 7:9 8:9 18:11 49:17 61:7 87:25

**spoke** 6:4

**spontaneous** 84:4,14

**sports** 15:23

**sprained** 16:2

**Springs** 8:7

**St** 8:18 33:15

**staff** 6:14 27:22 28:3 29:4 44:2,5 45:3,16 46:7 49:8, 11 51:16 52:12,14 53:23 57:21 62:10,16 72:16,24 73:21 74:8,22 77:4 79:15 84:23 88:5

**staffed** 57:5 74:19

**staffing** 76:9

**stands** 65:18

**start** 15:10 19:19

**started** 17:21

**state** 4:10 27:21 32:21 43:9 45:23 49:14 86:9

**stated** 50:15

**statement** 28:8,14 44:9

**statements** 52:3 75:6

**stating** 10:24

**station** 8:3

**stay** 29:5 56:13

**stays** 15:3

**stipend** 11:1

**stomach** 36:19 45:17 46:8

**stop** 31:9

**story** 81:16

**strike** 18:24 34:16 50:20 55:17 70:24 86:21

**student** 19:21 21:8,14,16, 22 26:25 27:12 37:4 45:17 46:8

**student's** 20:15,21

**students** 12:11,19 15:22 16:16 18:21 19:3 24:18 25:13 30:10,15 49:9 50:6 71:5

**students'** 29:5

**subacute** 15:24 16:1,6,10 83:12 85:12,18

**subjective** 88:16

**subsequently** 79:14

**successful** 64:24

**sued** 10:1

**suffering** 48:2 85:12

**suggest** 59:11

**suggesting** 80:5

**suggestions** 74:11

**suicide** 64:7,8

**suing** 54:14

**summary** 6:19

**support** 26:10

**supposed** 56:10

**Surgeon** 8:7

**survived** 77:8 84:11

**suspended** 10:4

**sweaty** 42:2

**sworn** 4:4

**symptoms** 41:15 46:9,19 48:1,9 56:8,16

**syndrome** 81:18 86:15

**system** 33:8,9,11

---

**T**

**table** 25:5 73:13

**taking** 47:13 49:17 50:25 53:4

**talk** 5:15 11:24 31:2 53:15 60:15,18 62:10 64:16

**talked** 49:1,2 57:16

**talking** 50:24 51:2 53:2

**Taylor** 6:7 11:22 22:10,23 23:20 26:22 27:13 32:2 35:8 36:2 38:18 45:16 46:6 48:19,25 49:13,20 50:19 51:3,5,14,17 52:9,10,24 53:3,4 55:19 61:15 62:1,22 67:21 69:11 74:20 77:5,23 78:12 79:9,14 80:6 84:7, 10,13 85:11 88:5

**Taylor's** 35:22 45:11 46:21 48:1 57:14 60:16,19 68:11 70:9

**teach** 8:25

**teacher** 73:25

**teaching** 61:7

**team** 74:18

**technician** 43:3

**teen** 24:20 85:24

**teens** 24:14

**tells** 10:15

**temperature** 37:9

**temperature's** 37:10

**ten** 18:15 22:2,4 49:19

**term** 43:8 76:25 77:6

**test** 32:24 41:10 89:14,17 90:6

**tested** 42:19

**testified** 4:4 30:6 76:17

**testify** 77:12

**testifying** 47:23 55:13

**testimony** 29:3 48:5 70:7 76:20 77:4,9 78:20,22 86:7 87:21,22

**tests** 42:21 48:11 51:13 76:19,22,25 77:1 83:16,22 84:12 87:5,6,14,19,25 88:2

**text** 20:10,13,25 36:22 48:16 49:1,2,12 50:22 51:15 78:17 79:13 88:14

**texted** 21:9

**texting** 51:16

**texts** 37:17 53:17,19,20 57:20,22 58:1,9

**therapist** 34:15,19

**therapists** 50:2 72:19 73:2

**therapy** 26:8,9

**thing** 66:1

**things** 9:11 16:10 47:8 56:9 74:3

**Thompson** 59:20 66:24 67:3,5,14,20,25 68:2,23 83:5 85:16 86:3 87:21 88:9,12 90:21

**thought** 50:21

**thousands** 83:22 87:17,24

**throat** 34:13

**throw** 81:12 89:12

**throwing** 81:5,13

**thrown** 41:6

**throws** 81:19

**time** 5:10,14 8:8 16:13 18:10,12,13 20:9 22:3,22 27:7 32:1,18 35:17 38:2, 10,20 44:3,7,18 45:10,21 46:7 47:4,16,24 51:25 53:5 56:4 58:10 63:11,12,14,15, 22 69:9,24 70:2,25 71:5, 11,13 72:13,15,23 73:18 74:5 81:20 82:7 84:6 86:16,20,21,24

**times** 4:19 20:19 21:9,12, 17,19,20,25 22:2,4 25:13 37:15 41:12 73:11 86:1

**title** 43:3

**today** 6:3 45:18 53:18 68:4 77:12

**told** 53:13 57:25 58:3

**top** 18:4 29:5 31:15

**total** 49:17 59:10

**track** 15:6

**tragedy** 84:13,14

**trained** 39:5 52:1,19

**training** 24:12,15 54:4,5 72:15,23 73:8,21

**transcript** 5:20 91:4

**transfer** 33:12

**transferred** 90:9,14,17

**transported** 21:18,19

**traveled** 8:2

**traveling** 8:9

**treat** 21:8 41:15

**treatment** 25:25 26:8 35:12,13,22 36:4 37:6 38:10,17 39:16 44:3 49:15, 18 50:7 60:1 61:19 63:8 68:17 69:18 85:25

**triage** 49:13 50:22,24 52:21 79:8 80:23,25 83:10, 20 88:1

**triaged** 79:2,25 80:6

**triaging** 39:6

**triggered** 84:18

**Tripler** 8:4

**troubled** 24:14,20 85:24

**true** 67:8

**trust** 39:22

**trusted** 65:1

**trusting** 52:1

**truthfully** 5:3

**Tuesday** 4:1

**turmoil** 74:21 75:5

**two-minute** 63:25

**types** 8:21 39:11 59:9

---

**U**

**Uh-huhs** 5:19

**UMIA** 18:8

**uncommon** 41:5

**undergone** 65:15

**undergraduate** 6:21

**unders-** 72:5

**understand** 4:25 5:4 62:14 66:4 71:10

**understanding** 10:7 43:21

**understood** 26:13 44:14 52:9

June 04, 2024

GOODRIDGE vs DIAMOND RANCH ACADEMY, INC.
Danny Worwood, M.D.

undue 47:25
unexpected 82:15
Uniform 6:22
Uniformed 7:12
University 6:22,23 9:1
unknown 77:20
unnecessary 83:23 87:25
unresponsive 56:19
untrained 75:1
unwilling 65:23
update 52:24 53:2
upset 45:17 56:14
urgent 51:12
Utah 7:6 8:11 9:1 43:10

**V**

valid 82:20,25
variations 81:15
varied 18:15 56:16
verbatim 5:10
verify 70:17
version 56:3,5
versus 54:9
video 5:20
view 16:15
viewed 24:3
viewing 88:5
violate 5:12
viral 41:17 46:16
Virginia 7:2,17
virtue 23:2
visit 21:11 30:11 40:8,11
  49:10 81:1
visits 73:22
Vista 9:1
vital 37:24 41:4,8 45:25
  46:24 56:15 58:5 73:15
  81:1,15 82:10
vitals 40:3,25 41:21,23
  42:23 46:21
vomit 47:4
vomited 36:20 37:15
vomiting 36:18 37:23
  41:10 42:16 43:14 45:17,
  22 46:7,13 61:14 81:7,17
  83:18 86:15,16

**W**

wait 5:7,11 58:22

waive 65:24
wanted 9:12,13,18 15:6
  18:7 33:1 41:9,10 61:15,17
  73:12 75:18 78:9,18
warm 42:1
wary 64:22
Wash 73:4
Washington 8:9
waste 69:9
wasting 47:16
watching 49:9
ways 67:17
weak 50:11,13,18
web 11:21 26:21
website 12:2 69:20 70:3,
  12,14,17 71:15
Wednesdays 18:20
week 16:13 18:20 20:8
  30:10 56:8 62:12 68:14,18
  76:3 84:16 86:21
weekend 51:16 52:15 57:6
  62:12
weeks 6:8 28:15 30:15
weight 73:15 81:14 88:6,
  17,18,20,25 89:1
weights 88:22
welcomed 61:6
well-being 84:1
well-qualified 39:8 75:14
well-trained 67:16
whip 30:25
white 59:2,7,10 63:10,13
  77:1 87:7 89:17 90:8
widely 56:16
Wiley 17:15 18:22 20:4,13
  21:2,4,7,20 22:7 30:4,18
  36:7 57:6,16 60:22 61:1
  67:6,7 68:17 79:10,15
Wiley's 67:10
window 72:13
withdraw 65:23
witness's 70:7
word 54:22 77:12
words 58:3
work 12:9 19:9 24:20 25:8
  58:25 59:15,25 76:24 77:2
worked 17:5,6,12 24:24
  40:1
working 15:18 20:4 21:12
  43:11 61:2 75:23 76:1
works 5:1
worried 53:13

worse 43:18 56:18
Worwood 4:3,12,14 31:20
  33:16 35:20,25 36:10
  37:12 38:3 40:6,13 42:3
  45:13 46:4 64:20 65:15
  67:4 82:5
Wright 75:11
written 17:18,20,25 20:3
wrong 68:17

**X**

Xed 54:21,22

**Y**

year 8:19 15:13 70:8 72:8
years 7:9 8:2,17 9:9 19:7
  22:5 49:18 70:9 84:6
young 6:22 30:24 64:5

**Z**

zebra 84:4
zebras 84:3
Zoom 5:5 28:25